| STATE OF TENNESSEE 16th JUDICIAL DISTRICT CHANCERY COURT | SUMMONS | CASE FILE NUMBER |
|---|---|---|

| PLAINTIFF | DEFENDANT |
|---|---|
| ADVANTAGE WAYPOINT LLC | VS.    MICHAEL BAKER |

**TO: (NAME & ADDRESS OF DEFENDANT)**

Michael Baker
2412 Delano Court
Murfreesboro, TN 37130

List each defendant on a separate summons.

YOU ARE HEREBY SUMMONED TO DEFEND A CIVIL ACTION FILED AGAINST YOU IN CHANCERY COURT, RUTHERFORD COUNTY, TENNESSEE. YOUR DEFENSE MUST BE MADE WITHIN THIRTY (30) DAYS FROM THE DATE THIS SUMMONS IS SERVED UPON YOU. YOU ARE DIRECTED TO FILE YOUR DEFENSE WITH THE CLERK OF THE COURT AND SEND A COPY TO THE PLAINTIFF'S ATTORNEY AT THE ADDRESS LISTED BELOW. IF YOU FAIL TO DEFEND THIS ACTION BY THE ABOVE DATE, JUDGMENT BY DEFAULT CAN BE RENDERED AGAINST YOU FOR THE RELIEF SOUGHT IN THE COMPLAINT.

| Attorney for plaintiff: | DATE ISSUED & ATTESTED |
|---|---|
| William S. Rutchow Ogletree, Deakins, Nash, Smoak & Stewart, P.C. 401 Commerce Street, Suite 1200 Nashville, TN 37219 William.Rutchow@ogletree.com (615) 254-1900 | JOHN A. W. BRATCHER, Clerk & Master BY: |
| | Deputy Clerk & Master |

## NOTICE OF DISPOSITION DATE

To expedite cases, the Court may take reasonable measures to purge the docket of old cases where the cases have been dormant without cause shown for an extended time.

## CERTIFICATION

I, John A. W. Bratcher, Clerk and Master of the Chancery Court of Rutherford County, Tennessee, do certify this to be a true and correct copy of the original summons issued in this cause. JOHN A. W. BRATCHER, CLERK AND MASTER.

BY:_____DEPUTY C & M

| TO THE SHERIFF: | DATE RECEIVED |
|---|---|
| Please execute this summons and make your return within thirty days of issuance as provided by law. | Sheriff |

Submit three copies: service copy, defendant's copy, file copy.     ADA COORDINATOR (615-494-4480)     10/02

**EXHIBIT**

1

## RETURN ON PERSONAL SERVICE OF SUMMONS

I hereby certify and return that I served this summons together with the complaint as follows:

| DATE OF PERSONAL SERVICE | |
|---|---|
| | Sheriff |
| | By: |

## ACCEPTANCE OF SERVICE

I do hereby accept service of process and a copy of this complaint in this cause for all purposes. This the     day of     ,20_____.

_____

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify and return that on the     day of     , 20____, I sent, postage prepaid by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in case #     to the defendant     , on the     day of     ,20____. I received the return receipt, which has been signed by     on the     day of     ,20____. The return receipt is attached to this original summons to be filed by the Chancery Court Clerk & Master.

| Sworn to and subscribed before me on this day of     '20 Signature of   0 Notary Public or 0 Deputy Clerk | Signature of plaintiff, plaintiff's attorney or other person authorized by statute to serve process. |
|---|---|
| My Commission Expires: | |

### NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S):

Tennessee law provides a four thousand dollar ($4,000.00) debtor's equity interest personal property exemption from execution or seizure to satisfy judgement. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

Mail list to:    Clerk & Master
Room 302, Judicial Building
20 Public Square North
Murfreesboro, TN 37130

Please state file number on list.

ATTACH
RETURN
RECEIPT
HERE
(IF APPLICABLE)

IN THE CHANCERY COURT OF RUTHERFORD COUNTY, TENNESSEE

FOR THE SIXTEENTH JUDICIAL DISTRICT AT MURFREESBORO

| | | |
|---|---|---|
| ADVANTAGE WAYPOINT LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| MICHAEL BAKER, | ) | |
| | ) | |
| Defendant. | ) | |

## VERIFIED COMPLAINT

Plaintiff Advantage Waypoint LLC ("Advantage Waypoint" or the "Company"), by and through its undersigned counsel, hereby brings the following Verified Complaint pursuant to Tennessee Rule of Civil Procedure 65.03 for injunctive relief and damages against Defendant Michael Baker ("Baker") based upon Baker's breach of his contractual obligations to Advantage Waypoint. In support of this Complaint, Advantage Waypoint avers as follows:

## INTRODUCTION

1.    Michael Baker was Advantage Waypoint's Vice President of Segment Sales for more than three and a half years. In that time, Advantage Waypoint paid Baker a *base salary* of $225,000 per year, plus other forms of compensation. In exchange for Baker's word that he would agree to certain post-employment restrictions, Advantage Waypoint not only paid him this substantial compensation, but entrusted him with highly confidential information and access to significant clients, including: Tyson Foods, Inc., Land O'Lakes, Inc., High Liner Foods, Inc., The J.M. Smucker Company, Smucker's Dry, Smucker's Frozen, The French's Food Company LLC, Ventura Foods LLC, Hershey Company, Barilla America Inc., Flowers Foods Specialty

- 1 -

Group, Mars Food, Ajinomoto Windsor, Inc., Butterball LLC, Dr. Pepper Snapple Group, Inc., Nestle, Chobani LLC, and Super Bakery.

2.     Despite Baker's repeated promises to Advantage Waypoint that he would not compete and/or solicit its clients, customers and employees for 18 months after his employment might end, on July 5, 2017, Baker announced he would do precisely what he promised he would not: Baker quit suddenly and without any notice on a company holiday, saying he was joining The Core Group ("Core"). Core is a direct competitor of Advantage Waypoint. Baker was reminded of his contractual obligations on July 5, 2017 and he acknowledged that he was aware of them. Nevertheless, he proceeded to violate those contractual obligations, knowingly and immediately.

3.     Just days later, Baker appeared at a trade show in Atlanta, Georgia, one that he was originally scheduled to attend on behalf of Advantage Waypoint. Baker, having now switched companies, instead attended and, on information and belief, solicited clients on behalf of Core. Advantage Waypoint is informed and believes that Baker actively solicited Advantage Waypoint clients about whom he had confidential information which he acquired from his employment with the Company. On information and belief, Core also told Advantage Waypoint's clients that Baker would be leading Core's "new" segment sales strategy.

4.     Further, on information and belief, Baker violated the noncompetition agreement, and his duty of loyalty, by engaging in strategy discussions with Core and providing Core with confidential information, even prior to his abrupt resignation.

5.     Advantage Waypoint is a foodservice sales and marketing agency that acts on behalf of large food production companies (clients) to market and sell their products to food service providers, such as restaurants, hotels, schools, and hospitals (customers). Advantage

Waypoint differentiates itself from its competitors by, among other things, utilizing a "segment model" whereby its sales employees specifically target certain business segments such as primary schools, midsize restaurant chains, and hospital groups. Further, Advantage Waypoint optimizes its sales and marketing efforts by relying upon proprietary analyses of market demand and trends using sophisticated data mining and analytic techniques.

6. Baker worked for Advantage Waypoint for more than five years. For more than three and a half years, he held the position of Vice President of Segment Sales. Baker's geographic area of responsibility as Vice President of Segment Sales encompassed the entire United States. He directly supervised eight (8) individuals and indirectly supervised, in his division, approximately 150 employees. As Vice President of Segment Sales, Baker had direct access to Advantage Waypoint's confidential and proprietary information and trade secrets, including but not limited to: (1) lists of its clients and customers, including the decision makers at those entities; (2) clients' confidential information regarding their products; (3) marketing strategies with respect to current and prospective "pipeline" clients; (4) strategies for selling the clients' products to customers, including plans to increase its market share using the segment model; (5) confidential contract pricing information that is individually negotiated with clients; (6) data analytics regarding market demand and trends; and (7) information regarding Advantage Waypoint's employees, including compensation and performance. Baker had ongoing direct communications with the President of Advantage Waypoint and other top-level executives regarding the Company's sales and marketing strategies.

7. Because Baker would have access to such important, confidential and proprietary information, as a condition of his promotion to Vice President, on January 3, 2014, Baker signed an Employee Restrictions and Proprietary Information Agreement (hereinafter the "2014

3

Agreement"). A true and correct copy of the 2014 Agreement is attached hereto as Exhibit 1. Baker agreed that during his employment with Advantage Waypoint, and for 18 months following its termination, he would not, *inter alia*: (1) unfairly compete with Advantage Waypoint by performing the Business[1] of Advantage Waypoint for a competitor within the United States; (2) solicit any client, customer or supplier of Advantage Waypoint to reduce or refrain from doing business with Advantage Waypoint, or damage Advantage Waypoint's relationship with its clients, customer or suppliers; (3) solicit Advantage Waypoint's employees, consultants, independent contractors to leave Advantage Waypoint; or (4) use, misappropriate, or disseminate Advantage Waypoint's confidential information and trade secrets, or the confidential information of its clients and customers. (*See* Exhibit 1 at §§ 2, 5, 6).

8.      Immediately after walking out the doors of Advantage Waypoint, Baker violated (and continues to violate) the noncompetition provisions of the Restrictive Covenant Agreements by working for Core. Advantage Waypoint is informed and believes that Baker further violated his nonsolicitation agreements – in a repeated and ongoing manner – by: (i) actively soliciting Advantage Waypoint's customers on behalf of Core; and (ii) using Advantage Waypoints confidential information and trade secrets to assist Core in developing for it a segment sales model that, while Baker was its Vice President of Segment Sales, Advantage Waypoint invested considerable resources to develop and took reasonable steps to keep confidential.

9.      Advantage Waypoint has therefore instituted the instant action to enjoin Baker's ongoing and blatant contractual violations and to recover damages.

---

[1] The term "Business" is defined in the 2014 Agreement as, "the food service brokerage business and business of providing sales, marketing, merchandising, event promotions and demonstrating services to manufacturers, suppliers, distributors, retailers, operators and producers of food and consumer packaged goods." (Exhibit 1 at § 1.)

4

## PARTIES

10.     Advantage Waypoint is a Delaware limited liability company maintaining its principal place of business in Tampa, Florida.  Advantage Waypoint is authorized to do business in Tennessee and transacts business in Tennessee.

11.     Michael Baker is a resident and citizen of Rutherford County, Tennessee.  While a Vice President at Advantage Waypoint, Baker's office was at his residence in Murfreesboro, Tennessee.  On information and belief, Baker continues to work out of his residence in Murfreesboro, Tennessee on behalf of Core.

## JURISDICTION AND VENUE

12.     Jurisdiction and venue are proper in this Court pursuant to T.C.A. §§ 16-11-102, -103, 20-2-222, -223, and 20-4-101, -104, inasmuch as Baker resides and transacts business in this county.  Baker's employment with Advantage Waypoint was based out of his home in Murfreesboro, Tennessee.  In addition, Advantage Waypoint transacts business in Tennessee and the causes of action arose in this county.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### Advantage Waypoint Contracts with Large Food Production Companies (Clients) to Sell Their Products to Foodservice Providers (Customers).

13.     Advantage Waypoint acts on behalf of its clients to market and sell their food products to foodservice providers.

14.     To distinguish its business from its competitors, among other things, Advantage Waypoint: (1) utilizes a "segment model", whereby its sales employees specifically target certain assigned business segments such as K-12 primary schools, hospitals, or midsize restaurant chains; and (2) optimizes its sales and marketing efforts by relying upon proprietary analyses of market demand and trends using sophisticated data mining.

5

15.     To analyze market demand and trends, Advantage Waypoint developed and utilizes a proprietary program known as Food IQ which provides significant value to Advantage Waypoint by analyzing mined data to identify trends in food purchasing and specific opportunities for its sales employees to sell additional products on behalf of clients based on these trends. In his position of Vice President of Segment Sales, Baker was given full access to these proprietary analyses, to which Advantage Waypoint restricts access and requires a password to review.

16.     Advantage Waypoint's work involves the use of highly confidential business information, including, but not limited to: (1) lists of its clients and customers, including the decision makers at those entities; (2) clients' confidential information regarding their products; (3) marketing strategies with respect to current and prospective "pipeline" clients; (4) strategies for selling the clients' products to customers, including plans to increase its market share using the segment model; (5) contract pricing information specific to each client; (6) data analytics regarding market demand and trends; and (7) information regarding Advantage Waypoint's employees, including compensation and performance.

17.     Advantage Waypoint takes reasonable and extensive efforts to maintain the secrecy of its trade secret, confidential business, proprietary, and technical information including, but not limited to, (a) restricting access to its databases, including through password protection; (b) requiring its employees to enter into contracts to prevent disclosure of confidential information; (c) requiring key employees to enter into contracts to prevent unfair competition against Advantage Waypoint and its clients; (d) requiring confidentiality provisions in contracts with customers, consultants, vendors, and other third parties; and (e) establishing

6

other procedures and protocols, as necessary, to protect confidential business, trade secret, proprietary, and technical information.

18.     If one of Advantage Waypoint's direct competitors, e.g., Core, had access to Advantage Waypoint's confidential information, Advantage Waypoint would immediately be at a competitive disadvantage and at substantial risk of losing market share.

19.     If one of Advantage Waypoint's direct competitors, e.g., Core, had access to Advantage Waypoint's confidential information, many of Advantage Waypoint's *clients* would immediately be at a competitive disadvantage with respect to competitive clients of Core and at substantial risk of losing market share.

## Baker, One Of Advantage Waypoint's Highest Ranking Employees, Led The Segment Sales Division.

20.     On information and belief, Baker has a degree in Business from the University of Missouri-Columbia, and approximately 20 years' experience marketing and selling food products.

21.     Advantage Waypoint initially hired Baker in approximately April 2012 as National Director of K-12 Programs (one of Advantage Waypoint's most important segments). In approximately January 2014, Baker was promoted to Vice President of Segment Sales, a position he held for more than three and a half years before his sudden resignation. Baker reported directly to Chuck Mascari, Advantage Waypoint's Executive Vice President of Foodservice Sales. Mascari in turn reports directly to Don Davis, President of Advantage Waypoint. Baker maintained ongoing direct communications with Davis regarding the Company's sales and marketing strategies.

22.     Baker directly supervised eight (8) individuals and indirectly supervised approximately 150 individuals in his division. He was provided with information regarding

7

these individuals' compensation, skills and job performance. He is therefore uniquely positioned to solicit those employees on behalf of Core, using that confidential information.

23.     Baker had responsibility for marketing and selling clients' products across the country. Thus, while based in Tennessee, Baker's responsibilities were national in scope, and the confidential information to which he had access spanned clients and customers across the country.

24.     Advantage Waypoint invested in developing its relationships, through Baker, with its clients and customers throughout the United States. In his role as Vice President of Segment Sales, Baker frequently traveled around the country, and mostly but not exclusively in the Southeastern United States. Just in the 16 months preceding his resignation, Baker travelled to numerous States on behalf of Advantage Waypoint, including: Arkansas, Florida, Georgia, Idaho, Illinois, Minnesota, New York, North Carolina, Ohio, South Carolina and Texas.

25.     As Vice President of Segment Sales, Baker was intimately familiar with Advantage Waypoint's confidential and proprietary information and trade secrets. Among other things, Advantage Waypoint provided Baker with specific and intimate knowledge regarding Advantage Waypoint's active negotiations with important clients, including those clients who also contract with competitor Core. Such confidential information also includes contract pricing specific to particular clients, which is highly sensitive given that Advantage Waypoint solicits business by bidding against its competitors, including Core. In fact Baker was recently charged with taking the lead on strategizing how to market Advantage Waypoint with respect to a large national client, and engaged in high-level discussions with Davis regarding same. The chief competitor for this business opportunity is Core. As a result, Baker had substantial knowledge of Advantage Waypoint's negotiations and sales strategy, the clients' confidential information, and

Advantage Waypoint's pricing information, and upon information and belief, this is now being used to directly compete against Advantage Waypoint.

### Baker Promised Not To Compete, Solicit Customers or Solicit Employees For a Reasonable Period of Time Following Termination of his Employment.

26.     On January 3, 2014, concurrent with his promotion to Vice President, Baker entered into the 2014 Agreement with Advantage Waypoint.

27.     Among other things, the 2014 Agreement was specifically designed to protect against: unfair competition; unlawful disclosure of valuable confidential information; unfair solicitation of Advantage Waypoint's actual and prospective clients; and unfair solicitation of Advantage Waypoint's current and former employees and consultants.

28.     Section 5 of the 2014 Agreement states, in pertinent part:

> Non-Compete. I agree that while employed by the Company and for a period of 18 months following the termination of my employment, I will not directly or indirectly, either for myself or any other person or entity, conduct, operate, carry out or engage in, or own any interest in, perform any services for, participate in or be connected with any Person other than the Company that conducts, operates, carries out or engages in, or receives any economic benefit in connection with, any business that is or may reasonably be considered to be competitive with the Business (including any expansions or extensions thereof which have either taken place prior to such termination or which were contemplated at the time of termination), within the Geographic Area.

(*Id.*)

33.     "Business" is defined in the 2014 Agreement as, "the food service brokerage business and business of providing sales, marketing, merchandising, event promotions and demonstrating services to manufacturers, suppliers, distributors, retailers, operators and producers of food and consumer packaged goods." (*Id.* at § 1.)

34.     The "Geographic Area" is defined as the United States and Canada. (*Id.*)

35.     Section 6 of Baker's 2014 Agreement states, in pertinent part:

9

Non-Solicitation. I agree that while employed by the Company and for a period of 18 months following the termination of my employment, I will not directly or indirectly, either for myself or any other person or entity, do any of the following:

(a) Clients and Customers. I will not, within the Geographic Area, (A) solicit or induce any client, customer or supplier of the Company to reduce or refrain from doing any business with the Company, (B) damage any relationship between the Company and any of its clients, customers or suppliers (or any Person in respect of which I am actually aware that the Company has approached or has made significant plans to approach as a prospective client, customer or supplier within 6 months prior thereto) or (C) aid Persons involved in any such acts.

(b) Employees. I will not solicit, induce or attempt to induce any individual who is or was an officer, employee, or consultant of the Company to leave the Company, or in any way interfere with the relationship between the Company and such individual; provided, that this clause shall not apply to any individual whose employment or engagement with the Company has been terminated (either voluntarily or involuntarily) for a period of one year or longer prior to such solicitation.

(*Id.*)

36.     Section 11(a) of the 2014 Agreement states that it is "governed by the laws of the State of Delaware, without regard to any conflicts of law principles thereof that would call for the application of the laws of any other jurisdiction." (*Id.*)

37.     The restrictive covenants contained in the 2014 Agreement are reasonably necessary to protect Advantage Waypoint's goodwill and legitimate business interests, including, but not limited to, Advantage Waypoint's confidential and proprietary business information not publicly known, and Advantage Waypoint's client, customer and employee relationships.

38.     The restrictive covenants contained in the 2014 Agreement are reasonably limited as to time, geography and scope.

39.     Because Baker conducted business on behalf of Advantage Waypoint across the United States, the geographic limit of the United States is reasonable. Specifically, Baker

managed a large division of employees marketing and selling Advantage Waypoint's clients' products to customers across the country and Baker personally traveled throughout the country in his role as Vice President of Segment Sales.

**Core Directly Competes With Advantage Waypoint**

40.     Like Advantage Waypoint, Core is a sales and marketing agency that acts on behalf of large food production companies to market and sell their products to food service providers.

41.     Advantage Waypoint and Core regularly compete for client contracts and market share. Advantage Waypoint and Core are currently in direct competition with respect to numerous major clients, representing millions of dollars in business. These clients include: Tyson Foods, Inc., Red Gold, Inc., Eagle Family Food Group LLC, J&J Snack Foods Corporation, Diamond Crystal Brands, Inc., Saputo Cheese USA, Inc., The French's Food Company LLC, C.H. Guenther and Son, Inc., Ventura Foods LLC, The J.M. Smucker Company, Michael Foods, Inc., and Hershey Foods, Corp.

42.     As Vice President of Segment Sales, Baker managed a large team of sales employees throughout North America. Because of his high ranking position in the company, he had access to confidential business and technical information, trade secrets, and proprietary information of the highest order related to most, if not all, company segment sales, prospective clients, and contract prices, as well as trade secret information belonging to Advantage Waypoint, and its clients and consumers.

43.     On information and belief, Core is attempting to implement a "segment model" similar to that used by Advantage Waypoint in order to attempt to minimize Advantage Waypoint's competitive advantage. On information and belief, Core hired Baker, an Advantage

Waypoint employee with extremely marketable, but highly confidential and proprietary, knowledge about Advantage Waypoint's business and sales strategies, clients, and data analytics, in order to attempt to replicate Advantage Waypoint's business strategies within Core. On information and belief, Core has represented to Advantage Waypoint clients that Baker will now lead its newly-created segment strategy.

### Baker Resigned Without Notice and Proceeded to Immediately and Blatantly Breach the Restrictive Covenants

44.     On or about July 5, 2017, Baker informed Chuck Mascari, Jr., Advantage Waypoint's Executive Vice President of Foodservice Sales, that Baker was resigning without notice to take a position with direct competitor Core.

45.     Baker told Advantage Waypoint employees that he accepted the position at Core because he would receive more compensation as well as equity in Core.

46.     On July 5, 2017, Baker was reminded expressly of his restrictive covenant obligations. He expressly acknowledged that he was aware of them.

47.     Notwithstanding the July 5, 2017 reminder of his contractual obligations, Baker continues to conduct Business (as so defined) on behalf of direct competitor Core in direct and flagrant breach of those restrictive covenants.

48.     Days after he quit, Baker attended a trade show (from approximately July 9, 2017 to July 11, 2017) in Atlanta, Georgia, that he previously was scheduled to attend on behalf of Advantage Waypoint. On information and belief, having joined Core, Baker attended on its behalf, soliciting clients and customers for Core, including Advantage Waypoint's clients and customers.

49.     On information and belief, Core plans to attempt to minimize Advantage Waypoint's competitive advantage by appropriating and copying its "sales segment" model. On

12

information and belief, Core hired Baker to implement the segment model at Core. On information and belief, at that Atlanta, Georgia conference, Core specifically represented to Advantage Waypoint clients that Baker would be leading its "new" segment sales strategy.

50.     Baker's continued employment with Core will result in immediate and irreparable harm to Advantage Waypoint. At the time Baker resigned without notice from Advantage Waypoint to take the position with direct competitor Core, he was privy to Advantage Waypoint's confidential business and technical information, trade secrets, and proprietary information. As a Core employee, Baker can now (1) use this confidential and invaluable information to solicit both Advantage Waypoints' clients and customers, and (2) sell and market products produced by Core's clients which are competitive with Advantage Waypoints' clients. This will result in material detriment to Advantage Waypoint and its clients.

51.     Baker's violation of his Restrictive Covenants Agreements threatens to cause Advantage Waypoint to lose tens of millions of dollars of potential contracts in the immediate future, and the future monetary damage caused by the disclosure and use of Advantage Waypoint's confidential information to Core is incalculable.

52.     Baker's unlawful acts, in direct and knowing violation of the 2014 Agreement have caused, and will continue to cause, immediate and irreparable damage to Advantage Waypoint and its business.

## CAUSES OF ACTION

### Count One – Breach of Contract

53.     Advantage Waypoint incorporates the allegations in Paragraphs 1 through 52 above by reference as though fully set forth herein.

54.     In connection with his promotion to Vice President, Baker voluntarily executed the 2014 Agreement, containing confidentiality, noncompetition, and nonsolicitation provisions.

LEGAL_US_W # 90642643.1

55.     The 2014 Agreement is a written and valid contract supported by valuable consideration, under both Delaware and Tennessee law.

56.     Advantage Waypoint has performed all of its obligations under the 2014 Agreement, except any obligations whose performance was made impossible or otherwise excused, and has satisfied all conditions prerequisite to bringing this claim.

57.     The restrictive covenants contained in the 2014 Agreement are reasonable as to scope, time and territory and serve Advantage Waypoint's legitimate interests in safeguarding against unfair competition, including, without limitation, protection of the trade secrets and confidential information of itself and its clients, as well as to protect Advantage Waypoint's goodwill, and client and customer relationships.

58.     The restrictive covenants contained in the 2014 Agreement are narrowly tailored to protect Advantage Waypoint's legitimate business interests and are consistent with applicable public policy.

59.     Baker resigned from Advantage Waypoint on July 5, 2017 and immediately began employment with direct competitor Core.

60.     Baker's employment with Core is in direct violation and breach of Section 5 of the 2014 Agreement, which prohibits Baker from competing with Advantage Waypoint for a period of 18 months following the termination of his employment with respect to Advantage Waypoint's Business, as so defined, in the United States. (*See* Exhibit 1, § 5).

61.     Section 6(a) of the 2014 Agreement also prohibits Baker, for a period of 18 months following the termination of his employment, from (a) soliciting Advantage Waypoint's clients, customers or suppliers to reduce or refrain from doing any business with Advantage Waypoint, (b) damaging any relationship between Advantage Waypoint and any of its clients,

14

customers or suppliers, or any person in respect of which Baker is actually aware that Advantage Waypoint has approached or has made significant plans to approach as a prospective client, customer or supplier within six (6) months before his employment terminated. (*Id.*, § 6(a))

62.   On information and belief, Baker is actively soliciting Advantage Waypoint's clients and customers on behalf of competitor Core in direct violation of Section 6(a) of the 2014 Agreement, including, but not limited to, his attendance of the July 2017 industry trade show in Atlanta, Georgia.   Indeed, on information and belief, one of the primary reasons Core hired Baker was to solicit Advantage Waypoint's clients and customers.

63.   Section 6(b) of the 2014 Agreement also prohibits Baker, for a period of 18 months following the termination of his employment, from soliciting, inducing, or attempting to induce Advantage Waypoint employees to leave Advantage Waypoint.

64.   Given Baker's wanton disregard for his other restrictive covenants, there is a substantial likelihood and risk that he will attempt to solicit Advantage Waypoint employees to terminate their employment with Advantage Waypoint and to accept positions at Core.

65.   The ongoing and threatened future acts of Baker have caused and will cause Advantage Waypoint irreparable harm and/or damage in excess of the minimum jurisdictional limits of the Court, by depriving Advantage Waypoint of the goodwill of its customers, trade secrets and/or confidential proprietary information, and profits from clients who have become or will become clients of Baker or his new employer, Core.

66.   As a result, Advantage Waypoint has suffered and/or will continue to suffer irreparable harm for which there is no legal remedy and/or damages in an amount that exceed the jurisdictional limits of the Court.

67.     Accordingly, this Court should enter an order for specific performance directing Baker to refrain from working for Core or another direct competitor of Advantage Waypoint, or from soliciting Advantage Waypoint's clients, prospective clients, customers, or employees for eighteen (18) months from the date of the Court's judgment in this matter and otherwise honor his obligations in the 2014 Agreement.

68.     In addition, Advantage Waypoint seeks compensation for all damages and losses proximately caused by the breaches and wrongful conduct of Baker, in addition to attorneys' fees, expenses, and costs, any other remedy available under the 2014 Agreement and Delaware and Tennessee law, and any and all further relief this Court deems just and proper.

WHEREFORE, Advantage Waypoint prays for relief as follows:

a.      That this Court take jurisdiction of the parties and subject matter hereof;

b.      That judgment be entered for Advantage Waypoint and against Baker granting preliminary and permanent relief, including an order enjoining Baker for the full duration of the restrictive covenants in the 2014 Agreement from further conduct constituting breach of Baker's restrictive covenants, including the noncompetition and nonsolicitation agreements;

c.      That the Court order Baker to return to Advantage Waypoint any of its trade secrets or confidential information still in his possession as well as to produce for forensic examination any electronic devices or accounts to which Baker has had access since he began pursuing employment at The Core Group to determine if any of Advantage Waypoint's trade secrets or confidential information is located on such devices or in such accounts;

d.      That judgment be entered for Advantage Waypoint and against Baker for any profits or revenue, together with interest thereon, lost by Advantage Waypoint as a consequence of Baker's breach of the restrictive covenants contained in the 2014 Agreement;

e.    That Advantage Waypoint be awarded its attorneys' fees and litigation costs and

have such other and further relief as the Court may deem just and proper.

Dated this 14th day of July, 2017.

Respectfully submitted,

William S. Rutchow (BPR #017183)
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
SunTrust Plaza, Suite 1200
401 Commerce Street
Nashville, Tennessee 37219
(615) 254-1900
(615) 254-1908 (*Facsimile*)

**ATTORNEYS FOR PLAINTIFF**
**ADVANTAGE WAYPOINT LLC**

STATE OF Illinois )
COUNTY OF DuPage )

I, Donald C Davis , President, Waypoint and I am authorized
     Name                Title

to make this verification on behalf of Plaintiff. I have reviewed Plaintiff's Verified Complaint
and attest that the facts and allegations contained therein are true and accurate to my knowledge
based upon personal knowledge, or facts developed and provided to me by other agents of
Plaintiff, except as to those matters stated on information and belief, and as to those matters, I
believe them to be true.

Sworn to and subscribed before me on the 13 day of July , 2017

Notary Public: Christine M Gericke

My Commission Expires: 08/14/2019

```
"OFFICIAL SEAL"
CHRISTINE M. GERICKE
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 8/14/2019
```

# EMPLOYEE RESTRICTIONS AND PROPRIETARY INFORMATION AGREEMENT

In consideration of my employment by Advantage Waypoint LLC or any of its direct or indirect subsidiaries, affiliated entities and divisions (collectively, the "Company")[1], my eligibility to be considered for future salary or wage increases, a promotion to a Vice President level role along with a salary increase to which I would not otherwise have been entitled, I agree to the terms set forth herein. This Employee Restrictions and Proprietary Information Agreement ("Agreement") shall be effective as of the date of execution of this Agreement.

      1.    <u>Employer</u>. The Company is engaged in the food service brokerage business and business of providing sales, marketing, merchandising, event promotions and demonstrating services to manufacturers, suppliers, distributors, retailers, operators and producers of food and consumer packaged goods (the "Business"). The Company is engaged in the Business throughout the United States and Canada (the "Geographic Area").

      2.    <u>Maintain Confidential Information</u>.

          a.    <u>Company Information</u>. I confirm and agree that at all times during my employment with the Company and thereafter that I have held and shall continue to hold in strictest confidence, and have not used and shall not use (except for the benefit of the Company in the performance of my job duties), or have not disclosed and shall not disclose to any person, firm or entity without written authorization of the Company (except as provided by applicable law), any trade secrets (as defined under applicable law), confidential knowledge, data, or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information, confidential personnel and other information related to employees of the Company, or other subject matter pertaining to any business of the Company or to any of its employees, clients, customers or other third parties (collectively, "Confidential Information").

          b.    <u>Former Employer Information</u>. I agree that I have not and will not, during my employment with the Company, improperly use or disclose any confidential or proprietary information of my former or concurrent employers or companies, or any other person, and that I will not bring onto the premises of the Company any unpublished documents or any property belonging to my former or concurrent employers or companies, or any other person, unless consented to in writing by said employers, companies, or other person.

          c.    <u>Third Party Information</u>. I recognize that the Company has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. I agree that I owe the Company and such third parties, during the term of my employment and thereafter, a duty to hold all such confidential and proprietary information in the strictest confidence and not to disclose it to any person, firm, or corporation (except as necessary in carrying out my work for the Company or such third party consistent with the Company's agreement with such third party) without the express written authorization of the Company.

      3.    <u>Retaining and Assigning Inventions and Original Works</u>.

          a.    <u>Inventions and Original Works Retained by Me</u>. I have listed in Section 14 hereof, descriptions of any and all inventions, original works of authorship, developments, improvements, and trade secrets which were made by me prior to my employment with the Company, which belong to me, which relate to the Company's proposed business and products, and which are not assigned to the Company.

          b.    <u>Inventions and Original Works Assigned to the Company</u>. I agree that I will promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of

---

[1] Employment is only with one specific legal entity of the Company, and not with all of the legal entities that constitute the Company; and any references to the "Company" as an employer are intended to refer to the employing entity.



EXHIBIT
1

the Company, and will assign to the Company all my right, title, and interest in and to any and all inventions, original works of authorship, developments, improvements, or trade secrets which I may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of time I am in the employment of the Company.

        (i)    <u>Excluded Inventions</u>. I understand that statutes in certain states prohibit employers and employees from entering into agreements requiring an employee to assign or offer to assign to an employer any invention that an employee developed entirely on his/her own time without using the employer's equipment, supplies, facilities or trade secret information except for those inventions that either: (A) relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or (B) result from any work performed by the employee for the employer.

        (ii)    <u>Unenforceable provisions; acknowledgement of notification</u>. To the extent any such state law applies to my employment with the Company, and to the extent a provision in this Agreement purports to require me to assign an invention otherwise excluded by such state law, that provision may be against public policy and, as result, unenforceable. I understand that the provisions of this Agreement requiring assignment to the Company do not apply to any invention which qualifies fully under the provisions of any such state laws.

        (iii)    <u>Disclosure of Excluded Inventions</u>. I will advise the Company promptly in writing of any inventions, original works of authorship, developments, improvements, or trade secrets that I believe are exempt from assignment to the Company based upon the application of the state laws described above, and I will at that time provide to the Company in writing all evidence necessary to substantiate that belief. I understand that the Company will keep in confidence and will not disclose to third parties without my consent any confidential information disclosed in writing to the Company relating to inventions that qualify fully under the provisions of such laws.

        (iv)    <u>United States Inventions</u>. The state law exclusions described above do not apply to any patent or invention covered by a contract between the Company and the United States or any of its agencies requiring full title to such patent or invention to be in the United States. I agree to assign to the United States government, all my right, title, and interest in and to any and all inventions, original works of authorship, developments, improvements, or trade secrets whenever such full title is required to be in the United States by a contract between the Company and the United States or any of its agencies.

        c.    <u>Works for Hire</u>. I acknowledge that all original works of authorship which are made by me (solely or jointly with others) within the scope of my employment and which are protectable by copyright are "works made for hire," as the term is defined in the United States Copyright Act, meaning the Company will be the sole owner of the copyright of such works.

        d.    <u>Maintenance of Records</u>. I agree to keep and maintain adequate and current written records of all inventions and original works of authorship made by me (solely or jointly with others) during the term of my employment with the Company. The records will be in the form of notes, sketches, drawings, and any other format that may be specified by the Company. The records will be available to and remain the sole property of the Company at all times.

        e.    <u>Assistance in Obtaining Rights</u>. I agree that my obligation to assist the Company to obtain patents or copyrights covering inventions or works of authorship, respectively, assigned hereunder to the Company shall continue beyond the termination of my employment, but the Company shall compensate me at a reasonable rate for time actually spent by me at the Company's request on such assistance. If the Company is unable because of my mental or physical incapacity or for any reason to secure my signature to apply for or to pursue any application for any United States patents or copyrights covering inventions or other rights assigned to the Company, as above, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, to act for and on my behalf and stead and to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of patents and copyrights with the same legal force and effect as if executed by me. I hereby waive and quitclaim to the Company any and

all claims of any nature whatsoever, which I now or may hereafter have for infringement of any patents or copyrights resulting from any such application assigned hereunder to the Company.

4. <u>Conflicting Employment</u>. I agree that, during my employment with the Company, I will not engage in any other employment, occupation, consulting, or other business activity directly related to the business in which the Company is now involved or becomes involved during my employment, nor will I engage in any other activities that conflict with my obligations to the Company. I also represent that my employment with the Company will not conflict with or result in the breach of any agreement to which I am a party or by which I may be bound (including without limitation any proprietary information, non-disclosure, non-competition, non-solicitation, or other similar covenant or agreement).

5. <u>Non-Compete</u>. I agree that while employed by the Company and for a period of 18 months following the termination of my employment, I will not directly or indirectly, either for myself or any other person or entity, conduct, operate, carry out or engage in, or own any interest in, perform any services for, participate in or be connected with any Person other than the Company that conducts, operates, carries out or engages in, or receives any economic benefit in connection with, any business that is or may reasonably be considered to be competitive with the Business (including any expansions or extensions thereof which have either taken place prior to such termination or which were contemplated at the time of termination), within the Geographic Area. Notwithstanding the foregoing, nothing contained in this Section 5 shall prohibit me or my affiliates from the passive collective ownership, in the aggregate, of less than two percent (2%) of any class of stock listed on a national securities exchange.

6. <u>Non-Solicitation</u>. I agree that while employed by the Company and for a period of 18 months following the termination of my employment, I will not directly or indirectly, either for myself or any other person or entity, do any of the following:

a. <u>Clients and Customers</u>. I will not, within the Geographic Area, (A) solicit or induce any client, customer or supplier of the Company to reduce or refrain from doing any business with the Company, (B) damage any relationship between the Company and any of its clients, customers or suppliers (or any Person in respect of which I am actually aware that the Company has approached or has made significant plans to approach as a prospective client, customer or supplier within 6 months prior thereto) or (C) aid Persons involved in any such acts.

b. <u>Employees</u>. I will not solicit, induce or attempt to induce any individual who is or was an officer, employee, or consultant of the Company to leave the Company, or in any way interfere with the relationship between the Company and such individual; provided, that this clause shall not apply to any individual whose employment or engagement with the Company has been terminated (either voluntarily or involuntarily) for a period of one year or longer prior to such solicitation.

7. <u>Company Documents and Property</u>. I agree that upon termination of employment or at the request of the Company at any time, I will deliver to the Company any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or copies of any aforementioned items belonging to the Company, its successors, assigns, clients, or customers. I further agree that any property owned by the Company, including computers, storage devices, telephones, desks, filing cabinets, or other storage or work area is subject to inspection by Company personnel at any time, with or without notice.

8. <u>No Employment Contract</u>. I acknowledge that this Agreement does not constitute a contract of employment for any specific period of time nor does it modify the at-will employment relationship, meaning that either I or the Company can terminate any such employment relationship at any time. I further acknowledge this Agreement does not constitute a guarantee of future salary or wage increases.

9. <u>Future Opportunities and Obligations</u>. I acknowledge and agree that compliance with this Agreement will not unduly burden or interfere with my ability to earn a living following any termination of employment with the Company and that certain obligations of this Agreement continue beyond any employment with the Company.

10.   Remedies. I understand that my breach of any covenant of this Agreement may lead to immediate termination of my employment. Termination of my employment for any reason shall not limit any remedy available to the Company, at law or in equity, which shall include, without limitation, the right to obtain damages and to obtain injunctive or other equitable relief to restrain any breach or threatened breach or otherwise to specifically enforce the provisions of this Agreement without the necessity of posting a bond, it being agreed that money damages alone would be an inadequate remedy for such breach.  The rights and remedies of the parties to this Agreement are cumulative and not alternative.

11.   General Provisions.

a.   Governing Law. This Agreement will be governed by the laws of the State of Delaware, without regard to any conflicts of laws principles thereof that would call for the application of the laws of any other jurisdiction.

b.   Entire Agreement.  This Agreement sets forth the entire agreement and understanding between the Company and me relating to the subject matter herein and supersedes all prior discussions between us; provided, however, that any previously or concurrently executed agreement between the Company and me which lawfully restricts my use or disclosure of any Confidential Information or my ability to compete against the Company or to solicit clients, customers, or employees of the Company, and which is deemed to provide greater protection to the Company shall continue to be binding and shall control over obligations in this Agreement deemed to be less protective to the Company. No modification of or amendment to this Agreement, or any waiver of any rights under this Agreement will be effective unless in writing signed by the party to be charged. Any subsequent change or changes in my duties, salary, or compensation will not affect the validity or scope of this Agreement.

c.   Severability; Blue Pencil. If any provision of this Agreement or portion thereof is determined by a court of competent jurisdiction to be invalid, illegal or otherwise unenforceable, then such provision will be severed and if possible replaced with a similar provision which conforms with applicable law and embodies as closely as possible the original intent of the parties, and in any event the remainder of this Agreement will remain in full force and effect according to its terms.  To the extent a court should reduce the scope, duration, and/or area of any term or provision in Sections 2 through 6 to a permissible scope, duration, or size; the applicable restricted period shall be the longest period, the geographic area covered shall comprise the largest territory, and the scope shall be as broad as possible as permitted by law under the circumstances.

d.   Successors and Assigns.  This Agreement will be binding upon my heirs, executors, administrators, and other legal representatives and will be for the benefit of the Company, its successors and its assigns.

e.   Survival. The provisions of this Agreement shall survive the termination of my employment (except as otherwise stated) and the assignment of this Agreement by the Company to any successor in interest or other assignee and I will not assign my rights or delegate my duties or obligations hereunder without the prior written consent of the Company.

f.   Advice of Counsel. I have had had the opportunity to consult with an attorney of my own choosing before signing this Agreement, if I elect to do so.

12.   Other Agreements.  The restrictive covenants contained in this Agreement shall be in addition to, and not in lieu of, and shall not in any way limit the enforceability of, any restrictive covenant covering similar subject matter contained in any other agreement between the parties to which I am a party or otherwise bound.

13.   Delivery by Electronic Delivery; Facsimile or Email.   This Agreement, and any amendments hereto, to the extent signed and delivered by means of an electronic delivery system, facsimile machine or email with scan or facsimile attachment, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. At the request of any party hereto, each

other party hereto shall re-execute original forms thereof and deliver them to all other parties. No party hereto shall raise the use of an electronic delivery system, facsimile machine or email to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of an electronic delivery system, facsimile machine or email as a defense to the formation or enforceability of a contract, and each such party forever waives any such defense.

      14.   <u>List of Inventions</u>. Pursuant to Section 3(a) of this Agreement, below is a list of my prior inventions and original works of authorship. (If disclosure of such inventions and original works of authorship would cause me to violate any prior confidentiality agreement, I understand I should not disclose any confidential information and should only disclose a brief name for the invention, the parties to whom it belongs, and the existence of the confidentiality obligations.) Check here if additional sheets are attached: _____

| Title | Date | Brief Description |
|---|---|---|

In the event, as a result of my work for the Company, the Company would infringe any intellectual property right of mine listed in this Section 14, the Company shall automatically have a royalty free, nonexclusive license throughout the world including the right to grant and sublicense to the extent necessary to permit the Company to use and to enjoy all the resulting product of such work of mine to the fullest extent, unless, prior to initiating any such work, I obtain the waiver, in writing, of the Company, by an officer of the Company, waiving the Company's license in such instance.

IF NO PRIOR INVENTIONS OR WORKS OF AUTHORSHIP ARE LISTED IN THIS SECTION 14, I HEREBY AFFIRM THAT THERE ARE NO SUCH INVENTIONS OR ORIGINAL WORKS OF AUTHORSHIP.

_____
Signature of Employee

_____
Michael Baker
Printed Name of Employee

_____1/3/14_____
Dated

<u>ACCEPTED AND AGREED</u>:

COMPANY:

ADVANTAGE WAYPOINT LLC

By: _____   Title: _____

Dated: _____