IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| ADVANTAGE WAYPOINT LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | No.: 3:17-cv-1053 |
| | ) | |
| MICHAEL BAKER, | ) | JUDGE: CRENSHAW |
| | ) | MAGISTRATE: BROWN |
| Defendant. | ) | |
| | ) | (Jury Demand Endorsed Hereon) |

## OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

## I.      INTRODUCTION

Mike Baker originally turned down the opportunity to leave Plaintiff Advantage Waypoint LLC ("Advantage") in April of 2017, but he reevaluated after a June 26 conversation with his superiors in which they wanted him to misrepresent his duties in order to justify his salary to the corporate superiors in Irvine, California who oversee Advantage operations.

The same kind of false misrepresentations are at the heart of the Advantage motion here, the most egregious of which is a false statement about Dropbox that changes the entire picture that Advantage tries to present. Dropbox is a file-sharing service that creates a virtual hard drive which shares folders on the computer of each Dropbox user. In the moving papers, the head of the Advantage division of Advantage Solutions, Inc. swears – under oath – that the use of Dropbox was "strictly prohibited."[1] Advantage then introduces evidence from Mike Baker's work computer that reflected the existence of hundreds of Advantage documents on a Dropbox shared folder.

[1] In deposition, the Advantage witness admitted that there was no written policy. Further, nobody had told him orally of such a policy, nor had he directed anyone to impose such a policy. He did not inquiry of anyone in his organization before testifying that the policy existed. He simply made up that testimony because he felt it would help the case against Mike Baker.

1

Advantage observes that files were copied from Mike Baker's computer to a USB drive, and then deleted from his work computer. From this, Advantage wrongly accuses Mike Baker of wholesale theft of corporate documents.

In truth, Advantage employees regularly used Dropbox shared drives to coordinate documents both internally and with clients. Far from precluding such internal collaboration, Advantage reimbursed Mike Baker for the expense of the Dropbox service. Moreover, because of the way that Dropbox creates a "virtual hard drive" on a Windows PC, each PC sharing an Advantage folder will mirror any change by *any* user on *any* PC connected to that shared folder. As such, the forensic evidence does not demonstrate any use of Dropbox specific to Mike Baker, but only the heavy use of Dropbox by various other employees within Advantage. Mike Baker himself rarely used the shared folders on Dropbox, preferring to have his administrative assistants at Advantage locate and forward him any documents he desired. It appears that he did not access the Dropbox folder within the month before he left Advantage. He certainly did not access it when preparing to leave Advantage, nor has he accessed his Dropbox folder at any time since. Stripped of the false claim that Dropbox was prohibited at Advantage, the forensic evidence demonstrates nothing more than the fact that Dropbox was used at Advantage.

The evidence on the USB device is likewise a red-herring. Mr. Baker did copy numerous files to the USB device when he left: family pictures, physical therapy videos, personal tax returns, and many other personal documents. This included his personal contacts (dating back many years before he started work at Advantage) and his personal calendar. Mr. Baker then deleted files so that his personal files would not be passed on to the next Advantage employee to receive the computer. Forensic analysis of the USB drive confirms Mr. Baker's own testimony: none of the Dropbox files identified by Advantage were copied to the USB drive, and Mr. Baker did not copy

2

Advantage documents to that drive as he was leaving the company. The only documents copied to the USB drive when Mr. Baker was leaving related to Mr. Baker personally. The whole allegation of trade secret theft is wrong, built upon the false statement that evidence of Dropbox use on Mr. Baker's PC is somehow evidence of conduct outside of and against the policies of Plaintiff Advantage.

This is not the only falsity underlying the moving papers. In fact, virtually all of the conclusory claims about the alleged "value" of Advantage proprietary information are untrue and designed to falsely suggest that Mr. Baker's new employer hired him to take unfair advantage of proprietary information. The companies at issue here are food sales companies. They represent numerous food manufacturers like Ocean Spray and Smuckers, selling their clients' food and related products to restaurants, schools, hospitals, museums, prisons, stadiums, cruise ships, etc. This was traditionally a local business, with a local Nashville broker selling to the full range of possible buyers in and around Nashville. Over the last decade, however, those local brokers have been consolidated into a growing number of national brokers. Virtually everything discussed in the Don Davis declaration reflects information already known or easily available to each and every one of the national brokers in the Foodservice industry.

For example, Mr. Davis suggests that the Advantage segment strategy is a closely guarded secret that gives the company a material advantage in the marketplace. He likewise testifies that Advantage keeps its rosters within its organization and its list of contacts outside its organization as closely held secrets that supposedly give the company a material advantage. In reality, Mr. Davis again simply made up these facts to help manufacture a false claim against Mr. Baker. The entire industry is moving to a segmentation model (and has been since at least 2010) because the clients seek that from their brokers. And to the extent that the rosters or contacts are not available

3

elsewhere (and they generally are), Advantage regularly sends out rosters of its sales people and other such information upon request without any confidentiality restrictions.

About the only true statement in the moving papers is that Mr. Baker signed a non-compete agreement, but even that statement is not what it seems because Advantage manipulated the choice of law in that agreement and it should not be applied. Specifically, although Advantage is nominally located in Florida, it is in fact operated out of Irvine, California and Advantage expressly applied California law to Mr. Baker's other employment-related agreement. This is essentially a dispute between two California employers over the services of an employee, and California has significantly more important contacts to this dispute than Delaware. Under California law, covenants not to compete are not only unenforceable, but are against fundamental California public policy. *Application Group v. Hunter*, 61 Cal.App.4th 881, 900-901 (1998) (California public policy invalidates non-compete for out-of-state employee to the extent such non-compete involves employees work for a California-based employer).

Moreover, even if California law were not to apply to this dispute (and it should), Tennessee law would likewise invalidate the Delaware choice of law. *Dill v. Continental Car Club, Inc.*, E2013-00170-COA-R3-CV, 2013 WL 5874713, *11-12 (Tn. App. October 31, 2013) (choice of out-of-state law not enforceable in Tennessee where out-of-state law is more restrictive of competition). Under Tennessee law, covenants not to compete are disfavored, and will not be enforced unless there is some particular danger to the employer beyond the mere fact of competition. *Vantage Tech. LLC v. Cross*, 17 S.W.3d 637, 644 (Tn. App. 1999) ("[T]hreshold question whether employer has a legitimate business, *i.e* one that is properly protectable by a non-competition covenant"); *see generally Selox, Inc. v. Ford*, 675 S.W.2d 474, 476 (Tenn. 1984) ("'An employer, however, cannot by contract restrain ordinary competition.'"); *Hickory*

4

*Specialties, Inc. v. Forest Flavors Int'l, Inc.*, 26 F.Supp.2d 1029, 1031-1032 (Md. Tenn. 1998) (covenant not to compete enforceable under Tennessee law only to protect "trade secret.").

The recognized interests that might justify enforcement in Tennessee of a non-competition covenant are: (1) specialized training from the employer, (2) legitimate trade secrets, or (3) such interaction between the employee and customers that the employee is the "face" of the employer and embodies the employer's goodwill. *Vantage Tech.*, 17 S.W.3d at 644-646. In this case, however, none of those interests apply. Mr. Davis did not receive any specialized training, he does not possess any legitimate trade secrets that give him an advantage in competing, and he was not the "face" of Advantage to the clients or customers such that the customers associated their goodwill toward Advantage with Mr. Baker. As such, even if California law does not apply to this matter, Tennessee law comes to the same result: the covenant not to compete in this case is unenforceable.[2]

## II.      FACTUAL BACKGROUND

### A.      Mike Baker Has a Twenty-Year History in the Foodservice Sales Industry

Defendant Michael Baker has worked in foodservice sales for more than two decades. [Declaration of Michael Baker ("Baker Dec.") ¶ 2.] He was hired by Advantage in April of 2012, originally serving as National Director of K-12 Programs. [*Id.* ¶ 3.] As National Director of K-12 Programs, Mike Baker oversaw the efforts of a sales force across the country to try to sell foodservice products to elementary and secondary schools. [*Id.*] In approximately January of

---

[2] As a technical matter, the covenant may also be unenforceable under Delaware law because Advantage never accepted or agreed to the terms. *See Schutzman v. Gill*, 154 A.2d 226, 229-30 (Del. Ct. Ch. 1959) (covenant not enforceable by party which had not signed agreement as contemplated by the agreement). However, since Delaware law in general is contrary to the public policy of two states with more important interests (California and Tennessee), the Court need not decide the enforceability under Delaware law.

5

2014, he was promoted to Vice President of Segment Sales. [*Id.*] In that capacity, he oversaw my replacement and similar individuals who, in turn, oversaw the efforts of sales forces to try to sell foodservice products to various different segments such as retail, gaming, K-12, etc. [*Id.*]

Advantage is essentially an outsourced sales arm for food manufacturers. [Baker Dec. ¶ 12 and Declaration of Mike Rich ("Rich Dec.") ¶2.] This means that the company represents food manufacturers like Tyson in selling food and products to restaurants, hospitals, hotels, prisons, schools, casinos, stadiums, etc. [*Id.*] As one of the founders of plaintiff Advantge itself has confirmed, there is no "secret sauce" for making the sales. [Rich Dec. ¶ 4.] Brokers are aware of the material clients who are looking to sell, and of the various customers (also known as operators) who are looking to purchase. [*Id.*] Detailed information about both clients and customers is also readily available from market sources. [*Id.*] Success at Advantage and in the industry in general is based upon being responsive to client concerns and developing relationships with both clients and customers. [*Id.* ¶5.] It is also about the nuts and bolts of getting things done. [*Id.*] There is no unique and confidential methodology that Advantage or other companies use to generate a competitive advantage. [*Id.*; *see also* Baker Dec. ¶ 13.]

In terms of his employment at Advantage, Mike Baker did not receive any specialized training. [Baker Dec. ¶ 12.] He did not obtain any trade secrets or other confidential information that would give rise to any competitive advantage available to him after his departure. [*Id.* ¶ 13.] Finally, although Mike Baker did interface with clients (including one client for whom he was asked to pay special attention), Advantage had "client teams" who were the face of the company for such clients. [*Id.* ¶ 14.] Mike Baker was not the "face" of the company such that clients would associate their goodwill towards Advantage solely with Mr. Baker. [*Id.*]

6

**B.** **Advantage Is Operated Out of California and Mike Baker's Other 2014 Employment Agreement Calls for California Law.**

While Advantage claims to be a Florida-based company, the company is actually operated out of Irvine, California as a division of Advantage Solutions, Inc. [Baker Dec. ¶ 16.] Advantage originally had a board of directors, but that board was dismissed after the company was purchased by Advantage Solutions. [Rich Dec. ¶ 1.] Key members of the Advantage executive staff (such as the Chief Information Officer) report directly to Irvine rather than anyone within Advantage itself. [Declaration of Michael S. Adler ("Adler Dec.") ¶ 4 and Ex. 1.] Functions like HR, payroll, legal, etc. are handled by Advantage from Irvine, California. [Baker Dec. ¶ 17.]

The reality of Advantage's operations is reflected in the only other employment agreement that Mike Baker signed with Advantage: a 2014 Management Retention Bonus Agreement, reflecting the fact that Mr. Baker was a key employee, signed by a California lawyer from Irvine as the Chief Legal Office of Advantage. [Baker Dec. ¶¶ 18-20 and Ex. 1.] That Agreement specifically calls for the application of California law. [*Id.*]

Likewise, after Mr. Baker gave notice, he received a call from a California attorney based in the Irvine corporate office to discuss the non-compete agreement at issue here. [Baker Dec. ¶¶ 35-37.]

By contrast, while Mike Baker regularly dealt with Advantage management in California, he had no interaction with any Advantage executive or administrator in Delaware. [Baker Dec. ¶ 22.] Except for the non-compete at issue in this case, Mr. Baker is not aware of any agreement with Advantage governed by Delaware law. [*Id.*]

**C.** **Use of Dropbox at Advantage.**

While Don Davis submitted a declaration under oath claiming that the use of the Dropbox file sharing service was "strictly forbidden" at Advantage, he acknowledged at deposition that

(a) there was no such written policy, (b) he had never heard of such a policy orally, (c) he had never directed such a policy to anyone orally, and (d) he had not inquired of anyone at Advantage before making such a claim. [Adler Dec. ¶ 5 and Ex. 1.] In fact, third-party affidavit testimony confirms testimony from Mr. Baker that Dropbox was regularly used at Advantage. [Declaration of Taylor Parkhurst ¶¶ 2-3; Baker Dec. ¶ 5.] Indeed, Advantage reimbursed Mike Baker for his Dropbox expense. [Baker Dec. ¶ 8.]

Because of the manner in which Dropbox creates and updates a virtual hard drive on a user's PC, the PC will by default reflect the use of that Dropbox account whenever *any* user makes any modification to *any* file on the shared folder. [Declaration of Greg Hooper ¶ 17.] As the Western District described it:

> DropBox is a file hosting service operated by Dropbox, Inc, that offers cloud storage, file synchronization, and client software. Dropbox allows users to create a special folder on each of their computers, which Dropbox then synchronizes so that it appears to be the same folder (with the same contents) regardless of the computer it is viewed on.

*ServiceMaster Co. v. Tesh*, No. 12-cv-2788 Ma/P, 2012 WL 12933225 *8 n. 21 (WD Tenn. November 8, 2012). As a result of this automatic synchronization, when Mr. Baker left Advantage, a forensic analysis of his Advantage computer might show considerable activity on the Dropbox drive at a time when Mike Baker himself did not access or use the drive. [*Id.*] In fact, Mr. Baker did not use that drive in connection with his leaving Advantage. [Baker Dec. ¶¶ 10, 34.]

**D.** **Mike Baker Decided to Leave Advantage After Being Asked to Misrepresent His Duties or Take a Pay Cut.**

In mid-April of 2017, Mr. Baker met with Travis King about the possibility of working at The CORE Group. [Baker Dec. ¶ 23.] Mr. Baker had known Mr. King for the better part of two

decades and considered Mr. King a personal friend. [*Id.*] Mr. Baker gave the issue some thought for the next two weeks, but decided to stay where he was. [*Id.*] He told his boss, Chuck Mascari, that he had been approached but that he had turned down The CORE Group. [*Id.*]

However, subsequent developments forced him to reevaluate his decision. [Baker Dec. ¶ 24.] During the month of June, 2017, Advantage lost its second largest client, as well as another multi-million dollar client. [*Id.*] Additional potential losses were looming on the horizon. [*Id.*] There were various discussions within the company about potential layoffs, salary cuts, no merit increases, no bonus, and similar issues. [*Id.*]

On June 26, at approximately 12 p.m. Central time, Mr. Baker had a call with Chuck Mascari and Dan Dougherty. [Baker Dec. ¶ 25.] Mr. Mascari notified Mr. Baker of cutbacks at Advantage that would mean layoffs amongst those who reported to him. [*Id.*] In addition, Mr. Mascari informed Mr. Baker that, in light of the new financial situation at Advantage, there would be pressure from the corporate offices in Irvine to cut Mr. Baker's salary. [*Id.* ¶ 26.] In order to avoid cuts to Baker's salary, Mr. Mascari proposed to justify the current salary by representing to the corporate offices in Irvine that Mr. Baker had responsibility for "profit and loss" items within my division. [*Id.*] However, as Mr. Mascari knew, Mr. Baker's division was organized in a way that makes it impossible to track "profit and loss." [*Id.*] Mr. Baker understood Mr. Mascari to present the choice between taking a salary cut or keeping his current salary by being complicit in a misrepresentation to the corporate offices in Irvine. [*Id.*] That was not acceptable to Mr. Baker. [*Id.*]

Within minutes after the noon call with Mr. Mascari, Mike Baker realized that he was no longer comfortable working at Advantage. [Baker Dec. ¶ 27.] He therefore reached out to Travis King to determine if they still had interest in his coming to work for The CORE Group. [*Id.*] Over

the next three days, Mr. Baker flew out to California to interview and then the parties negotiated a new employment agreement. [Baker Dec. ¶ 28.] They reached final agreement on terms around the end of the day on Friday, June 30, calling for Mr. Baker to start working for The CORE Group on Monday, July 10. [*Id.*] His new contract was for roughly the same compensation as his old contract. [Baker Dec. ¶ 29.] He did not leave Advantage to secure more money, but because he was no longer comfortable working at Advantage. [*Id.*]

**E.** **Mike Baker's Actions After Determining to Leave Advantage**

As the Court may recall, July 4th fell on a Tuesday this year. Many people, including Baker's immediate supervisor, were on vacation for the long weekend. [Baker Dec. ¶ 30.] Mr. Baker concluded that it did not make sense to tender a resignation at the beginning of a long weekend. [*Id.*]

With the exception of the efforts described below, he therefore engaged in "business as usual" through the July 4 holiday, and in particular, responded to any matters that arose on behalf of Advantage through that time. [Baker Dec. ¶ 31.] He then informed his immediate supervisor of his resignation early on July 5, 2017. [*Id.*]

During the intervening period, Mr. Baker did take a few actions in preparation for leaving his employment. [Baker Dec. ¶ 32.] Most particularly, he downloaded various personal files from his work computer to a USB drive. [*Id.*] These included family pictures, physical therapy videos, personal tax returns, and other personal documents that he had saved on his Advantage computer over the years. [*Id.*] He also downloaded his personal contacts (which date back many years before he started work at Advantage Waypoint) and his calendar. [*Id.*] He did not download any emails, or any proprietary Advantage Information. [*Id.*] He only copied to his USB drive files that related to him personally. [*Id.*] Forensic analysis of the USB drive has shown only files

personal to Mr. Baker having been copied to the drive in 2017, and they do not show that he deleted any files after he met with The Core Group this year. [Hooper Dec. ¶¶ 14-15.][3]

As Mr. Baker understood the procedure at Advantage, his work computer would be reassigned to another employee of Advantage Waypoint or another division of Advantage Solutions, Inc. after being returned to the company. [Baker Dec. ¶ 33.] Although the IT department is supposed to wipe the hard drives before sending onto a new user, he did not feel comfortable relying on the IT department to wipe such personal files from the hard drives. [*Id.*] He therefore deleted his personal files from the Advantage work computer. [*Id.*] He did not, however, intend to delete any information specific to Advantage and he is not aware of any Advantage information on that computer that was unique to the computer. [*Id.*] In other words, he did not intend to (nor is he aware that he did) destroy any Advantage information. [*Id.*]

Mr. Baker certainly did not download any information from Advantage Waypoint to any Dropbox drive in preparation for leaving Advantage, nor did he copy any information from Dropbox to any other source. [Baker Dec. ¶ 34.] Although he understands that Dropbox was installed on his system and may have operated automatically when other users modified shared folders, he cannot recall accessing Dropbox myself within 30 days before he left Advantage. [*Id.*] He is certain that he has not accessed his Dropbox account since that time. [*Id.*]

**F.     Current Nexus With California**

Mike Baker currently works for The CORE Group. [Baker Dec. ¶ 38.] The CORE Group was founded in California. [Declaration of Travis King ("King Dec.") ¶ 4.] CORE's first

---

[3] The USB drive does appear to have forensic evidence that Mr. Baker had used it while working for Advantage in 2016 and that he had deleted those files well before even the initial conversation in March of 2017. [Hooper Dec. ¶ 14.] This evidence shows only that Mr. Baker reused what appeared to be blank USB drive that he had, in fact, previously used at Advantage but which no longer appeared to have any files on it visible outside forensic analysis. [*Id.*]

acquisition was in California. [*Id.*] California is the state where The CORE Group generates the most revenue and profit, where the most employees are located, the most senior management employees are located, and the corporate headquarters are located. [*Id.*] Mike Baker reports to Travis King (who is in California) and Mr. Baker oversees employees in California. [Baker Dec. ¶ 38.]

## G. <u>Harm From the Proposed Injunction</u>

The proposed injunction would impose significant harm on Mr. Baker. As an initial matter, if he were enjoined from working at The CORE Group, he would expect to be ineligible for any bonus. [Baker Dec. ¶ 40.] While his agreement with The CORE Group does not guarantee any such bonuses, senior executives in the industry often receive tens of thousands of dollars in discretionary bonuses for meeting or exceeding targets. [*Id.*] He has expectations that, if allowed to perform his duties, he will earn such bonuses over the next eighteen months. [*Id.*]

More importantly, there will likely be long-term repercussions if he is unable to work in the industry for the next eighteen months. [Baker Dec. ¶ 41.] As an initial matter, he understands that Advantage has circulated allegations that he stole confidential information, and an injunction against him will create an impression that such allegations have merit even though they do not. [*Id.*] Second, this is an industry in which personal relationships are important, and being out of the industry for eighteen months will risk his relationships becoming stale. Last, but certainly not least, his career will be sidetracked and he runs a significant risk that he will be passed over for promotions or other opportunities that would be available were he to continue to work for his employer. [*Id.*; *see also* King Dec. ¶ 20.]

### III.    ANALYSIS

Plaintiff's motion for a preliminary injunction presents two basic issues.  The first issue is whether Advantage has demonstrated a likelihood that Mike Baker stole Advantage proprietary information.  If the Court finds such a likelihood, Mr. Baker acknowledges that an injunction of some variety would be appropriate.  If, as Mr. Baker contends, the evidence does not demonstrate any such theft, then there is no basis to issue a preliminary injunction as it relates to any alleged breach of any confidentiality obligation on Mr. Baker.

The second issue is whether Advantage can demonstrate a likelihood of success on its attempt to enforce the covenant not to compete.  If the Court finds that Advantage is likely to be able to enforce that covenant, then again Mr. Baker acknowledges that an injunction of some variety will be appropriate.  If, however, Tennessee or California law is likely to apply to the covenant, then it is unlikely that Advantage will be able to enforce that covenant and no injunction would be appropriate as relates to the alleged obligation not to compete.

### A.    The Evidence Does Not Support a Claim That Mike Baker Took Proprietary Information (And He Did Not)

This is essentially an issue of fact, and while the Court will make its own determination following live testimony, the evidence already on the record supports Mr. Baker's testimony that he did not take any proprietary information.

In particular, as discussed above, the Advantage claim that Mike Baker stole proprietary documents depends on (a) an inference from the fact that Mr. Baker's PC reflects Advantage document activity on his Dropbox account after Mr. Baker decided to leave Advantage, and (b) an inference from the fact that he copied unspecified files to a USB drive from the same work PC after deciding to leave Advantage.

Neither inference stands up to scrutiny.

13

The first inference depends on the false testimony that the use of Dropbox violated Advantage policy and was therefore likely illicit. As discussed above, that false testimony was made without any basis in fact, and third-party testimony confirms Mr. Baker's own testimony that Dropbox was regularly used at Advantage. Indeed, Advantage reimbursed Mr. Baker for the expense of the Dropbox service. Mr. Baker accepts that computer forensics reflects Advantage activity on the shared folder of his virtual Dropbox drive, but it does not show that *he* engaged in such activity - and he did not. The activity on the shared folder of the virtual Dropbox drive was a feature of normal operations at Dropbox and demonstrates only that Mike Baker had access to a drive that others were using at Advantage until he left.

The second inference is disproved by examination of the USB drive itself, which confirms Mr. Baker's testimony. He did copy files to the USB drive, but they were personal files and did not reflect proprietary information of Advantage. This is merely a red-herring.

**B.** **California or Tennessee Law Should Apply and The Covenant Not to Compete Is Unenforceable**

1. The Court Applies Forum Law to Determine What Substantive Law Applies.

This is a diversity case. In exercising its diversity jurisdiction, a federal district court must apply the choice of law rules of the state in which is located. *Waltzer v. Transidyne General Corp.*, 697 F.2d 130, 132 (6th Cir. 1983). In this case, that means application of Tennessee's choice of law rules. *Id.*

2. Tennessee Follows the Restatement (Second) on Conflicts

As the Tennessee Court of Appeals explained in *Vantage Technology, LLC v. Cross*:

Tennessee follows the rule of *lex loci contractus*. This rule provides that a contract is presumed to be governed by the law of the jurisdiction in which it was executed absent a contrary intent. *Ohio Cas. Ins. Co. v. Traverlers Indem. Co.* 493 S.W.2d

14

465, 467 (Tenn. 1973). If the parties manifest an intent to instead apply the laws

of another jurisdiction, then that intent will be honored <u>provided certain</u>

<u>requirements are met</u>. The choice of law provision must be executed in good faith.

*Goodwin Bros. Leasing, Inc. v. H & B Inc.*, 597 S.W.2d 303, 306 (Tenn. 1980).

The jurisdiction whose law is chosen must bear a material connection to the

transaction. *Id.* The basis for the choice of another jurisdiction's law must be

reasonable and not merely a sham or subterfuge. *Id.* <u>Finally, the parties' choice of</u>

<u>another jurisdictions' law must not be "contrary to a 'fundamental policy' of a state</u>

<u>having [a] materially greater interest' and whose law would otherwise govern."</u> *Id.*

n.2 (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187(2)

(1971).

*Vantage Technology LLC v. Cross*, 17 S.W.2d 637, 650 (Tenn. App. 1999) (emphasis added).

    3.    <u>The Delaware Choice of Law Provision Should Not Be Applied</u>

As an initial matter, Mr. Baker believes that the choice of Delaware law was not made in

good faith and that it was a subterfuge to avoid application of fundamental California public policy

which – as reflected by the Management Retention Bonus Agreement executed the same year –

would otherwise have governed the relationship between the parties. As the Court may be aware,

California statutory law expressly precludes any contract which purports to preclude a regular

employee from competing against his former employer. Cal. Bus & Prof. Code § 16600; *Edwards*

*v. Arthur Andersen LLP* 44 Cal.4th 937, 948-950 (2008) (non-competition and non-solicitation

clauses violate fundamental California public policy). Advantage is operated out of California,

and California has held that this policy applies to *any* competition over the services of any

*employer* (like Advantage or CORE) based out of California, even if the employee (like Mr. Baker) is based in another state. *Application Group v. Hunter*, 61 Cal.App.4th 881, 900-901 (1998).

However, the Court need not determine whether the choice of Delaware law was made in good faith or not, because it is clear that both Tennessee and California have a "materially greater interest" in the matter and case law in both states demonstrates that the application of Delaware non-competition law would violate the public policy of both states. In this case, there are two contracting parties (and one very interested third party). The first party, who is sought to be enjoined, is Mr. Baker and he lives and works in Tennessee. He is the only party to have signed the non-compete agreement asserted here. If the covenant not to compete is enforced, Mr. Baker will suffer the effects of that covenant more here than anywhere else.

The second party, and the interested third-party, are both employers based out of California. As noted above, California has a strong public policy in favor of allowing California employers to hire employees without such employees being hindered by non-compete agreements. *Application Group,* 61 Cal.App.4th at 900-901. By contrast, Delaware has only a limited connection with this dispute, since while the employers are incorporated in Delaware, neither maintains any executive officers there and the financial impact of the dispute will not be felt in Delaware.

     a.   <u>The Terms Violate California Public Policy And Should Not Be Enforced</u>
                  <u>Pursuant to California Law</u>

The question of whether there is a conflict between Delaware law and California law is a simple one. Delaware typically allows enforcement of covenants not to compete, while California flatly precludes them. Indeed, as noted above, the California courts have explained that California

public policy on this is not only fundamental but reaches any out-of-state employee who works for a California employer:

> [California Business & Professions Code S]ection 16600. . . ensures that California employers will be able to compete effectively for the most talented, skilled employees in their industries, wherever they may reside .... [and] California has a correlative interest in protecting its employers and their employees from anticompetitive conduct by out-of-state employers. [*Furthermore, t]o the extent it is invoked by a California employer to protect itself from unfair competition, . . . section 16600 . . . is all the more important as a statement of California public policy which ensures that California employers will be able to compete effectively for the most talented, skilled employees in their industries, wherever they may reside*. In this day and age—with the advent of computer technology and the concomitant ability of many types of employees in many industries to work from their homes, or to 'telecommute' to work from anywhere a telephone link reaches— an employee need not reside in the same city, county, or state in which the employer can be said to physically reside. *California employers . . . have a strong and legitimate interest in having broad freedom to choose from a much larger, indeed a 'national,' applicant pool in order to maximize the quality of the product or services they provide, as well as the reach of their 'market.' California has a correlative interest in protecting its employers and their employees from anticompetitive conduct by out-of-state employers . . . including litigation based on a covenant not to compete to which the California employer is not a party*.

*Application Group*, 61 Cal.App.4th at 900-901 (emphases added).

      b.   <u>The Terms Violate Tennessee Public Policy</u>

To determine whether there is a conflict between Delaware law and Tennessee law, the case of *Dill v. Continental Car Club, Inc.* supplies the answer. *Dill v. Continental Car Club, Inc.*,

E2013-00170-COA-R3-CV, 2013 WL 5874713, *11-12 (Tn. App. October 31, 2013). In *Dill*, the parties selected Florida law, but the Tennessee Court of Appeals concluded that Florida law on non-competes violated Tennessee public policy. *Id.* Specifically, the Tennessee Court of Appeals found that Florida law violated Tennessee public policy *inter alia* because Florida law did not construe such covenants narrowly whereas Tennesee public policy is generally opposed to covenants not to compete unless justification is shown beyond mere competition. *Id.*

Delaware law likewise suffers from the same characteristic as Florida law. *See generally Concord Steel, Inc. v. Wilmington Steel Processing Co.*, 3369-CVP, 2009 WL 3161643, * 12 (Del. Ch. Ct. Sept. 30, 2009) (adopting "broader of the two options" for construing covenant not to compete); *see also Vitalink Pharmacy Servs., Inc. v. Grancare, Inc.,* 15744, 1997 WL 458494 *11 n.54 (Del. Ch. Ct. August 7, 1997) (rejecting proposition that covenants not to compete are disfavored by Delaware). As such, for the reasons identified by the Tennessee Court of Appeals in *Dill*, Delaware law violates Tennessee public policy and should not be applied. *Dill*, 2013 WL 5874713 at *11-12.

### c. The Covenant Cannot Be Enforced Under Tennessee Law

As discussed above, covenants not to compete are disfavored in Tennessee. *Hasty v. Rent-A-Driver*, 671 S.W.2d 471, 472 (Tenn. 1984). Each case is fact driven, and must be decided on an *ad hoc* basis. *Allright Auto Parks, Inc. v. Berry*, 219 Tenn. 280, 285 (1966) ("Each case must stand or fall on its own facts"). While covenants not to compete can be enforced under the right circumstances, "the basic requirement for the enforceability of a covenant not to compete is the existence of a legitimate business interest which is properly protectable and . . . [t]here is no legitimate interest in protection from competition, only from *unfair* competition." *Girtman &*

*Associates, Inc. v. St. Amour*, M2005-0096-COA-R3-CV, 2007 WL 1241255 (Tenn. App. 2007) (emphasis added). The Tennessee Supreme Court has explained this distinction as follows:

> It would be contrary to our commitment to the freedom of the marketplace to allow an employer to use a restrictive covenant to prevent ordinary competition from former employees. To enforce a covenant not to compete, the employer must be able to show the presence of special facts above and beyond ordinary competition that would give the employee an unfair advantage when competing with his former employer.

*Selox, Inc. v. Ford*, 675 S.W.2d 474, 476 (Tenn. 1984).

The cases discussing a "legitimate business interest" in Tennessee have identified three factors that may, individually or together, demonstrate a legitimate business interest beyond merely protecting competition. *Vantage Technology LLC v. Cross*, 17 S.W.3d 637, 644 (Tenn. App. 1999). The first is specialized training that would give the defendant an advantage if allowed to use it for a competitor. *Id.* However, the training must be specific to the employer: expensive training is not a protectable interest if the knowledge and skill are not peculiar to the former employer. *Girtman*, 2007 WL 1241255 at * 7 (citing *Corbin v. Tom Lange Co., Inc.*, No. M2002-01162-COA-R3-CV, 2003 WL 22843167 (Tenn. App. Dec. 1, 2003) (Tenn.R.App.P. 11 perm. App. Denied Oct. 4, 2004). In this case, Advantage has not identified any specialized training, and Mr. Baker did not receive any specialized training. This factor cannot support a prohibition on competition.

The second factor is possession of trade secrets or other confidential information. As this Court has previously noted, the terms "trade secrets" and "confidential information" are synonymous and purportedly confidential information will not qualify as a legitimate business

interest if it does not meet the definition of a trade secret. *Hickory Specialties, Inc. v. Forest Flavors Int'l, Inc.*, 26 F.Supp.2d 1029, 1032 (MD Tenn. 1998); *see generally Heyer-Jordan & Assoc. v. Jordan*, 801 S.W.2d 814, 820-22 (Tenn. App. 1990). As this Court explained in *Hickory:*

> Even where a former employee signs a contract promising never to divulge
> confidential information such as customer lists and so forth, that contract is
> only enforceable to the extent that the information in question actually is (1)
> secret, (2) business related, and (c) afforded the employer a competitive
> advantage.

*Hickory Specialties.*, 26 F.Supp.2d at 1032. The plaintiff has the burden of demonstrating that the former employee has access to customer lists or other information that could not be obtained through other sources. *Girtman,* 2007 WL 1241255 at *6; *see generally American Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir. 1998) (employee may use contacts, and plaintiff bears burden to demonstrate information is secret). Likewise, pricing information that is common knowledge or which changes regularly will also not constitute a trade secret. *Id.* *7; *see also Amarr Co., Inc. v. Depew*, No. 03A01-9511-CH-00412, 1996 WL 600330, *4 (Tenn. App. Oct. 16, 1996) (reversing judgment on grounds that "general information available in the trade" would not support a covenant not to compete). Moreover, the mere fact that a party once had access to voluminous confidential information is not relevant if he has not retained that information and credibly does not remember it. *ServiceMaster Co. v. Tesh*, No. 12-cv-2788 Ma/P, 2012 WL 12933225 *13 (WD Tenn. November 8, 2012). Lastly, when it comes to trade secrets, it is worth noting that a plaintiff must identify their trade secret with specificity and explain *how* it provides an alleged competitive advantage. *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583-84 (7th Cir. 2002). Vague statements are not sufficient to meet the burden.

Here, Advantage asserts that Mike Baker engaged in wholesale theft of Advantage proprietary documents when he left. As discussed above, however, the evidence not only fails to support that claim but forensic analysis of the USB drive confirms the opposition. So the question is whether Mike Baker – simply by being employed at Advantage – was privy to protectable, secret information that (a) he would retain after he left, and (b) that would provide a competitive advantage. *Hickory Specialties*, 26 F.Supp.2d at 1032; *see generally Ventury Exp., Inc. v. Zilly*, 973 S.W.2d 602, 606 (Tenn. App. 1998) (typically not confidential are "(1) Remembered information as to a business's prices; (2) The specific needs and business habits of certain customers, and (3) An employee's personality and the relationships which he has established with certain customers."); *Stangenberg v. Allied Distrib. And Building Co. Inc.,* 86-12-11, 1986 WL 7618, *7 (Tenn. App. July 9, 1986). The short answer is that Advantage has not even tried to demonstrate this, and they have not tried because there is no such information. *See generally PartyLine Gifts, Inc. v. Swiss Colony Occassions*, 246 Fed.Appx. 969, 973-974 (6th Cir. 2007) (rejecting claim that lists of sales consultants were company trade secret).

Finally, under Tennessee law, the third factor that could support a covenant not to compete is where the employee has become the "face" of the former employer such that the consuming public associates the company's goodwill with that individual. *Hinson v. O'Rourke*, No. M2014-00361-COA-R3-CV, 2015 WL 5033908, *4. This means plaintiff must do more than show that the defendant represented the former employer. *Id.* *4.

Here, while Advantage notes that Mr. Baker was asked to assist with one particular client, Advantage does not attempt to show that the client considered Mr. Baker the "face" of Advantage and for good reason. Advantage maintains client teams that represent Advantage with the clients, and in general, Mr. Baker was not responsible for maintaining relationships with any specific

21

client.  Even the example cited by Advantage does not change this analysis: Mr. Baker's personal relationship may have helped smooth relations with the client, but he did not replace the client team and the client would not have perceived Mr. Baker as embodying the goodwill that the organization as a whole had developed.

In short, none of the factors that support a covenant not to compete apply here, either individually or in concert.  Even if the Court declines to apply California law, it should apply Tennessee law and the motion should be denied.

    4.   <u>If Any Injunction Were to Issue, It Should Be Limited to the Protectable Interest</u>

To the extent that the Court determines that Advantage is likely to prevail on any of its claims under the applicable law, the Court would then have to determine what sort of injunction would be appropriate.  As the Sixth Circuit has observed:

> "'There is no power the exercise of which is more delicate, which requires greater caution, deliberation, and sand discretion, or more dangerous in a doubtful case, than the issuing of an injunction [sic]'" [*Detroit Newspaper Publis. Ass'n v. Detroit Typographical Union No. 18*, 471 F.2d 872, 876 (6th Cir. 1972)] *quoting* 3 Barron & Holzoff, Federal Practice and Procedure (Wright Ed.) § 1431.  Precisely because equitable relief is an extraordinary remedy to be cautiously granted, it follows that the scope of the relief sought should be strictly tailored to accomplish only that which the situation specifically requires . . .

*Aluminum Workers Intern. Union, AFL-CIO, Local Union No. 215 v. Consolidated Aluminum Corp.*, 696 F.2d 427, 446 (6th Cir. 1982).

Even under Delaware law, which is far more aggressive on covenants not to compete than Tennessee law (or California law), injunctions are limited to the protectable interests at issue:

> The Court cannot risk greater harm to the defendants, the public or other identified interests, than it seeks to prevent. Nor will equity enforce an oppressive covenant or one that goes further than the legitimate interests of the plaintiff justify.

*Vitalink Pharmacy Servs., Inc. v. Grancare, Inc.*, No. 15744, 1997 WL 458494 * 11 (Del. Ct. Ch. August 7, 1997).

Mr. Baker does not believe Advantage has any protectable interests which would be violated merely by the fact of his working for a competitor. He does not believe he possess (and certainly is not using) any protectable trade secret belonging to Advantage. However, to the extent that the Court determines that Advantage is likely to prevail on either point, Mr. Baker respectfully requests that any injunction be narrowly tailored to the issue identified by the Court.[4]

## IV.    **CONCLUSION**

For the reasons discussed above, the Defendant Mike Baker respectfully requests that the motion for a preliminary injunction be denied.


Respectfully submitted,

  s/J. Britt Phillips_____
  J. BRITT PHILLIPS, #20937
  CHRISTOPHER J. SCHROECK, #31875

---

[4] In addition, to the extent that any injunction issues at all, the Court should require a bond pursuant to Federal Rule of Civil Procedure 65(c), which requires a bond sufficient to "pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." F.R.C.P. 65(c).

23

**Sutter O'Connell Co.**
341 Cool Springs Blvd Suite 430
Franklin, TN 37067
(615) 771-5008
e-mail: bphillips@sutter-law.com
cschroeck@sutter-law.com

MICHAEL S. ADLER, pro hac
**Tantalo & Adler LLP**
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
(310) 734-8695
e-mail: madler@ta-llp.com

*Counsel for Michael Baker*

## CERTIFICATE OF SERVICE

I hereby certify that on August 2, 2017, a copy of **Opposition to Motion for a Preliminary Injunction w**as filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's electronic filing system:

William S. Rutchow #7183
**Ogletree, Deakins, Nash, Smoak & Stewart, PC**
401 Commerce Street Suite 1200
Nashville TN 37219

Justin M. Scott, pro hac
**Paul Hastings LLP**
101 California Street 48th Floor
San Francisco CA 9411

Elena Baca, pro hac
**Paul Hastings LLP**
515 South Flower Street, 25th Floor
Los Angeles CA 90071

*Counsel for Plaintiff*

 s/J.Britt Phillips
J. Britt Phillips

24

# APPENDIX TO OPPOSITION TO MOTION FOR A PRELIMINARY INJUNCTION

Application Group, Inc. v. Hunter Group, Inc., 61 Cal.App.4th 881 (1998)

72 Cal.Rptr.2d 73, 1998-1 Trade Cases P 72,076, 13 IER Cases 1366...

KeyCite Yellow Flag - Negative Treatment

Distinguished by Troisi v. Cannon Equipment Co., Cal.App. 4 Dist., May 25, 2010

61 Cal.App.4th 881, 72 Cal.Rptr.2d 73, 1998-1 Trade Cases P 72,076, 13 IER Cases 1366, 98 Cal. Daily Op. Serv. 1317, 98 Daily Journal D.A.R. 1808

APPLICATION GROUP, INC., et al., Plaintiffs and Respondents,

v.

HUNTER GROUP, INC., Defendant and Appellant.

No. A071528.

Court of Appeal, First District, Division 3, California.

Feb 23, 1998.

## SUMMARY

A California corporation recruited and hired an employee of a competitive Maryland corporation, in spite of a covenant not to compete in the employee's employment contract with the Maryland corporation. In the ensuing declaratory relief action brought by the employee and the California corporation, the trial court declared that the covenant not to compete was illegal, based on Bus. & Prof. Code, § 16600 (restraint of trade), and Bus. & Prof. Code, § 17200 (unfair competition). (Superior Court of the City and County of San Francisco, No. 951106, Roy L. Norman, Judge,* and William J. Cahill, Judge.)

The Court of Appeal modified the judgment to delete those portions relating to the employee's individual claims for relief and, as modified, affirmed. The court held that those claims were moot, since the one-year period of the noncompetition covenant had expired. The court also held that since it was necessary to resolve the dispute, the trial court did not abuse its discretion by granting declaratory relief relating to employees of the Maryland corporation who were residents of California, even though the Maryland corporation conceded that it could not lawfully require a California resident to agree to a noncompetition covenant. The court further held that the trial court properly applied California law to rule that the noncompetition clause was rendered unenforceable by Bus. & Prof. Code, §§ 16600 and 17200. California and Maryland had diametrically opposed laws regarding the enforceability of the noncompetition clause, and Bus. & Prof. Code, § 16600, reflects a strong public policy. The

court also held that nonresident businesses can be held to account for wrongful business conduct affecting California employers and employees under Bus. & Prof. Code, § 17200. (Opinion by Phelan, P. J., with Parrilli and Walker, JJ., concurring.)

## HEADNOTES

### Classified to California Digest of Official Reports

([1a], [1b])

Declaratory Relief § 7--Actual Controversy--Determination of Preliminary Matter.

In a declaratory relief action brought by a California computer consulting corporation that had recruited and hired an employee of a competitive Maryland corporation in spite of her covenant not to compete, the trial court did not abuse its discretion by granting declaratory relief relating to other employees of the Maryland corporation who were residents of California, even though the Maryland corporation conceded that it could not lawfully require a California resident to agree to a covenant not to compete. It was necessary to resolution of the dispute concerning the employee for the trial court to determine as a preliminary matter whether the particular noncompetition clause used by the Maryland corporation would be enforceable if required of California employees. However, because the employee's one-year covenant term had expired and final judgment had been entered in her favor in a Maryland lawsuit, her individual claims for declaratory relief were moot.

([2])

Declaratory Relief § 12--Trial And Appeal--Appellate Review.

Whether a determination is proper in an action for declaratory relief is a matter within the trial court's discretion, and the court's decision to grant or deny relief will not be disturbed on appeal unless it is clearly shown that the discretion was abused. Whether an action is justiciable for purposes of the Code Civ. Proc., § 1060, is also a matter entrusted to the sound discretion of the trial court.

([3a], [3b], [3c])

Conflict of Laws § 5--Contracts--Employee's Covenant Not to Compete in Contract With Out-of-state

Application Group, Inc. v. Hunter Group, Inc., 61 Cal.App.4th 881 (1998)

72 Cal.Rptr.2d 73, 1998-1 Trade Cases P 72,076, 13 IER Cases 1366...

Corporation--California Public Policy:Employer and Employee § 4--Contracts of Employment.

In a declaratory relief action brought by a California computer consulting corporation that had recruited and hired an employee of a competitive Maryland corporation in spite of her covenant not to compete, the trial court properly applied California law to rule that the Maryland noncompetition clause was rendered unenforceable by Bus. & Prof. Code, §§ 16600 (restraint of trade), and 17200 (unfair competition). California and Maryland had diametrically opposed laws regarding the enforceability of the employee's noncompetition clause: California law rendered such provisions void (Bus. & Prof. Code, § 16600), while Maryland law permitted them so long as they are reasonable in scope and duration. The trial court correctly declined to enforce the contractual conflict of law provision in the Maryland employment agreement, since Bus. & Prof. Code, § 16600, reflects a strong public policy, particularly important in its out-of-state application in these days of telecommuting and virtual employment, and California had a materially greater interest than Maryland in the application of its law to the parties' dispute. Furthermore, the Maryland corporation had significant contacts with California, which included head-to-head competition with the California corporation for California customers.

[See 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, §§ 45, 51, 62, 63.]

[4]
Conflict of Laws § 1--Governmental Interest Analysis.

California does not apply a mechanical test to choice-of-law questions. Rather, it employs the "governmental interest analysis." Under this approach, California law will be applied unless the foreign law conflicts with California law and California and the foreign jurisdiction have significant interests in having their law applied. The proper approach is for the court first to determine either: (1) whether the chosen state has a substantial relationship to the parties or their transaction, or (2) whether there is any other reasonable basis for the parties' choice of law. If neither of these tests is met, that is the end of the inquiry, and the court need not enforce the parties' choice of law. If, however, either test is met, the court must next determine whether the chosen state's law is contrary to a fundamental policy of California. If there is no such conflict, the court shall enforce the parties' choice of law. If, however, there is a fundamental conflict with California law, the court must then determine whether California has a materially greater interest than the chosen state in the determination of the particular issue. If California has a materially greater interest than the chosen state, the choice of law shall not be enforced.

[5]
Conflict of Laws § 5--Contracts--Governmental Interest Analysis-- Consideration of Relevant Contacts of Foreign State.

With the governmental interest approach to resolution of choice-of-law questions, relevant contacts of the foreign state with California are not disregarded, but are examined in connection with the analysis of the interest of the involved state in the issues, the character of the contract, and the relevant purposes of the contract law under consideration. In contract cases, these "relevant contacts" include: the place of contracting, the place of negotiation of the contract, the place of performance, the location of the subject matter of the contract, and the domicile, residence, nationality, place of incorporation, and place of business of the parties.

[6a, 6b, 6c]
Unfair Competition § 3--Unfair Trade Practices Act--Application to Nonresident Businesses.

In a declaratory relief action brought by a California computer consulting corporation that had recruited and hired an employee of a competitive Maryland corporation in spite of her covenant not to compete, the trial court properly concluded that the Maryland noncompetition clause violated Bus. & Prof. Code, § 17200 et seq. Nonresident businesses can be held to account for wrongful business conduct affecting California employers and employees.

[7a, 7b]
Unfair Competition § 3--Unfair Trade Practices Act--Scope of Prohibited Practices.

The unlawful business practices prohibited by Bus. & Prof. Code, § 17200 are any practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made. It is not necessary that the predicate law provide for private civil enforcement. Section 17200 borrows violations of other laws and treats them as unlawful practices independently actionable. An employer's business practices concerning its employees are within the scope of § 17200. Where the employer's policy or practice is forbidden by or found to violate the Labor Code or the Business and Professions Code, it may also be held to constitute an unlawful business practice subject to redress under § 17200.

COUNSEL
Thelen, Marrin, Johnson & Bridges, Charles S. Birenbaum and Thomas M. McInerey for Defendant and

Appellant.

Stephen E. Taylor, Jan J. Klohonatz and Paul Beach for Plaintiffs and Respondents.

**PHELAN, P. J.**

The Hunter Group, Inc. (Hunter or appellant), timely appeals from a judgment by which the San Francisco Superior Court declared that covenants not to compete contained in the employment contracts of Hunter consultants who do not reside in California are illegal in the circumstances of this case, and cannot be enforced against respondents The Application Group, Inc. (AGI), a California-based corporation, and Dianne Pike (Pike), a resident of Maryland and former Hunter consultant who was recruited to work for AGI in California in 1992. The trial court's judgment **\*885** was based on sections 16600 and 17200 of the California Business and Professions Code.[1]

On appeal, Hunter contends: (1) There is no "actual controversy" between or among the parties and, therefore, certain of AGI's and Pike's claims for declaratory and injunctive relief are not justiciable; (2) the enforceability of the relevant covenants not to compete must be determined under the law of Maryland, not California; and (3) under Maryland law, the covenants not to compete are lawful and enforceable.

We conclude the trial court did not abuse its discretion in determining that AGI's claims are justiciable. We further conclude, in agreement with the trial court, that California law may be applied to determine the enforceability of a covenant not to compete, in an employment agreement between an employee who is not a resident of California and an employer whose business is based outside of California, when a California-based employer seeks to recruit or hire the nonresident for employment in California. However, we agree with Hunter that the trial court abused its discretion by granting declaratory relief in favor of Pike, whose individual claims became moot during the pendency of the proceedings below. Accordingly, we vacate those portions of the judgment relating to Pike's individual claims for relief. As thus modified, the judgment will be affirmed.

## I. Factual and Procedural Background

### A. *The Parties.*

Hunter is a privately held Maryland corporation, with its headquarters in Maryland. It provides computer consulting services for businesses that use human resources software, including software manufactured by the California-based company, PeopleSoft, Inc. Hunter maintains a branch office in San Francisco, California, as well as in Georgia, Illinois, New York, and Massachusetts. Hunter frequently competes with AGI and other California-based companies for consulting projects. Although its business is centered primarily in the eastern United States, Hunter has provided and continues to provide consulting services to customers in California.

Between October 1992 and July 1993, Hunter employed six computer consultants and one administrative assistant who were California residents. **\*886** None of these employees had a covenant not to compete in their employment agreements. However, all of Hunter's employees who reside outside of California and work primarily in other states do so under covenants not to compete, which prevent them from working for any of Hunter's competitors for up to one year from termination unless the employee is laid off for economic reasons.

Between August 1993 and May 1994, Hunter performed no billable work in California.[2] However, in 1994, Hunter again attempted to enter the California computer consulting market. By late 1994, Hunter had ninety employees nationwide, only two of whom resided in California, and five California-based customers. At this time, too, the employment agreements of all of Hunter's non-California resident employees contained covenants not to compete, but those of the two California residents did not. To increase its capacity in California, Hunter assigned temporary projects in California to employees from other states.

AGI is a California corporation, with its headquarters in San Francisco, California. It is a subsidiary of Automatic Data Processing, a publicly held corporation, and maintains offices in Georgia, Illinois, and New Jersey. Like Hunter, AGI provides its customers with the services of trained, specialized computer consultants who frequently travel substantial distances to work directly on the customer's premises. Sometimes these consultants travel from their home state to the customer's location for a project of extended duration. Competition for the limited number of qualified computer consultants among prospective employers-including Hunter and AGI-is "stiff." As of the end of 1994, AGI employed 106 consultants nationwide, 30 of them in California.

AGI and Hunter are structured differently and manage their employees in different ways. AGI conducts both its in-state and out-of-state business from its San Francisco headquarters. AGI's employees are treated as California employees; all AGI employees are residents of, work in,

Application Group, Inc. v. Hunter Group, Inc., 61 Cal.App.4th 881 (1998)

72 Cal.Rptr.2d 73, 1998-1 Trade Cases P 72,076, 13 IER Cases 1366...

or are managed from California, and, with one exception, have employment agreements governed by California law. Unlike Hunter, AGI does not vary the terms of its employment agreements depending upon the employee's state of residence. AGI does not require a covenant forbidding employment with its competitors.

Pike is a consultant who is skilled in computerized human resources management systems, the field in which Hunter and AGI compete. She has **887** been a resident of Maryland since 1963, and was hired by Hunter in 1991. During the 16 months she was employed by Hunter, Pike worked at Hunter's Baltimore offices and at various customer sites in Arizona, Colorado, Massachusetts, and New York. It is undisputed that Pike never set foot in California, even for pleasure, during the time she was employed by Hunter.

Hunter objected to AGI's recruitment and hiring of Pike, and demanded she withdraw her resignation and continue service under her employment contract. When Pike refused, Hunter sued her in the Circuit Court for Montgomery County, Maryland, in an action entitled Hunter Group, Inc. v. Pike (No. 95647), for breach of the covenant not to compete contained in her employment agreement. Hunter also sued AGI for unlawful interference with that contractual relationship. That action was concluded in May 1994, following presentation of the plaintiff's case, when the Maryland court granted Pike's and AGI's motion for judgment because of Hunter's failure to present any evidence of damages.[3]

### B. *Hunter's Covenant Not to Compete.*

The covenant not to compete contained in Pike's employment contract is similar to those used by Hunter with respect to all its employees who may or may not work in, but are not residents of, California. The covenant in Pike's employment contract provided: "During the term of [her] employment, and for a period of [one year] after the date of its termination, [Pike] agrees that [she] will not render, directly or indirectly, any services of an advisory or consulting nature, whether as an employee or otherwise, to any business which is a competitor of [Hunter]." The noncompetition clause does not apply where the employee is "terminated by [Hunter] for economic or budgetary reduction purposes." Pike's employment contract expressly provided it was to be "governed by and construed in accordance with the laws of the State of Maryland."

Hunter uses the covenant not to compete for the admitted purpose of deterring and preventing the solicitation, recruitment and hiring of Hunter's employees by its competitors, especially those in California. Hunter intends **888** that the covenant not to compete will serve as a complete barrier between its competitors and all of its employees. Hunter's use of the covenants not to compete also allows it to avoid a "bidding war" that would increase the salary of its consultants. Hunter has admitted its consultants cannot, and do not, shop for a potential offer from a competitor to obtain leverage in salary negotiations with Hunter. Hunter has objected, and continues to object, to what Hunter calls AGI's "poor business practice" of "trying to hire [Hunter's] people and steal them away from all their competitors." Indeed, Hunter's president testified that the covenant not to compete was designed to "scare [AGI] away" from soliciting its employees and that, until the Maryland action, Hunter's strategy had "worked quite well for three years."

Hunter endeavors to assure the efficacy of its covenant not to compete by repeatedly notifying competitors in California, including AGI, that they are not to solicit, recruit, or hire any Hunter employee in California. For example, in a letter of July 20, 1989, Hunter warned AGI, as follows: "[Y]ou should be aware [Hunter] has secured very strict employment agreements with each staff that disallows working for a competitor company or in a competitive position after leaving Hunter. We would seek an injunction barring any provision of similar services by Hunter employees hired by [AGI]." Similarly, during the pendency of this action in August 1994, Hunter warned AGI in writing to "cease and desist its solicitation of [Hunter] employees." Hunter's covenant not to compete has, in fact, chilled the interest of Hunter's consultants to seek employment with its competitors, and has chilled AGI's efforts to solicit and recruit such consultants.

### C. *The Instant Action.*

AGI and Pike filed their original verified complaint in San Francisco Superior Court on April 16, 1993, seeking a declaratory judgment that section 16600, and not Maryland law, applied to Pike's covenant not to compete and AGI's recruitment of Pike. At that time the Maryland action was still pending, and Hunter successfully moved the San Francisco court on forum non conveniens grounds for a stay of the action pending completion of Maryland litigation. On January 20, 1994, AGI and Pike jointly filed a verified first amended complaint for declaratory relief.

In their amended complaint, AGI and Pike first sought a declaration that California law, specifically sections 16600 and 17200, and not Maryland law, applied to Pike's covenant not to compete, and that Hunter would be prohibited from enforcing any judgment obtained in the

WESTLAW    © 2017 Thomson Reuters. No claim to original U.S. Government Works.                    4

Application Group, Inc. v. Hunter Group, Inc., 61 Cal.App.4th 881 (1998)

72 Cal.Rptr.2d 73, 1998-1 Trade Cases P 72,076, 13 IER Cases 1366...

Maryland action. Second, AGI sought a declaration that these California statutes provided it with a "privilege" to contact and recruit any Hunter consultant, wherever he *889 or she resided or worked, who was employed under a covenant not to compete. Third, AGI sought a declaration that, by including an illegal noncompetition provision in its employees' contracts, Hunter was engaging in "unfair competition" within the meaning of section 17200. Finally, AGI sought a declaration that, pursuant to sections 16600 and 17200, Hunter was precluded from enforcing in California any out-of-state judgment or injunction it "might obtain" which upholds the validity of its covenant not to compete.

### D. *The Trial Court's Orders.*

The parties filed cross-motions for summary judgment or, in the alternative, summary adjudication, in the law and motion department of the San Francisco Superior Court. On December 13, 1994, the Honorable William Cahill issued an order granting AGI's motion in part, ruling as follows: (1) As a matter of law, California law applies to the actions of AGI in *calling and recruiting from California*, any Hunter consultants or former consultants who have covenants not to compete in their employment contracts. (2) Sections 16600 and 17200 permit AGI to recruit and hire from California any Hunter consultants who are *residents of California*, and the use by Hunter of covenants not to compete, for such employees, is illegal under sections 16600 and 17200. (3) California law applied to *Pike's* covenant not to compete, which was "invalid and unenforceable in California" as to her but, in any event, the covenant with Hunter no longer prohibited her from working for AGI. Judge Cahill *denied* AGI's motion to the extent it sought a declaration that Hunter's covenant is unenforceable against its consultants "who work or have worked in California, or who report to or are managed from, or have reported to or have been managed from, any [Hunter] California office," ruling that "[a] case-by-case evaluation is needed for these individuals." Judge Cahill also ruled that case-by-case evaluation would be necessary for any out-of-state judgment or injunction against AGI because of its recruitment or hiring of a Hunter employee who has a covenant not to compete. Finally, Judge Cahill declined to recognize a "privilege," based on sections 16600 and 17200, in favor of AGI.[4]

The balance of the case proceeded to trial in January 1995 before the Honorable Roy Norman, an assigned judge. The matter was submitted after a half-day of live testimony by AGI's president, William Campbell, and the filing of a stipulated statement of facts.

On January 30, 1995, Judge Norman issued a statement of decision, denying AGI's claims for declaratory relief. However, on April 5, 1995, *890 in response to AGI's objections to the proposed statement of decision, Judge Norman issued a revised statement of decision which, for the most part, adopted the rationale of Judge Cahill's prior ruling. Judge Norman also ruled-for the first time-that Hunter's covenant not to compete is an "unenforceable contract [] to restrain trade," the use of which constitutes "unfair competition" in violation of section 17200. More specifically, in his final statement of decision, Judge Norman ruled that AGI was entitled to a declaratory judgment, as follows:

"1. California law applies to [AGI's] hiring of [Hunter] employees to engage in a profession or business in California. The reason is that California has a strong public policy concerning contracts which would prohibit employment in California regardless of where the parties exchanged promises. The fact that [AGI] does the hiring itself from California is not an operative fact. The operative fact is that California is precluded from the benefits of a business or profession by contract.

"2. Sections 16600 and 17200 of the Business and Professions Code respectively do not confer a privilege. The former deprives certain contract provisions of legal recognition. The latter is a definition. Each separate [*sic*] and in combination are limitations on conduct to promote public policy. Under Section 17203, [AGI] is given the privilege of enforcing that public policy in its own interest to prevent its breach. The effect of Business and Professions Code section 16600 can be imagined to be an addendum to [Hunter's] non-compete clause to add the words 'void in California.' That neither gives the privilege to recruit or hire, it simply renders that promise unenforceable in California.

"3. With respect to [Hunter] employees who work or have worked or who report to or are managed from [Hunter's] California office, neither Business and Professions Code sections 16600 or 17200 state or imply that, foreign contracts valid where made, are vitiated by engaging in business in California. California's concern is to prevent the offending term from enforcement to the detriment of its citizens. The operative fact is not its offensive language but its offensive effect. [¶] [AGI's] recruitment efforts to secure employees for employment in California are protected by invalidating employment contracts which seek to preclude acceptance of such offers. Such efforts are not dependent on the employee's domicile nor his contacts with California. On the other hand, [AGI's] recruitment for employment beyond the borders of California are not brought under California law

Application Group, Inc. v. Hunter Group, Inc., 61 Cal.App.4th 881 (1998)

72 Cal.Rptr.2d 73, 1998-1 Trade Cases P 72,076, 13 IER Cases 1366...

so as to apply California employment restrictions of Business and Professions Code section 16600 simply because that party has California connections. **891

"4. [Hunter] is bound by California law only to the extent that its consultants are free from the stricture against employment by a competitor in a business to be performed in California. This is so without reference to present residence or employment location and whether or not the employee has engaged in any of [Hunter's] business in California.

"5. No controversy exists at this time with regard to an existing out-of-state injunction or judgment against [AGI] enforcing [Hunter's] non-compete provision. The Court therefore declines to make any declaration with respect to such injunctions or judgments.

"6. The Court declines to render declaratory relief as specifically requested in paragraphs 50-52 and 55-57⁵ of the First Amended Verified Complaint since these paragraphs, as specifically worded, are inconsistent with the law of California as this Court understands it to be and as stated herein."

Finally, Judge Norman was careful to add that the revised statement of decision, filed April 5, 1995, superseded his prior statement of decision, and that it was not intended to modify, vacate or change Judge Cahill's orders of December 15, 1994, and January 30, 1995, on the parties' cross-motions for summary judgment and summary adjudication of issues. On June 15, 1995, **892 judgment was entered based on Judge Norman's revised statement of decision and Judge Cahill's orders. Hunter timely filed a "Notice of Partial Appeal," specifying portions of this judgment.

## II. Discussion

This appeal raises one of the many interesting and difficult legal questions created by the rapid expansion of computer technology. It involves what might be called the "virtual employer," one whose employees work out of their homes, or from branch offices scattered throughout the country, or at customer sites in various states, as necessary to provide "consulting" services with respect to the customers' computerized human resources systems. Competition among such employers is fierce, both for customers and for qualified employees. The situation gives rise to potential conflicts among the laws governing solicitation, recruitment, and employment in the various states where the employees, employers and customers can be said to "reside."

In this case, we must decide whether California law may be applied to determine the enforceability of a covenant not to compete, in an employment agreement between an employee who is not a resident of California and an employer whose business is based outside of California, when a California-based employer seeks to recruit or hire the nonresident for employment in California. Before proceeding to the merits of the parties' dispute on that issue, however, we must address a few preliminary questions.

### A. Although Pike's Individual Claims Are Moot, the Trial Court Did Not Err in Adjudicating the Issue of Enforceability of Hunter's Noncompetition Clause When Invoked to Preclude Employment in California.

([11a]) Hunter contends that certain of AGI's claims about the enforceability of its covenants not to compete are not justiciable. Specifically, Hunter challenges those portions of the declaratory judgment relating to Hunter consultants who are residents of California, contending they reflect a decision on issues as to which there was and is no "actual controversy." Hunter also contends that Pike's individual claims are moot.

([2]) Code of Civil Procedure section 1060 confers standing upon "[a]ny person interested under a ... contract" to bring an action for declaratory relief "in cases of actual controversy relating to the legal rights and duties of the respective parties." "Whether a determination is proper in an action for declaratory relief is a matter within the trial court's discretion ... and the **893 court's decision to grant or deny relief will not be disturbed on appeal unless it be clearly shown ... that the discretion was abused." (Hannula v. Hacienda Homes (1949) 34 Cal.2d 442, 448 [211 P.2d 302, 19 A.L.R.2d 1268]; see also General of America Ins. Co. v. Lilly (1968) 258 Cal.App.2d 465, 471 [65 Cal.Rptr. 750].) Whether an action is justiciable for purposes of Code of Civil Procedure section 1060 is also a matter entrusted to the sound discretion of the trial court. (See Tehachapi-Cummings County Water Dist. v. Armstrong (1975) 49 Cal.App.3d 992, 998 [122 Cal.Rptr. 918].) ([1b]) In this case, we conclude the trial court did not abuse its discretion either by finding AGI's claims to be justiciable, or by granting declaratory relief in AGI's favor.

Hunter does not appear to challenge AGI's standing as a "person interested under" the noncompetition agreement. Nor does Hunter raise any issue about the justiciability of the parties' dispute about the enforceability of covenants not to compete in the employment agreements of its nonresident employees.⁶ Hunter simply contends that any

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Application Group, Inc. v. Hunter Group, Inc., 61 Cal.App.4th 881 (1998)

72 Cal.Rptr.2d 73, 1998-1 Trade Cases P 72,076, 13 IER Cases 1366...

controversy over the use of covenants not to compete for its employees residing in California is purely "conjectural" because, as a matter of corporate policy, Hunter never has and never will include a noncompetition clause in the employment agreements of its employees who reside in California.

In this regard, Hunter's justiciability argument is beside the point. It is true that Hunter never really disputed and, indeed, conceded it cannot lawfully require a covenant not to compete in the employment agreement of any employee who is a California resident. Ordinarily, declaratory relief would be inappropriate in such a situation. (See *Auberry Union School Dist. v. Rafferty* (1964) 226 Cal.App.2d 599, 602-603 [38 Cal.Rptr. 223].) However, in this case, it was *necessary* for the trial court to determine as a **894** preliminary matter whether the particular noncompetition clause used by Hunter would be enforceable if required of California employees. If so, there would have been no need to decide the central issue raised by AGI's and Pike's complaint: Whether the covenant is enforceable with respect to Hunter's nonresident employees who-like Pike-maintain their foreign domicile, but seek to engage in a business or profession in California. (§ 16600.)⁷ That the trial court chose to articulate a logical premise of its declaratory judgment was not error.

As to Hunter's mootness argument, it is true the one-year term stated in Pike's covenant had expired, and final judgment had been entered in her favor in the Maryland lawsuit, by the time the summary judgment proceedings commenced below. There is nothing to indicate that Pike faces any further liability under her noncompetition pledge, or that she is interested in becoming reemployed by Hunter (or by any other out-of-state company that requires covenants not to compete from its consultants) any time in the near future. Thus, as Hunter contends, Pike's individual claims for declaratory relief under Code of Civil Procedure section 1060, for the alleged violations of sections 16600 and 17200, were and are entirely moot.⁸ Of course, there is little to be gained by vacating those portions of Judge Cahill's order relating to Pike's noncompetition agreement. As we discuss in part II.B, *post*, the declaratory judgment in favor of AGI with respect to nonresident employees necessarily implies Hunter's noncompetition clause would be enforceable to prevent the recruitment and hiring of any employee situated precisely as was Pike. Nevertheless, this court is not in the business of deciding issues that have lost their vitality as matters in "actual controversy." Accordingly, we will vacate those portions of the judgment relating to Pike's individual claims for declaratory relief.

### B. *The Trial Court Did Not Err in Concluding That California Law Governs the Issues Presented in This Appeal.*

([3a]) Hunter's principal contention on appeal is that the trial court erred in its application of conflict of laws principles to this case. AGI counters **895** that there is no true conflict of laws issue because all of the rulings by the trial court govern conduct and activities that occur exclusively in California. We reject both of these arguments but nevertheless conclude that the trial court did not err in applying California law to the issues raised by the complaint.

It is important at the outset to clear away issues we need not decide to resolve the conflict of laws issue presented. As we have noted, there is no real dispute about the enforceability of a covenant not to compete in the employment agreement of Hunter employees who are residents of California. To the extent AGI and Pike alleged that Hunter requires a covenant not to compete from its employees who *are* California residents, Hunter has conceded that California law invalidates such provisions. It is quite clear that a covenant prohibiting a California employee from working for a competitor after termination of his or her employment violates section 16600, except in two circumstances not present here. (*Muggill v. Reuben H. Donnelley Corp.* (1965) 62 Cal.2d 239, 242 [42 Cal.Rptr. 107, 398 P.2d 147, 18 A.L.R.3d 1241]; *Metro Traffic Control, Inc. v. Shadow Traffic Network* (1994) 22 Cal.App.4th 853, 860 [27 Cal.Rptr.2d 573].) Nor is there any genuine dispute about AGI's recruitment of Hunter consultants exclusively "for employment beyond the borders of California." Judge Norman clearly ruled that California law does *not* apply to or regulate such recruitment or employment, and AGI does not object to that aspect of the trial court's judgment.

What is at issue is the trial court's ruling that Hunter's noncompetition clause is rendered unenforceable by sections 16600 and 17200 as against its nonresident consultants (such as Pike) when a California employer (such as AGI) seeks to hire them *for employment in California*.⁹ Hunter does not suggest any theory under which this use of its covenant not to compete would survive challenge if California law applies. Hunter simply contends the trial court should have decided this issue under Maryland lawin accordance with the contractual choice-of law-provision in the employment agreements of Hunter's nonresident employees-and, thus, found its noncompetition covenant to be enforceable in the present context. (See *Holloway v. Faw, Casson & Co.* (1990) 319 Md. 324 [572 A.2d 510, 515] [noncompetition agreements are enforceable so long as they are reasonable

**Application Group, Inc. v. Hunter Group, Inc., 61 Cal.App.4th 881 (1998)**

72 Cal.Rptr.2d 73, 1998-1 Trade Cases P 72,076, 13 IER Cases 1366...

in scope and duration]; *Ruhl v. F. A. Bartlett Tree Expert Co.* (1967) 245 Md. 118 [225 A.2d 288, 291] [same].) AGI, for its part, does not dispute that **\*896** Hunter's covenant not to compete would be enforceable in these circumstances if Maryland law applies, but contends that application of Maryland law to the parties' dispute would be contrary to fundamental public policy of California. Thus, we must decide whether California or Maryland law applies to a dispute over the enforceability of Hunter's noncompetition clause when a California employer (such as AGI) seeks to hire one of Hunter's nonresident consultants (such as Pike) for employment in California.

### 1. *California Choice-of-Law Principles.*

([14]) Perhaps the most comprehensive statement of the California choice of laws principles applicable to this case can be found in a federal court opinion upon which Hunter places heavy reliance. In *S. A. Empresa, etc. v. Boeing Co.* (9th Cir. 1981) 641 F.2d 746 (*S.A. Empresa*), the court observed: "California does not apply a mechanical test to choice-of-law questions. Rather, it employs the 'governmental interest analysis.' Under this approach, California law will be applied unless the foreign law conflicts with California law and California and the foreign jurisdiction have significant interests in having their law applied. [Citations.] Where significant interests conflict, the court must assess the 'comparative impairment' of each state's policies. [Citations.] The law applied will be that of the state whose policies would suffer the most were a different state's law applied. [Citations.] A separate choice-of-law inquiry must be made with respect to each issue in a case. [Citation.] [¶] The preceding rules apply regardless of whether the dispute arises out of contract or tort. [Citation.] An exception applies, however, in the case of contracts with choice-of-law provisions. California will apply the substantive law designated by the contract unless the transaction falls into either of two exceptions: [¶] 1) the chosen state has no substantial relationship to the parties or the transaction, or [¶] (2) application of the law of the chosen state would be contrary to a fundamental policy of the state. [Citations.] Under the second exception, where application of a choice-of-law provision would result in the contravention of California's public policy, the provision will be ignored to the extent necessary to preserve public policy. [Citations.]" (*Id.* at pp. 749-750; see also *Bernhard v. Harrah's Club* (1976) 16 Cal.3d 313, 319-321 [128 Cal.Rptr. 215, 546 P.2d 719] ["governmental interest" and "comparative impairment" approaches to choice of law problems]; *Sommer v. Gabor* (1995) 40 Cal.App.4th 1455, 1468 [48 Cal.Rptr.2d 235] [summarizing "comparative impairment" test]; *North*

*American Asbestos Corp.* v. *Superior Court* (1986) 180 Cal.App.3d 902, 905 [225 Cal.Rptr. 877] [application of comparative impairment test in "'true'" conflict situation]; *Dixon Mobile Homes, Inc. v. Walters* (1975) 48 Cal.App.3d 964, 972 **\*897** [122 Cal.Rptr. 202] ["comparative impairment" approach applies to both tort and contract cases].)

Recently, the *S.A. Empresa* court's exposition and application of California choice of laws rules met with the approval of our Supreme Court. (*Nedlloyd Lines B.V. v. Superior Court* (1992) 3 Cal.4th 459, 464-466 & fn. 1 [11 Cal.Rptr.2d 330, 834 P.2d 1148] (*Nedlloyd*).) The *Nedlloyd* court recognized that, although the Ninth Circuit did not expressly say so, it was applying the "modern, mainstream" approach of section 187 of the Restatement Second of Conflicts of Laws (hereinafter Restatement), and, more particularly, subdivision (2) of that section.[10] (*Nedlloyd, supra,* 3 Cal.4th at pp. 464-466, fns. 1 & 6; see also *S.A. Empresa, supra,* 641 F.2d at p. 749, citing *Gamer v. duPont Glore Forgan, Inc.* (1976) 65 Cal.App.3d 280, 287-288 [135 Cal.Rptr. 230] [explicit reference to Rest. § 187].)

The *Nedlloyd* court elaborated: "[T]he proper approach under Restatement section 187, subdivision (2) is for the court first to determine either: (1) whether the chosen state has a substantial relationship to the parties or their transaction, or (2) whether there is any other reasonable basis for the parties' choice of law. If neither of these tests is met, that is the end of the inquiry, and the court need not enforce the parties' choice of law.... If, however, either test is met, the court must next determine whether the chosen state's law is contrary to a *fundamental* policy of California.... If there is no such conflict, the court shall enforce the parties' choice of law. If, however, there is a fundamental conflict with California law, the court must then determine whether California has a 'materially greater interest than the chosen state in the determination of the particular issue ....' (Rest., § 187, subd. (2).) If California has a materially greater interest than the chosen state, the choice of law shall not be enforced, for the obvious reason that in such circumstances we will decline to enforce a law contrary to this state's fundamental policy." (*Nedlloyd, supra,* 3 Cal.4th at p. 466, italics in original, fns. omitted.)

Although the *Nedlloyd* court thus outlined the analytical approach to cases involving contractual choice-of-law provisions, it expressly declined to **\*898** decide how the principles of subdivision (2)(b) of section 187 of the Restatement would apply to cases in which the interests of the chosen state clash with a "fundamental policy" of California, because the court found that no "fundamental

Case 3:17-cv-01053 Document 24 Filed 08/02/17 Page 33 of 92 PageID #: 404

**Application Group, Inc. v. Hunter Group, Inc., 61 Cal.App.4th 881 (1998)**

72 Cal.Rptr.2d 73, 1998-1 Trade Cases P 72,076, 13 IER Cases 1366...

policy" of California was implicated in the case before it. (*Nedlloyd, supra,* 3 Cal.4th at pp. 466, fn. 6, 468.) However, in dicta, the *Nedlloyd* court cited *S.A. Empresa, supra,* 641 F.2d 746, as an example of a case involving such a conflict and, indeed, suggested that the Ninth Circuit had properly enforced the parties' contractual choice-of-law provision after finding that the interests of the chosen state (Washington) were materially greater than those of the forum state (California) *even though* "fundamental policy" of California may have been implicated in the parties' dispute. (*Nedlloyd, supra,* at p. 466, fn. 6; *S.A. Empresa, supra,* at pp. 750-753.)

One of the difficulties in these cases is that the "materially greater interest" test of subdivision (2)(b) of section 187 of the Restatement overlaps with the "governmental interest" and "comparative impairment" analyses that must be conducted in California to determine which state "would be the state of the applicable law in the absence of an effective choice of law by the parties" (see *Dixon Mobile Homes, Inc.* v. *Walters, supra,* 48 Cal.App.3d at p. 972). Neither *Nedlloyd* nor *S.A. Empresa,* nor any other case disclosed by our research, discusses the relationship between and among these tests. The approach utilized by the Ninth Circuit for dealing with that problem in the *S.A. Empresa* case appears to have been to first examine the respective "governmental interests" of the chosen and forum states and then determine the extent to which those interests would be impaired by application of the other state's laws. (See *S.A. Empresa, supra,* 641 F.2d at pp. 752-753.)[11] Under this approach, a court can decline to enforce the parties' contractual choice-of-law provision only if the interests of the forum state are "materially greater" than those of the chosen state, *and* the forum state's interests would be more seriously impaired by enforcement of the parties' contractual **\*899** choice-of-law provision than would the interests of the chosen state by application of the law of the forum state.[12]

## 2. *Application of California Choice-of-Law Rules to This Case.*

[[3b]] Hunter is correct that the trial court did not explicitly undertake any formal choice-of-law analysis, as prescribed by the foregoing case law, but that does not mean the trial court came to the wrong conclusion.[13] There is no dispute that the chosen state-Maryland-has a "substantial relationship" to the parties and their transaction. There is also no dispute that there is a "reasonable basis" for the parties' contractual choice-of-law provision. Indeed, the mere fact that one of the parties to the contract is incorporated in the chosen state is sufficient to support a finding of "substantial relationship," and the mere fact that one of the parties

resides in the chosen state provides a "reasonable basis" for the parties' choice of law. (*Nedlloyd, supra,* 3 Cal.4th at pp. 467-468.)

The parties also agree that California and Maryland are "potentially concerned" states with diametrically opposed laws regarding the enforceability of Hunter's noncompetition clause. (See *Sommer v. Gabor, supra,* 40 Cal.App.4th at p. 1467; *North American Asbestos Corp. v. Superior Court, supra,* 180 Cal.App.3d at p. 905.)[14] As we have noted, with certain limited exceptions, California law renders void such provisions (§ 16600), while **\*900** Maryland law permits them so long as they are reasonable in scope and duration (*Holloway v. Faw, Casson & Co., supra,* 572 A.2d 4th at p. 515; *Ruhl v. F. A. Bartlett Tree Expert Co., supra,* 225 A.2d at p. 291). Furthermore, as we will discuss, each state purports to have significant interests in having its law applied. Thus, the real issues for decision are whether Maryland's law is contrary to a *fundamental* policy of California and, if so, which state has a "materially greater interest" in the determination of the issue and which state's interests would be more seriously impaired if its policy were subordinated to the policy of the other state. (*Bernhard v. Harrah's Club, supra,* 16 Cal.3d at p. 320; *Sommer v. Gabor, supra,* 40 Cal.App.4th at p. 1468.) As our Supreme Court has instructed, "careful consideration" of California policy and Maryland's interests is required in order to resolve these issues. (*Nedlloyd, supra,* 3 Cal.4th at p. 466, fn. 6.)

AGI is correct when it argues that section 16600 reflects a "strong public policy" of the State of California. (*KGB, Inc. v. Giannoulas* (1980) 104 Cal.App.3d 844, 848 [164 Cal.Rptr. 571]; *Frame v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1971) 20 Cal.App.3d 668, 673 [97 Cal.Rptr. 811] (*Frame*); *Scott v. Snelling and Snelling, Inc.* (N.D.Cal. 1990) 732 F.Supp. 1034, 1042.) Indeed, the strength of California's policy interest was the *explicit* basis for Judge Norman's rulings on the applicability of California law to Hunter's noncompetition covenants insofar as it affects employment in California. As the Second Appellate District recently observed: "California courts have consistently declared this provision an expression of public policy to ensure that every citizen shall retain the right to pursue any lawful employment and enterprise of their choice. [Citation.] Section 16600 has specifically been held to invalidate employment contracts which prohibit an employee from working for a competitor when the employment has terminated, unless necessary to protect the employer's trade secrets. [Citation.] The corollary to this proposition is that [a competitor] may solicit another's employees if they do not use unlawful means or engage in acts of unfair competition." (*Metro Traffic Control, Inc. v. Shadow*

Application Group, Inc. v. Hunter Group, Inc., 61 Cal.App.4th 881 (1998)

72 Cal.Rptr.2d 73, 1998-1 Trade Cases P 72,076, 13 IER Cases 1366...

*Traffic Network, supra,* 22 Cal.App.4th at p. 859.) In *Diodes, Inc. v. Franzen* (1968) 260 Cal.App.2d 244 [67 Cal.Rptr. 19], the court further explained the policy underpinnings of section 16600, as follows: "The interests of the employee in his own mobility and betterment are deemed paramount to the competitive business interests of the employers, where neither the employee nor his new employer has committed any illegal act accompanying the employment change." (*Diodes, Inc. v. Franzen, supra,* at p. 255.) It follows that California has a strong interest in **\*901** protecting the freedom of movement of persons whom California-based employers (such as AGI) wish to employ to provide services in California, regardless of the person's state of residence or precise degree of involvement in California projects, and we see no reason why these employees' interests should not be "deemed paramount to the competitive business interests" of out-of-state as well as in-state employers. (*Ibid.*)

To the extent it is invoked by a California *employer* to protect itself from "unfair competition," moreover, section 16600 (as implemented through sections 17200 and 17204) is all the more important as a statement of California public policy which ensures that California employers will be able to compete effectively for the most talented, skilled employees in their industries, wherever they may reside. In this day and age-with the advent of computer technology and the concomitant ability of many types of employees in many industries to work from their homes, or to "telecommute" to work from anywhere a telephone link reaches-an employee need not reside in the same city, county, or state in which the employer can be said to physically reside. California employers in such sectors of the economy have a strong and legitimate interest in having broad freedom to choose from a much larger, indeed a "national," applicant pool in order to maximize the quality of the product or services they provide, as well as the reach of their "market." California has a correlative interest in protecting its employers and their employees from anticompetitive conduct by out-of-state employers such as Hunter-including litigation based on a covenant not to compete to which the California employer is not a party-who would interfere with or restrict these freedoms.

Hunter suggests, however, that Maryland has an equally strong public policy favoring the use and enforcement of its noncompetition covenants, insofar as they serve the interests of Maryland employers in preventing recruitment of employees who provide "unique services," and the misuse of trade secrets, routes, or lists of clients, or solicitation of customers. (*Fowler v. Printers II* (1991) 89 Md.App. 448 [598 A.2d 794, 799]; *Becker v. Bailey* (1973) 268 Md. 93 [299 A.2d 835]; *Holloway v. Faw,*

*Casson & Co., supra,* 572 A.2d at p. 515.) However, there is nothing in the record of this case to support a finding that failure to enforce Hunter's noncompetition covenant would significantly impair either of the asserted interests. We have no reason to doubt the parties' showing that highly skilled consultants such as Pike are a scarce resource. But, with all due respect to Ms. Pike, there is no showing **\*902** that she performed "unique services" for Hunter.[15] There is also no showing that Pike was attempting to exploit Hunter's trade secrets or other protected information about its customers. In any event, should such concerns arise with respect to the recruitment of other Hunter consultants for employment in California, Hunter has recourse under both Maryland and California law. (See, e.g., *Morlife, Inc. v. Perry* (1997) 56 Cal.App.4th 1514 [66 Cal.Rptr.2d 731].)

We are, therefore, convinced that California has a materially greater interest than does Maryland in the application of its law to the parties' dispute, and that California's interests would be more seriously impaired if its policy were subordinated to the policy of Maryland. Accordingly, the trial court did not err when it declined to enforce the contractual conflict of law provision in Hunter's employment agreements. To have done so would have been to allow an out-of-state employer/competitor to limit employment and business opportunities in California. As the *Nedlloyd* court held, California courts are not bound to enforce a contractual conflict of law provision which would thus be "contrary to this state's fundamental policy." (*Nedlloyd, supra,* 3 Cal.4th at p. 466, fn. omitted; see also *Frame, supra,* 20 Cal.App.3d at p. 673; *Hollingsworth Solderless Terminal Co. v. Turley* (9th Cir. 1980) 622 F.2d 1324, 1338; *Davis v. Jointless Fire Brick Co.* (9th Cir. 1924) 300 F. 1, 2-3; *Scott v. Snelling and Snelling, Inc., supra,* 732 F.Supp. at pp. 1039-1040, 1041.)

*Frame, supra,* 20 Cal.App.3d 668, is closely on point. In that case, the plaintiff brought an action seeking a determination that a portion of an agreement between the plaintiff and his former employer, a stock brokerage, was void under section 16600 to the extent it provided for forfeiture of profit-sharing rights by any employee who voluntarily terminated his employment and went to work for a competitor. (20 Cal.App.3d at p. 670.) The trial court and the court of appeal agreed with the plaintiff, and rejected the employer's argument that the forfeiture clause was valid under New York law and, thus, enforceable under a clause in the profit-sharing plan designating New York law as governing their rights under the contract. (*Id.* at p. 673.) The *Frame* court held that it could not allow New York law to defeat the "strong public policy" embodied in section 16600 and, thus,

Application Group, Inc. v. Hunter Group, Inc., 61 Cal.App.4th 881 (1998)

72 Cal.Rptr.2d 73, 1998-1 Trade Cases P 72,076, 13 IER Cases 1366...

declined to give effect to the parties' contractual choice-of-law provision. (20 Cal.App.3d at p. 673; see also *Davis v. Jointless Fire Brick Co., supra,* 300 F. at pp. 2-3.) It is noteworthy that the court in **\*903** *S.A. Empresa, supra,* 641 F.2d 746, cited *Frame* for the proposition that "... where application of a choice-of-law provision would result in the contravention of California's public policy, the provision will be ignored to the extent necessary to preserve public policy." (*Id.* at p. 749, cited with approval in *Nedlloyd, supra,* 3 Cal.4th at pp. 464-466, fns. 1 & 6.)

In defense of its noncompetition clause, Hunter does not rely heavily upon a claim that the State of Maryland has legitimate and compelling interests in the enforcement of the covenant, beyond a general interest in the enforceability of a contract valid where made. Hunter simply suggests that we should focus our attention on the "relevant contacts" of the parties with California and Maryland (see *Robert McMullan & Son, Inc. v. United States Fid. & Guar. Co.* (1980) 103 Cal.App.3d 198, 205 [162 Cal.Rptr. 720], citing *Dixon Mobile Homes, Inc.* v. *Walters, supra,* 48 Cal.App.3d at p. 972, fn. 4), and, on that basis, conclude the trial court erred by reading section 16600 as a "super-statute" applicable to out-of-state contracts as to which California has no interest. In a related argument, Hunter suggests that Maryland law was the "only law apparently applicable" at the time of contracting and that we must honor the expectations of the parties in that regard. (See *Bernkrant v. Fowler* (1961) 55 Cal.2d 588, 594-595 [12 Cal.Rptr. 266, 360 P.2d 906].)[16] It is only by exaggerating and distorting the reach of the trial court judgment, and by ignoring important features of "relevant contacts" analysis, that Hunter can take this position.

[5] "With the governmental interest approach, 'relevant contacts' stressed by the Restatement Second of Conflict of Laws are not disregarded, but are examined in connection with the analysis of the interest of the involved state in the issues, the character of the contract and the relevant purposes of the contract law under consideration." (*Dixon Mobile Homes, Inc.* v. *Walters, supra,* 48 Cal.App.3d at p. 972, fn. omitted.) In contract cases, these "relevant contacts" include: " '(a) the place of contracting, [¶] (b) the place of negotiation of the contract, [¶] (c) the place of performance, [¶] (d) the location of the subject matter of the contract, and [¶] (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.' " (*Id.*, at p. 972, fn. 4, quoting Rest. § 188, subd. (2).) **\*904**

[3c] In essence, Hunter suggests this court should mechanically apply an outdated-or at least incomplete-"choice-of-laws" test which, it contends,

would result in a choice of Maryland law because that was the place where the contract was negotiated, entered into and performed, as well as "the domicil, residence, nationality, place of incorporation and place of business" of the parties to the contract, i.e., Hunter and Pike. While partially correct, this argument indicates that Hunter's focus is on the wrong "contract." There is no issue in this case about the enforceability of Pike's employment agreement, only of the covenant not to compete.[17] That covenant was negotiated and signed in Maryland, which is both Pike's and Hunter's state of residence, but Maryland was not the exclusive place of business of either Hunter or Pike and was not necessarily the place where the covenant was to be "performed." In this case, moreover, the contracting parties were undoubtedly well aware that the purpose of the noncompetition clause was to prevent Hunter's competitors, *especially* those in California, from recruiting and hiring Hunter's consultants. Thus, the parties were or should have been alerted to the possibility that California law could come into play in the course of their relationship. In fact, the issue of "performance" arose-at least in part-in California when Pike was recruited by and accepted employment with a California employer to perform services in California. Similarly, although Hunter overlooks this aspect of the Restatement test, "the subject matter of the contract" is arguably subsequent employment which was, in this case, employment by a competitor who is "located" in California.[18]

Even more fundamentally, however, Hunter overlooks the facts that AGI is a key player in this drama. AGI is a California employer against whom Hunter has repeatedly threatened and attempted to "enforce" the relevant "contract"-a contract, as we have noted, to which AGI is not even a party. We simply cannot ignore AGI's interests, and those of the state of California, with respect to enforceability of Hunter's noncompetition covenants as it affects employment and business opportunities in California.

Nor can we overlook the fact that Hunter itself has significant "contacts" with California. Hunter maintains an office in California, conducts business in California, competes head-to-head with AGI for California customers, and **\*905** maintains close relationships with California software companies whose products it supports. Hunter also freely admits it has actively sought to recruit AGI employees who, under California law and AGI policy, cannot be saddled with a covenant not to compete. Indeed, Hunter even pays its current employees a reward for referring any AGI consultant who is successfully recruited for employment by Hunter. Thus, if we were to engage only in the "relevant contacts" analysis

Hunter urges, we would not find error in the trial court's decision to apply California law.

Finally, Hunter contends that the trial court's declaratory judgment was "woefully vague and ambiguous" and, for that reason, unenforceable. We disagree. It is true that, to fall within the scope of the trial court's declaratory judgment, a recruited employee need not have had any prior contact with California, so long as the goal of the solicitation is "employment in California," or employment in "business to be performed in California." As to any such employee, the trial court declared that Hunter's covenant not to compete is invalidated by section 16600. In essence, the trial court acted to protect AGI's freedom to solicit or recruit out-of-state consultants for employment in California, as well as the rights of non-California residents, who are *prospective* employees of a California company, to engage in a business or profession in California if they so choose. (§ 16600.) Under Judge Norman's ruling, however, it is plainly not sufficient simply to be employed by a California-based employer such as AGI, or to be treated as a California employee for tax and other legal purposes, if the employee is to perform services exclusively "beyond the borders of California."

Under Hunter's own reasoning, it could not enforce its noncompetition covenant against a former consultant who accepts a position with AGI after moving to California and becoming a "citizen" of this state-even if the consultant does 100 percent of his or her work outside the State of California. But we agree with the trial court that the enforceability of Hunter's noncompetition covenant does not turn on whether the recruited employee physically resides in California. The concept of "employment in California" is broader than that, at least in the expansive and dispersed industry with which we deal in this case. It must also take into account the location of the employer, and the location of the employer's vendors and customers. Viewing the larger picture, the trial court did not err in concluding that an employee of a California-based employer, who performs services for California-based customers, is "employed in California" and, thus, "engage[d] in a business or profession" in California, so as to enjoy the protection of section 16600.[19] **906

### C. The Trial Court Did Not Err in Finding That Hunter's Unlawful Use of Covenants Not to Compete to Preclude Employment in California Also Violates Section 17200.

[6a] Hunter also contends the trial court erred when it concluded that, in addition to violating section 16600,

Hunter's use of its noncompetition covenant to prevent its former consultants from obtaining employment by AGI in California violates the Unfair Practices Act (UPA) (§ 17200 et seq.).[20] Section 17200 expresses California public policy against unfair **907 competition, and prohibits "wrongful business conduct in whatever context such activity might occur." (*Stoiber v. Honeychuck* (1980) 101 Cal.App.3d 903, 927 [162 Cal.Rptr. 194].) Section 17200 defines unfair competition as, inter alia, any "unlawful, unfair or fraudulent business practice." ( [7a]"The 'unlawful' practices prohibited by section 17200 are any practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made. [Citation.] It is not necessary that the predicate law provide for private civil enforcement. [Citation.] As our Supreme Court put it, section 17200 'borrows' violations of other laws and treats them as unlawful practices independently actionable under section 17200 et seq. [Citation.]" (*Saunders v. Superior Court* (1994) 27 Cal.App.4th 832, 838-839 [33 Cal.Rptr.2d 438].)

[6b] In this case, Judge Norman expressly found that, to the extent Hunter requires a covenant not to compete in the employment agreements of employees who are not California residents, but who seek employment in California with a California-based employer, the noncompetition agreement is an "unenforceable contract[] to restrain trade," use of which constitutes "unfair competition" in violation of section 17200. AGI contends, more broadly, that use of a covenant not to compete in this context is both "unlawful" and "unfair" within the meaning of section 17200.

[7b] California courts have recognized that an employer's business practices concerning its employees are within the scope of section 17200. (*Hudgins v. Neiman Marcus Group, Inc.* (1995) 34 Cal.App.4th 1109, 1126 [41 Cal.Rptr.2d 46]; *Wilkinson v. Times Mirror Corp.* (1989) 215 Cal.App.3d 1034, 1052 [264 Cal.Rptr. 194]; *People v. Los Angeles Palm, Inc.* (1981) 121 Cal.App.3d 25, 32-33 [175 Cal.Rptr. 257].) For example, where the employer's policy or practice is forbidden by or found to violate the Labor Code, it may also be held to constitute an "unlawful business practice" subject to redress under the UPA. (See *Hudgins v. Neiman Marcus Group, Inc.*, *supra*, 34 Cal.App.4th at p. 1126 [employer policy of deducting losses for unidentified returns when calculating employees' wages violates both Labor Code section 221 and Business and Professions Code section 17200]; *People v. Los Angeles Palm, Inc.*, *supra*, 121 Cal.App.3d at pp. 32-35 [employer practice of crediting tips of restaurant employees against their minimum wage violates both Labor Code section 351 and Business and

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 12

Application Group, Inc. v. Hunter Group, Inc., 61 Cal.App.4th 881 (1998)

72 Cal.Rptr.2d 73, 1998-1 Trade Cases P 72,076, 13 IER Cases 1366...

Professions Code section 17200].) The reasoning of these cases applies as well to contractual provisions that are found to violate the Business and Professions **\*908** Code. (See *Saunders v. Superior Court*, *supra*, 27 Cal.App.4th at pp. 838-839; but cf. *Californians for Population Stabilization v. Hewlett-Packard Co.*, *supra*, 58 Cal.App.4th at pp. 287-292.)[21]

([6c]) Of course, the twist in this case is that the employer whose practice is being challenged as "unfair competition" is not a California-based employer. But Hunter presents no authority that holds or suggests that nonresident businesses cannot be held to account for "wrongful business conduct" affecting California employers and employees (*Stoiber v. Honeychuck*, *supra*, 101 Cal.App.3d at p. 927), and none is disclosed by our research. Indeed, one California court has held that the law of the state in which a "restraint of trade" will occur overrides that of other states with more limited contacts with the transaction at issue. (*Bushkuhl v. Family Life Ins. Co.* (1969) 271 Cal.App.2d 514, 521 [76 Cal.Rptr. 602]; cf. *Birbrower*, *supra*, 17 Cal.4th at pp. 128-129 [section 6125 regulates out-of-state attorneys, and invalidates fee agreement made with out-of-state law firm to the extent contract is for legal representation "in California"].) We have already discussed at length the interests of California

and Maryland in the enforceability of Hunter's noncompetition covenant in the circumstances of this case and have concluded that California's interests should prevail. For similar reasons, we conclude California law may be applied to AGI's claim of unfair competition and that, thus, the trial court did not err in finding Hunter's use of a covenant not to compete in violation of section 16600 to be a violation of section 17200 as well.[22] **\*909**

### III. Conclusion

The judgment shall be modified to delete those portions relating to Pike's individual claims for relief. As thus modified, the judgment will be affirmed. The parties shall bear their own costs.

Parrilli, J., and Walker, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 13, 1998. **\*910**

Footnotes

\*    Retired judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

1    All statutory references are to the Business and Professions Code unless otherwise indicated.
     In relevant part, section 16600 provides: "[E]very contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Section 17200 defines "unfair competition." It "... include[s] any unlawful, unfair or fraudulent business act or practice ...." (*Ibid.*)

2    Between July 1991 and the end of 1993, 14 Hunter employees performed 12,250 hours of billable service for its California-based customers. Two of these employees, who were responsible for 3 percent of Hunter's billings in California during the same period, worked under covenants not to compete.

3    In the course of argument on the motion for judgment, the Maryland court found that the covenant not to compete in Pike's employment agreement was valid on its face and enforceable, at least under Maryland law. However, as far as this record discloses, the parties did not actively litigate, and the Maryland court did not actually decide, the *choice-of-laws* issue presented in the instant action. Even if it did decide that Maryland law determines the enforceability of Hunter's covenant not to compete in all circumstances, the court's ruling on the choice-of-laws issue was not essential to the judgment in favor of Pike and AGI and, thus, need not be given issue preclusive (collateral estoppel) effect. (See *Lumpkin v. Jordan* (1996) 49 Cal.App.4th 1223, 1230 [57 Cal.Rptr.2d 303]; Rest.2d Judgments, § 27.)

4    A final order on the parties' cross-motions for summary judgment and summary adjudication of issues was not filed until February 22, 1995, after the trial of this action was completed.

5    These paragraphs were part of the prayer for relief, as follows: "50. For a declaration that Business and Professions Code sections 16600 and 17200 give AGI a privilege, with respect to any of [Hunter's] computer consultants and former consultants, to call and recruit such consultants from California; [¶] 51. For a declaration that Business and Professions Code sections 16600 and 17200 permit AGI to recruit and hire, from California, any [Hunter] computer consultants and former consultants who are residents of California, who work or have worked in California, or who

Application Group, Inc. v. Hunter Group, Inc., 61 Cal.App.4th 881 (1998)

72 Cal.Rptr.2d 73, 1998-1 Trade Cases P 72,076, 13 IER Cases 1366...

report to or are managed from, or have reported to or have been managed from, any California office, whether or not such employees have a Covenant Not To Compete with [Hunter]; [¶] 52. For a declaration that, under California law, [Hunter] may not attempt to enforce in California any out-of-state judgment or injunction which [Hunter] might obtain against AGI for AGI's recruitment or hiring of any [Hunter] computer consultant who has a Covenant Not To Compete with [Hunter]; [¶] ... [¶] 55. For a declaration that [Hunter] is bound by the law of the State of California, specifically Business and Professions Code sections 16600 and 17200, with respect to its computer consultants who are residents of California, or who work or have worked in California, or who report to or are managed from, or have reported to or have been managed [from a Hunter] office in California. [¶] 56. For a declaration that with respect to [Hunter's] computer consultants who are residents of California, or who work or have worked in California, or who report to or are managed, or have reported to or been managed from, [a Hunter] office in California, [Hunter's] use of Covenants Not To Compete with such consultants is illegal, invalid and unenforceable under Business and Professions Code sections 16600 and 17200. [¶] 57. For a declaration that, under California law, [Hunter] may not attempt to enforce in California any out-of-state judgment or injunction which [Hunter] might obtain against AGI for interference in [Hunter's] Covenant Not To Compete."

6    Nor could it. AGI seeks declaratory relief regarding the enforceability of a specific contract, under which Hunter has made multiple threats of litigation and has on at least one occasion brought suit against AGI, and as to which AGI and Hunter will continue to have run-ins as they compete for employees to work on projects for their customers, and otherwise conduct their business in California. In these respects, we cannot fairly conclude that the trial court abused its discretion to grant declaratory relief. This is not a case in which the court is being called upon to "imagine a myriad of hypotheticals," or to speculate on the application of law to such hypotheticals. (Cf. *BKHN, Inc. v. Department of Health Services* (1992) 3 Cal.App.4th 301, 309-310 [4 Cal.Rptr.2d 188]; see also *Brownfield v. Daniel Freeman Marina Hospital* (1989) 208 Cal.App.3d 405, 410-411 [256 Cal.Rptr. 240].) The trial court had before it evidence of the very real and concrete controversy over Pike's recruitment by AGI. The court reasonably could find that the dispute over Pike's employment is typical of controversies that will almost certainly continue to arise between AGI and Hunter over nonresident employees. Furthermore, it is essentially a pure question of law whether Hunter's covenant not to compete is enforceable when invoked to prevent a California-based competitor from soliciting or recruiting a current or former Hunter consultant for employment in California. Plainly, AGI is such a competitor and it has been and will continue to be subject to litigation in this precise factual context.

7    In addition, there is the issue of enforceability of Hunter's covenants not to compete as to *former consultants* who may relocate to become residents of California during the period of noncompetition stated in their employment agreements, insofar as such nonresident employees may wish to become employed in California.

8    There is no argument that Pike's claim is "capable of repetition, yet evading review" (*Gannett Co.* v. *DePasquale* (1979) 443 U.S. 368, 377 [99 S.Ct. 2898, 2904, 61 L.Ed.2d 608]), or that the controversy was of such short duration so as to preclude normal appellate review (*In re Willon* (1996) 47 Cal.App.4th 1080, 1089 [55 Cal.Rptr.2d 245]; cf. *Press-Enterprise Co.* v. *Superior Court* (1986) 478 U.S. 1, 6 [106 S.Ct. 2735, 2739, 92 L.Ed.2d 1]; *San Jose Mercury-News v. Municipal Court* (1982) 30 Cal.3d 498, 501, fn. 2 [179 Cal.Rptr. 772, 638 P.2d 655]).

9    Again, this statement of the issue encompasses former Hunter employees who may relocate from out of state to become California residents during the period of noncompetition stated in their employment agreements.

10   In relevant part, Restatement section 187, subdivision (2), provides that the law of the chosen state will be applied *unless*: "(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, *or* [¶] (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue *and* which ... would be the state of applicable law in the absence of an effective choice of law by the parties." (Italics added.)

11   In that regard, the *S.A. Empresa* court apparently found that Washington had a materially greater interest in having its law determine the validity of an exculpatory clause in a contract for sale of a plane that later crashed, i.e., a clause which effectively immunized the Washington-based airplane manufacturer against a breach of warranty suit filed by a foreign purchaser (a Brazilian corporation) and, thus, required the purchaser to bear the entire loss even if misconduct by the manufacturer caused the crash. (641 F.2d at p. 753.) Indeed, the *S.A. Empresa* court did not consider California as having any significant interest in the dispute because its public policy was designed to protect its citizens and the plaintiff purchaser was not even a California corporation. Accordingly, even though California public policy may have prohibited enforcement of the exculpatory clause (see Civ. Code, § 1668), and despite the probability that application of the chosen state's laws would produce a result in conflict with a "fundamental policy" of California, the *S.A. Empresa* court held that it was proper to apply the law of the chosen state, Washington. (*S.A. Empresa, supra,* 641 F.2d at p. 753.)

Application Group, Inc. v. Hunter Group, Inc., 61 Cal.App.4th 881 (1998)

72 Cal.Rptr.2d 73, 1998-1 Trade Cases P 72,076, 13 IER Cases 1366...

12    It is efficient to begin the analysis under Restatement section 187, subdivision (2)(b), with the standard "governmental interest" and "comparative impairment" tests because an early determination that the chosen state and the state that would provide "the applicable law in the absence of an effective choice of law by the parties" are one and the same, or a finding that the chosen state is the *only* state with a significant interest in having its law applied, obviates any need to weigh the forum's public policy interests against the chosen state's interests or to determine which state has the "materially greater interest" in having its law applied.

13    Furthermore, it is clear Judge Norman did consider both the interests of the concerned states, and the parties' "contacts" and "connections" with those states. That he did not analyze the issues precisely as Hunter would have liked did not render his statement of decision, or the judgment, deficient in any way.

14    Thus, this is a " 'true' conflict" case. (See *Sommer v. Gabor*, *supra*, 40 Cal.App.4th at p. 1467; *North American Asbestos Corp. v. Superior Court*, *supra*, 180 Cal.App.3d at p. 905.) There are other "potentially concerned" states including, for example, the ones in which other nonresident Hunter employees may reside, which may have interests, like Maryland's, in the enforceability of covenants not to compete, valid where made, and the competitive advantages of such provisions. On the other hand, other "potentially concerned" states may broadly prohibit covenants not to compete, as does California, with the result being no real "choice-of-law" issue. Or the "other" states might allow "reasonable" restrictions on the Hunter employee's freedom to compete after termination, but may find one year too long a period or the geographical reach of the covenant too broad. However, the parties focus their choice of laws arguments on California and Maryland as the two "potentially concerned states" with respect to the enforceability of Pike's covenant not to compete, and agree that these laws call for diametrically opposite results on that issue. For that reason, our discussion will maintain the same focus.

15    It appears that Hunter's *real* concern about Pike's recruitment was that it would have to pay more for a replacement than it was paying her. But, in light of the "no damages" judgment in the Maryland court, even that concern did not materialize.

16    Hunter also relies on *Roesgen v. American Home Products Corp.* (9th Cir. 1983) 719 F.2d 319, a case in which the Ninth Circuit affirmed a trial court's ruling that New York law applied to a forfeiture provision in an employment agreement, which was triggered by the employee's subsequent employment by a California-based competitor of the first employer. That reliance is misplaced. The federal appellate court applied the highly deferential "clear error" standard of review to the trial court's ruling, one which Hunter insists is inappropriate in the conflict of laws context. Indeed, application of such a lenient standard of review may well have resulted in an erroneous decision under California law by a federal court, which we need not follow. (Cf. *Muggill v. Reuben H. Donnelley Corp.*, *supra*, 62 Cal.2d at p. 242; *Frame, supra,* 20 Cal.App.3d at pp. 672-673.)

17    Thus, we express no opinion about the enforceability of other provisions in the employment agreements of Hunter consultants who may perform services in California but whose contracts expressly state that they are to be "governed by and construed in accordance with the laws of the State of Maryland."

18    In these respects, *Bernkrant v. Fowler, supra,* 55 Cal.2d 588, is distinguishable because the contract in that case was a "purely local transaction" made and performed in Nevada, involving the refinancing of obligations arising from the sale of Nevada land and secured by interests therein. (*Id.* at pp. 594-595.)

19    We note that Judge Norman did not attempt to define what it means to be employed "in California." We express no opinion as to the precise contours of that concept, leaving it to the parties to raise the issue in the future if and when a dispute over that issue should arise in connection with the declaratory judgment in this case. We note, however, that our Supreme Court recently decided a case which may provide some guidance on the issue. In *Birbrower, Montalbano, Condon & Frank v. Superior Court* (1998) 17 Cal.4th 119 [70 Cal.Rptr.2d 304, 949 P.2d 1] (*Birbrower*), the court held that whether an attorney may be deemed to be practicing law "in California" for purposes of section 6125 (requiring State Bar membership) will be determined on a case-by-case basis using a "sufficient contacts" analysis, as follows: "In our view, the practice of law 'in California' entails sufficient contact with the California client to render the nature of the legal service a clear legal representation. In addition to a quantitative analysis, we must consider the nature of the unlicensed lawyer's activities in the state. Mere fortuitous or attenuated contacts will not sustain a finding that the unlicensed lawyer practiced law 'in California.' The primary inquiry is whether the unlicensed lawyer engaged in sufficient activities in the state, or created a continuing relationship with the California client that included legal duties and obligations. [¶] Our definition does not necessarily depend on or require the unlicensed lawyer's physical presence in the state. Physical presence here is one factor we may consider ..., but it is by no means exclusive. For example, one may practice law in [California] although not physically present here by advising a California client on California law in connection with a California legal dispute by telephone, fax, computer, or other modern technological means.

Application Group, Inc. v. Hunter Group, Inc., 61 Cal.App.4th 881 (1998)

72 Cal.Rptr.2d 73, 1998-1 Trade Cases P 72,076, 13 IER Cases 1366...

Conversely, although we decline to provide a comprehensive list of what activities constitute sufficient contact with the state, we do reject the notion that a person *automatically* practices California law 'in California' whenever that person practices law anywhere, or 'virtually' enters the state by telephone, fax, e-mail, or satellite. [Citations.]" (17 Cal.4th at pp. 128-129, italics in original.)

20     Just prior to oral argument on November 25, 1997, AGI and Pike moved to dismiss this appeal on the grounds that Hunter failed to notify the Consumer Law Section of the Office of the Attorney General and the San Francisco District Attorney of the pendency of this "appellate proceeding," as required by section 17209 when the "application or construction" of the UPA is in issue. In *Californians for Population Stabilization v. Hewlett-Packard Co.* (1997) 58 Cal.App.4th 273 [67 Cal.Rptr.2d 621], the Sixth Appellate District held that a notice served pursuant to section 17209 will be deemed timely if it is served within three days of the filing of the appellant's opening brief on appeal, but that failure to give timely notice is not a jurisdictional defect. (58 Cal.App.4th at pp. 284-285.) Counsel for Hunter candidly admits he was unaware of the requirements of section 17209, and that the statutory notices were not served until November 18, 1997, long after the case had been fully briefed and calendared for oral argument. We are not convinced that Hunter has made an adequate showing of good cause for an extension of time to serve the required notices. Nevertheless, based on the proofs of service filed in this court, we are satisfied that the relevant public prosecutors have had ample time to seek permission to participate as amici curiae or otherwise influence the prosecution of this appeal. Accordingly, we will deny AGI's motion to dismiss and proceed to the merits of Hunter's claims of error under section 17200. Should the Attorney General or the San Francisco District Attorney wish to intervene prior to entry of final judgment in this case, we will entertain a timely petition seeking rehearing on that basis, as to those portions of the opinion dealing with the UPA.

21     Hunter quotes language from *Californians for Population Stabilization v. Hewlett-Packard Co.*, *supra*, 58 Cal.App.4th 273, for the proposition that "The mere fact that certain provisions were unenforceable in California does not render the use of the documents an unfair business practice." (58 Cal.App.4th at p. 293.) This passage appears, at first blush, to support a conclusion that Hunter's use of covenants not to compete does not violate section 17200. Upon closer examination, however, the Sixth Appellate District's holding follows from the fact that the plaintiff failed to prove any of its claims that the contractual provisions at issue were "unlawful" under various California statutes, including section 16600, leaving it with only the "unfair" business practice prong of section 17200 as a basis for obtaining relief. (58 Cal.App.4th at pp. 287-293.) The instant challenge is different in that AGI is claiming, and proved to the satisfaction of the trial court, that Hunter's covenant not to compete (as it was used against Pike and AGI) is not simply "unfair" or "unenforceable" but, rather, violates a specific statute (§ 16600) and is, thus, to that extent "unlawful" under section 17200. Of course, the *Californians for Population Stabilization* court also stated, in dictum, that it is questionable whether violations of the statutes at issue there (§ 16600; Civ. Code, §§ 1670.5, 1671) can support a cause of action under 17200 for an "unlawful" business practice. (58 Cal.App.4th at p. 287.) As with most dicta, this statement is deserving of little or no weight in our analysis.

22     We need not decide, and express no opinion on, two additional issues raised by Hunter in its briefs. We do not construe the trial court's judgment as including declaratory relief with respect to either the "full faith and credit" owed to any judgment Hunter "might obtain" against AGI or Pike, or the existence of a "privilege" under California law to disregard Hunter's covenant not to compete. AGI and Pike have conceded as much.

---

**End of Document**          © 2017 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by USS-POSCO Industries v. Case, Cal.App. 1 Dist., January 26, 2016

44 Cal.4th 937
Supreme Court of California

Raymond EDWARDS II, Plaintiff and Appellant,
v.
ARTHUR ANDERSEN LLP, Defendant and Respondent.

No. S147190.
|
Aug. 7, 2008.

**Synopsis**

**Background:** After refusing to execute termination of noncompete agreement (TONC) as condition of hire with company that bought his employer's business, former accounting employee brought action against former employer for intentional interference with prospective economic advantage and violation of the Cartwright Act. The Superior Court, Los Angeles County, No. BC294853, Andria K. Richey, J., sustained employer's demurrer to Cartwright Act claim, and subsequently entered judgment for employer on interference claim. Employee appealed. The Court of Appeal affirmed in part, reversed in part, and remanded. The Supreme Court granted review, superseding the opinion of the Court of Appeal.

**Holdings:** The Supreme Court, Chin, J., held that:

[1] noncompetition agreement between parties was invalid;

[2] there is no "narrow restraint" exception to general rule voiding noncompetition agreements, disapproving Boughton v. Socony Mobil Oil Co., 231 Cal.App.2d 188, 41 Cal.Rptr. 714, and King v. Gerold, 109 Cal.App.2d 316, 240 P.2d 710;

[3] demand that employee execute TONC as consideration for release from invalid agreement could support liability for interference with prospective economic advantage; but

[4] TONC waiver did not encompass unwaivable employee indemnity rights.

Affirmed in part, reversed in part, and remanded.

Opinion, 47 Cal.Rptr.3d 788, superseded.

Kennard, J., filed concurring and dissenting opinion, in which Werdegar, J., joined.

West Headnotes (19)

[1]     **Torts**
        Prospective advantage, contract or relations; expectancy

        The elements of the tort of intentional interference with prospective economic advantage are: (1) an economic relationship between plaintiff and a third party, with the probability of future economic benefit to the plaintiff; (2) defendant's knowledge of the relationship; (3) an intentional act by the defendant, designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the defendant's wrongful act, including an intentional act by the defendant that is designed to disrupt the relationship between the plaintiff and a third party.

        58 Cases that cite this headnote

[2]     **Torts**
        Improper means; wrongful, tortious or illegal conduct

        In order to prove a claim for intentional interference with prospective economic advantage, a plaintiff must prove that the interference was wrongful, independent of its interfering character.

        56 Cases that cite this headnote

[3]     **Torts**

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.                    1

👉Improper means; wrongful, tortious or illegal conduct

An act is "independently wrongful," for purposes of the tort of intentional interference with prospective economic advantage, if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard.

50 Cases that cite this headnote

[4]     **Contracts**
👉Restraint of Trade or Competition in Trade

In California, covenants not to compete are generally void. West's Ann.Cal.Bus. & Prof.Code § 16600 et seq.

25 Cases that cite this headnote

[5]     **Contracts**
👉Limitations as to time and place in general

Noncompetition agreement signed by accounting employee as condition of employment was invalid, where agreement prohibited performing professional services of the type employee had provided at accounting firm for any client on whose account he had worked for 18 months after termination, and agreement prohibited providing professional services to any client of local office where employee had worked for a year after termination; agreement restricted employee from performing work for local office's clients and therefore restricted his ability to practice his accounting profession. West's Ann.Cal.Bus. & Prof.Code § 16600.

26 Cases that cite this headnote

[6]     **Contracts**
👉Restraint of Trade or Competition in Trade

The statutory rule against contracts in restraint of trade is not subject to a "narrow-restraint" exception, as would permit contracts in restraint of trade that do not entirely bar an person from practicing his or her profession, trade, or business. West's Ann.Cal.Bus. & Prof.Code § 16600.

*See Cal. Jur. 3d, Monopolies and Restraints of Trade, §§ 3, 5; Annot., Statutes Prohibiting Restraint on Profession, Trade, or Business as Applicable to Restrictions in Employment or Agency Contracts (1949) 3 A.L.R.2nd 522;* 6 Witkin, Cal. Procedure (4th ed. 1997) Provisional Remedies, § 310.

39 Cases that cite this headnote

[7]     **Labor and Employment**
👉Economic or competitive interests of employer

An employer cannot lawfully make the signing of an employment agreement, which contains an unenforceable covenant not to compete, a condition of continued employment. West's Ann.Cal.Bus. & Prof.Code § 16600.

1 Cases that cite this headnote

[8]     **Labor and Employment**
👉Economic or competitive interests of employer
**Labor and Employment**
👉Interference with the Employment Relationship

An employer's termination of an employee who refuses to sign an agreement which contains an unenforceable covenant not to compete constitutes a wrongful termination in violation of public policy, for purposes of tort of interference with prospective economic advantage. West's Ann.Cal.Bus. & Prof.Code § 16600.

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.          2

5 Cases that cite this headnote

**[9]**    **Labor and Employment**
    Elements

To the extent that employer demanded that employee execute a termination of noncompete agreement (TONC) as consideration for release of the provisions of noncompetition agreement invalidly restricting employee from performing work for employer's clients, employer's demand could be considered a "wrongful act," as would support employee's claim for interference with prospective economic advantage. West's Ann.Cal.Bus. & Prof.Code § 16600.

22 Cases that cite this headnote

**[10]**    **Labor and Employment**
    Rights and Duties of Employers and Employees in General

Employee indemnity rights are nonwaivable, and any contract that does purport to waive an employee's indemnity right would be contrary to the law and therefore unlawful to that extent. West's Ann.Cal.Labor Code §§ 2802, 2804.

1 Cases that cite this headnote

**[11]**    **Labor and Employment**
    Defending claims against employee; indemnity

California has a strong public policy that favors the indemnification and defense of employees by their employers for claims and liabilities resulting from the employees' acts within the course and scope of their employment. West's Ann.Cal.Labor Code § 2802.

18 Cases that cite this headnote

**[12]**    **Release**
    Scope and extent in general

A contract provision releasing "any and all" claims does not per se encompass nonwaivable statutory protections, such as an employee's right to indemnification from the employer. West's Ann.Cal.Labor Code §§ 2802, 2804.

5 Cases that cite this headnote

**[13]**    **Contracts**
    Application to Contracts in General

Where the language of a contract is clear and not absurd, it will be followed. West's Ann.Cal.Civ.Code §§ 1637, 1638.

3 Cases that cite this headnote

**[14]**    **Contracts**
    Application to Contracts in General

Where the language of a contract is uncertain, the general rules of interpretation are to be applied. West's Ann.Cal.Civ.Code §§ 1637, 1638.

4 Cases that cite this headnote

**[15]**    **Contracts**
    Construction to give validity and effect to contract
    **Contracts**
    Reasonableness of construction

If a contract is capable of two constructions courts are bound to give such an interpretation as will make it lawful, operative, definite, reasonable and capable of being carried into

effect. West's Ann.Cal.Civ.Code § 3541.

9 Cases that cite this headnote

[16]  **Contracts**
👉 Construction to give validity and effect to contract

It is one of the cardinal rules of interpreting an instrument to give it such construction as will make it effective rather than void. West's Ann.Cal.Civ.Code § 3541.

7 Cases that cite this headnote

[17]  **Labor and Employment**
👉 Elements
**Release**
👉 Legality of consideration

Waiver of "any and all" claims against former employer, required as condition of hire with company that bought former employer's business, did not per se encompass a waiver of employee's unwaivable indemnity rights, and thus was not an independent wrongful act as required for the tort of intentional interference with prospective advantage, where waiver did not expressly reference indemnity rights, absent evidence of conduct by employer demonstrating that a waiver of right to indemnification was intended; parties to contract were presumed to know and incorporate applicable laws, and such a reading made waiver valid and enforceable. West's Ann.Cal.Labor Code §§ 2802, 2804; West's Ann.Cal.Civ.Code §§ 1643, 3541.

7 Cases that cite this headnote

[18]  **Contracts**
👉 Existing law as part of contract

All applicable laws in existence when an agreement is made, which laws the parties are presumed to know and to have had in mind, necessarily enter into the contract and form a part of it, without any stipulation to that effect, as if they were expressly referred to and incorporated.

8 Cases that cite this headnote

[19]  **Release**
👉 Legality of consideration

In the context of a release of "any and all" of an employee's rights against an employer, the phrase "except as otherwise prohibited by law" is vague and essentially informs the employee of nothing, and thus voiding all existing releases which include the language "any and all" without the phrase "except as otherwise prohibited by law" is inappropriate. West's Ann.Cal.Labor Code § 2804.

Cases that cite this headnote

**Attorneys and Law Firms**

***284 Law Offices of Richard A. Love, Richard A. Love, Beth A. Shenfeld, Los Angeles; Greines, Martin, Stein & Richland, Marc J. Poster and Robin Meadow, Los Angeles, for Plaintiff and Appellant.

Kastner Banchero, Eric C. Kastner, Palo Alto, and Scott R. Raber as Amici Curiae on behalf of Plaintiff and Appellant.

Feldman Gale, James A. Gale, Miami, FL, Todd M. Malynn, Los Angeles, and Michael J. Weber, Palo Alto, for St Jude Medical, S.C., Inc., Pacesetter, Inc., and Advanced Bionics Corporation as Amici Curiae on behalf of Plaintiff and Appellant.

***285 Law Offices of Jeffery K. Winikow and Jeffrey K. Winikow, Los Angeles, for California Employment Lawyers Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Mark A. Lemley, San Francisco; Morrison & Foerster and James Pooley, Palo Alto, for Professors and Writers of

WESTLAW  © 2017 Thomson Reuters. No claim to original U.S. Government Works.                4

Learned Treatises as Amicus Curiae on behalf of Plaintiff and Appellant.

Latham & Watkins, Wayne S. Flick, Yury Kapgan, Los Angeles, Kristine L. Wilkes, Colleen C. Smith, Shireen M. Becker, San Diego; and Sharon A. McFadden for Defendant and Respondent.

Paul, Hastings, Janofsky & Walker, Paul Grossman and Jennifer S. Baldocchi, Los Angeles, for California Employment Law Council and Activision, Inc., as Amici Curiae on behalf of Defendant and Respondent.

O'Melveny & Myers, Scott H. Dunham, Los Angeles, and Christopher W. Decker for Employers Group as Amicus Curiae on behalf of Defendant and Respondent.

**Opinion**

CHIN, J.

**\*941 \*\*288** We granted review to address the validity of noncompetition agreements in California and the permissible scope of employment release agreements. We limited our review to the following issues: (1) To what extent does Business and Professions Code section 16600[i] prohibit employee noncompetition agreements; and (2) is a contract provision requiring an employee to release "any and all" claims unlawful because it encompasses **\*942** nonwaivable statutory protections, such as the employee indemnity protection of Labor Code section 2802?

We conclude that section 16600 prohibits employee noncompetition agreements unless the agreement falls within a statutory exception, and that a contract provision whereby an employee releases "any and all" claims does not encompass nonwaivable statutory protections, such as the employee indemnity protection of Labor Code section 2802. We therefore affirm in part and reverse in part the Court of Appeal judgment.

**FACTS**

In January 1997, Raymond Edwards II (Edwards), a certified public accountant, was hired as a tax manager by the Los Angeles office of the accounting firm Arthur Andersen LLP (Andersen). Andersen's employment offer was made contingent upon Edwards's signing a noncompetition agreement, which prohibited him from working for or soliciting certain Andersen clients for limited periods following his termination. The agreement was required of all managers, and read in relevant part:

"If you leave the Firm, for eighteen months after release or resignation, you agree not to perform professional services of the type you provided for any client on which you worked during the eighteen months prior to release or resignation. This does not prohibit you from accepting employment with a client. [¶] For twelve months after you leave the Firm, you agree not to solicit (to perform professional services of the type you provided) any client of the office(s) to which you were assigned during the eighteen months preceding release or resignation. [¶] You agree not to solicit away from the Firm any of its professional personnel for eighteen months after release or resignation." Edwards signed the agreement.

Between 1997 and 2002, Edwards continued to work for Andersen, moving into the firm's private client services practice **\*\*\*286** group, where he handled income, gift, and estate tax planning for individuals and entities with large incomes and net worth. Over this period he was promoted to senior manager and was on track to become a partner. In March 2002, the United States government indicted Andersen in connection with the investigation into Enron Corporation, and in June 2002, Andersen announced that it would cease its accounting practices in the United States. In April 2002, Andersen began selling off its practice groups to various entities. In May 2002, Andersen internally announced that HSBC USA, Inc. (a New York-based banking corporation), through a new subsidiary, Wealth and Tax Advisory Services (WTAS), would purchase a portion of Andersen's tax practice, including Edwards's group.

**\*943 \*\*289** In July 2002, HSBC offered Edwards employment. Before hiring any of Andersen's employees, HSBC required them to execute a " Termination of Non-compete Agreement" (TONC) in order to obtain employment with HSBC. Among other things, the TONC required employees to, inter alia, (1) voluntarily resign from Andersen; (2) release Andersen from "any and all" claims, including "claims that in any way arise from or out of, are based upon or relate to Employee's employment by, association with or compensation from" defendant; (3) continue indefinitely to preserve confidential information and trade secrets except as otherwise required by a court or governmental agency; (4) refrain from disparaging Andersen or its related entities or partners; and (5) cooperate with Andersen in connection with any investigation of, or litigation against, Andersen. In exchange, Andersen would agree to accept Edwards's resignation, agree to Edwards's employment by HSBC, and release Edwards from the 1997 noncompetition agreement.

HSBC required that Andersen provide it with a completed

TONC signed by every employee on the "Restricted Employees" list before the deal went through. At least one draft of the Restricted Employees list contained Edwards's name. Andersen would not release Edwards, or any other employee, from the noncompetition agreement unless that employee signed the TONC.

Edwards signed the HSBC offer letter, but he did not sign the TONC.[2] In response, Andersen terminated Edwards's employment and withheld severance benefits. HSBC withdrew its offer of employment to Edwards.

## PROCEDURAL HISTORY

On April 30, 2003, Edwards filed a complaint against Andersen, HSBC and WTAS for intentional interference with prospective economic advantage and anticompetitive business practices under the Cartwright Act (Bus. & Prof.Code, § 16720 et seq.). Edwards alleged that the Andersen noncompetition agreement violated section 16600, which states "[e]xcept as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." He further alleged that the TONC's release of "any and all" claims violated Labor Code sections 2802 and 2804, which make an employee's ***287 right to indemnification from his or her employer nonwaivable.

*944 Edwards settled with all parties except Andersen. The trial court sustained Andersen's demurrer to Edwards's Cartwright Act claim without leave to amend, concluding Edwards lacked standing to bring the action. It then denied Andersen's subsequent motion for summary adjudication on Edwards's intentional interference with prospective economic advantage cause of action, after concluding that triable issues of fact existed on the meaning of the agreements, and whether the agreements protected trade secrets. The court then granted Andersen's motion to sever trial on the issue of the enforceability of the noncompetition agreement and the TONC. (Code Civ. Proc. §§ 598, 1048, subd. (b).) The court dismissed all claims against Andersen, except for those relating to intentional interference with prospective economic advantage, which it concluded presented pure questions of law.

The trial court heard argument from both parties, but took no evidence. The court determined all issues of law in favor of Andersen on the merits, and entered judgment in its favor. The court specifically decided that (1) the noncompetition agreement did not violate section 16600

because it was narrowly tailored and did not deprive Edwards of his right to pursue his profession; and (2) the TONC did not purport to waive Edwards's right to indemnification. Thus, requiring him to sign these documents was not unlawful. Edwards appealed the trial court's decision.

**290 [1] [2] [3] At issue in the Court of Appeal was one of the elements required to prove a claim for intentional interference with prospective economic advantage. In order to prove a claim for intentional interference with prospective economic advantage, a plaintiff has the burden of proving five elements: (1) an economic relationship between plaintiff and a third party, with the probability of future economic benefit to the plaintiff; (2) defendant's knowledge of the relationship; (3) an intentional act by the defendant, designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the defendant's wrongful act, including an intentional act by the defendant that is designed to disrupt the relationship between the plaintiff and a third party. (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1153–1154, 131 Cal.Rptr.2d 29, 63 P.3d 937.) The plaintiff must also prove that the interference was wrongful, independent of its interfering character. (*Della Penna v. Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376, 392–393, 45 Cal.Rptr.2d 436, 902 P.2d 740.) "[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." (*Korea Supply Co., supra,* 29 Cal.4th at p. 1159, 131 Cal.Rptr.2d 29, 63 P.3d 937.)

At issue here is the third element of the tort. In the Court of Appeal, Edwards argued the independently wrongful acts requirement in this case was *945 met in several ways that are pertinent here: (1) the noncompetition agreement was illegal under section 16600, making Andersen's demand that he give consideration to be released from it against public policy; (2) the TONC's additional release of "any and all" claims constituted a waiver of his indemnity rights in violation of Labor Code sections 2802 and 2804; and (3) the TONC's nondisparagement clause violated Labor Code section 1102.5.

In the published part of its opinion, the Court of Appeal held: (1) the noncompetition ***288 agreement was invalid under section 16600, and requiring Edwards to sign the TONC as consideration to be released from it was an independently wrongful act for purposes of the elements of Edwards's claim for intentional interference with prospective economic advantage; (2) the TONC

purported to waive Edwards's indemnification rights under the Labor Code and was therefore in violation of public policy and an independently wrongful act; and (3) the TONC's nondisparagement provision did not violate Labor Code section 1102.5 and so was not an independently wrongful act. As initially discussed, we limited our review to resolve the first two issues.

## DISCUSSION

### A. *Section 16600*

[4] Under the common law, as is still true in many states today, contractual restraints on the practice of a profession, business, or trade, were considered valid, as long as they were reasonably imposed. (*Bosley Medical Group v. Abramson* (1984) 161 Cal.App.3d 284, 288, 207 Cal.Rptr. 477.) This was true even in California. (*Wright v. Ryder* (1868) 36 Cal. 342, 357 [relaxing original common law rule that all restraints on trade were invalid in recognition of increasing population and competition in trade].) However, in 1872 California settled public policy in favor of open competition, and rejected the common law "rule of reasonableness," when the Legislature enacted the Civil Code. (Former Civ.Code, § 1673, repealed by Stats.1941, ch. 526, § 2, p. 1847, and enacted as Bus. & Prof.Code, § 16600, Stats.1941, ch. 526, § 1, p. 1834; *Bosley, supra,* 161 Cal.App.3d at p. 288, 207 Cal.Rptr.2d 495.) Today in California, covenants not to compete are void, subject to several exceptions discussed briefly below.

Section 16600 states: "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." The chapter excepts **\*946** noncompetition agreements in the sale or dissolution of corporations (§ 16601), partnerships **\*\*291** (*ibid.;* § 16602), and limited liability corporations (§ 16602.5). In the years since its original enactment as Civil Code section 1673, our courts have consistently affirmed that section 16600 evinces a settled legislative policy in favor of open competition and employee mobility. (See *D'sa v. Playhut, Inc.* (2000) 85 Cal.App.4th 927, 933, 102 Cal.Rptr.2d 495.) The law protects Californians and ensures "that every citizen shall retain the right to pursue any lawful employment and enterprise of their choice." (*Metro Traffic Control, Inc. v. Shadow Traffic Network* (1994) 22 Cal.App.4th 853, 859, 27 Cal.Rptr.2d 573.) It protects "the important legal right of persons to engage in businesses and occupations of their choosing." (*Morlife, Inc. v. Perry* (1997) 56 Cal.App.4th 1514, 1520, 66 Cal.Rptr.2d 731.)

This court has invalidated an otherwise narrowly tailored agreement as an improper restraint under section 16600 because it required a former employee to forfeit his pension rights on commencing work for a competitor. (*Muggill v. Reuben H. Donnelley Corp.* (1965) 62 Cal.2d 239, 242–243, 42 Cal.Rptr. 107, 398 P.2d 147 (*Muggill* ); *Chamberlain v. Augustine* (1916) 172 Cal. 285, 289, 156 P. 479 [invalidating contract with partial trade restriction].) In *Muggill,* the court reviewed an **\*\*\*289** adverse judgment against a company's retired employee whose pension plan rights were terminated after the former employee commenced work for a competitor. (*Muggill,* at p. 240, 42 Cal.Rptr. 107, 398 P.2d 147.) The retired employee had sued the former employer, seeking declaratory relief on the ground that the provision in the pension plan that terminated the retirement payments because the retiree went to work for a competitor was "against public policy and unenforceable." (*Ibid.*) *Muggill* held that, with exceptions not applicable here, section 16600 invalidates provisions in employment contracts and retirement pension plans that prohibit "an employee from working for a competitor after completion of his employment or imposing a penalty if he does so [citations] unless they are necessary to protect the employer's trade secrets [citation]." (*Muggill,* at p. 242, 42 Cal.Rptr. 107, 398 P.2d 147.)[4] In sum, following the Legislature, this court generally condemns noncompetition agreements. (See, e.g., *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 123, fn. 12, 99 Cal.Rptr.2d 745, 6 P.3d 669 [such restraints on trade are "largely illegal".)

Under the statute's plain meaning, therefore, an employer cannot by contract restrain a former employee from engaging in his or her profession, trade, or business unless the agreement falls within one of the exceptions to **\*947** the rule. (§ 16600.) Andersen, however, asserts that we should interpret the term "restrain" under section 16600 to mean simply to "prohibit," so that only contracts that totally prohibit an employee from engaging in his or her profession, trade, or business are illegal. It would then follow that a mere limitation on an employee's ability to practice his or her vocation would be permissible under section 16600, as long as it was reasonably based.

Andersen contends that some California courts have held that section 16600 (and its predecessor statutes, Civil Code former statutes 1673, 1674, and 1675) are the statutory embodiment of prior common law, and embrace the rule of reasonableness in evaluating competitive restraints. (See, e.g., *South Bay Radiology Medical Associates v. Asher* (1990) 220 Cal.App.3d 1074, 1080,

WESTLAW  © 2017 Thomson Reuters. No claim to original U.S. Government Works.

269 Cal.Rptr. 15 (*South Bay Radiology* ) [§ 16600 embodies common law prohibition against restraints on trade]; *Vacco Industries, Inc. v. Van Den Berg* (1992) 5 Cal.App.4th 34, 47–48, 6 Cal.Rptr.2d 602 (*Vacco* ) [§ 16600 is codification of common law reasonable restraint rule].) Andersen claims that these cases show that section 16600 "prohibits only broad agreements that prevent a person from engaging entirely in his chosen business, trade or profession. Agreements that do not have this broad effect—but merely regulate some aspect of post-employment conduct, e.g., to prevent raiding [employer's **292** personnel]—are not within the scope of [s]ection 16600."

As Edwards observes, however, the cases Andersen cites to support a relaxation of the statutory rule simply recognize that the statutory exceptions to section 16600 reflect the same exceptions to the rule against noncompetition agreements that were implied in the common law. For example, *South Bay Radiology* acknowledged the general prohibition against restraints on trade while applying the specific partnership dissolution exception ***290** of section 16602 to the facts of its case. (*South Bay Radiology, supra,* 220 Cal.App.3d at p. 1080, 269 Cal.Rptr. 15.) In that case, the covenant not to compete was set forth in a partnership agreement to which appellant doctor was a party. When appellant's partnership with several other doctors dissolved due to his inability to work following an accident, he challenged the noncompete clause. The court found the partnership exception to section 16600 applicable. (*South Bay Radiology, supra,* at pp. 1078–1080, 269 Cal.Rptr. 15.)

*Vacco* involved the sale of shares in a business, an exception to section 16600 found in section 16601. The Court of Appeal upheld an agreement not to compete made by a terminated employee who had sold all of his stock in the business for $500,000 prior to his termination. In applying the exception to section 16600, the court held that section 16601 "permits agreements not to compete made by a party selling the goodwill of a business or *all* of the shares of stock in a corporation." (*Vacco, supra,* 5 Cal.App.4th at p. 47, 6 Cal.Rptr.2d 602.) As **948** the present Court of Appeal recognized, "Fairly read, the foregoing authorities suggest section 16600 embodies the original, strict common law antipathy toward restraints of trade, while the section 16601 and 16602 exceptions incorporated the later common law 'rule of reasonableness' in instances where those exceptions apply."

[5] We conclude that Andersen's noncompetition agreement was invalid. As the Court of Appeal observed, "The first challenged clause prohibited Edwards, for an

18–month period, from performing professional services of the type he had provided while at Andersen, for any client on whose account he had worked during 18 months prior to his termination. The second challenged clause prohibited Edwards, for a year after termination, from 'soliciting,' defined by the agreement as providing professional services to any client of Andersen's Los Angeles office." The agreement restricted Edwards from performing work for Andersen's Los Angeles clients and therefore restricted his ability to practice his accounting profession. (See *Thompson v. Impaxx, Inc.* (2003) 113 Cal.App.4th 1425, 1429, 7 Cal.Rptr.3d 427 [distinguishing "trade route" and solicitation cases that protect trade secrets or confidential proprietary information].) The noncompetition agreement that Edwards was required to sign before commencing employment with Andersen was therefore invalid because it restrained his ability to practice his profession. (See *Muggill, supra,* 62 Cal.2d at pp. 242–243, 42 Cal.Rptr. 107, 398 P.2d 147.)

### B. Ninth Circuit's Narrow-restraint Exception

Andersen asks this court to adopt the limited or "narrow-restraint" exception to section 16600 that the Ninth Circuit discussed in *Campbell v. Trustees of Leland Stanford Jr. Univ.* (9th Cir.1987) 817 F.2d 499 (*Campbell* ), and that the trial court relied on in this case in order to uphold the noncompetition agreement. In *Campbell,* the Ninth Circuit acknowledged that California has rejected the common law "rule of reasonableness" with respect to restraints upon the ability to pursue a profession, but concluded that section 16600 "only makes illegal those restraints which preclude one from engaging in a lawful profession, trade, or business." (*Campbell, supra,* 817 F.2d at p. 502.) The court remanded the case to the district court in order to allow the employee to prove that the noncompetition agreement at issue completely restrained him from practicing his "profession, trade, or business within the meaning of section 16600." (*Campbell,* at p. 503.)

***291** The confusion over the Ninth Circuit's application of section 16600 arose in a paragraph in *Campbell,* in which the court noted that some California courts have excepted **293** application of section 16600 " 'where one is barred from pursuing only a small or limited part of the business, trade or profession.' " (*Campbell, supra,* 817 F.2d at p. 502.) The Ninth Circuit cited two **949** California cases that it believed may have carved out such an exception to section 16600. (See *Boughton v. Socony Mobil Oil Co.* (1964) 231 Cal.App.2d 188, 41 Cal.Rptr. 714 (*Boughton* ) [interpreting deed restriction on land use] and *King v. Gerold* (1952) 109

Cal.App.2d 316, 240 P.2d 710 (*King* ) [rejecting manufacturer's argument that clause not to produce its product after license expiration was not an illegal restraint under section 16600].) Andersen relies on those cases, citing them as the underpinnings of the Ninth Circuit's exception to section 16600, and urges the court to adopt their reasoning here.

As the Court of Appeal observed, however, the analyses in *Boughton* and *King* do not provide persuasive support for adopting the narrow-restraint exception. In *Boughton,* the restriction was not upon the plaintiff's practice of a profession or trade, but took the form of a covenant in a deed to a parcel of land that specified the land could not be used as a gasoline service station for a specified time period. (*Boughton, supra,* 231 Cal.App.2d 188, 41 Cal.Rptr. 714.) Because the case involved the use of the land, section 16600 was not implicated. Of note is the fact that *Boughton* relied on *King,* an unfair competition case in which the court applied a trade secret exception to the statutory rule against noncompetition clauses. (*King, supra,* 109 Cal.App.2d 316, 240 P.2d 710.) In *King,* the plaintiff was not simply engaged in the manufacture and sale of goods (house trailers) but was allegedly using a trailer design substantially similar to his former employer's, the inventor of the design. (*Id.* at p. 318, 240 P.2d 710.)

Andersen is correct, however, that *Campbell* has been followed in some recent Ninth Circuit cases to create a narrow-restraint exception to section 16600 in federal court. For example, *International Business Machines Corp. v. Bajorek* (9th Cir.1999) 191 F.3d 1033, upheld an agreement mandating that an employee forfeit stock options if employed by a competitor within six months of leaving employment. *General Commercial Packaging v. TPS Package* (9th Cir.1997) 126 F.3d 1131, held that a bargained-for contractual provision barring one party from courting a specific named customer was not an illegal restraint of trade prohibited by section 16600, because it did not "entirely preclude[ ]" the party from pursuing its trade or business. (*General Commercial Packaging v. TPS Package, supra,* 126 F.3d at p. 1133.)

[6] Contrary to Andersen's belief, however, California courts have not embraced the Ninth Circuit's narrow-restraint exception. Indeed, no reported California state court decision has endorsed the Ninth Circuit's reasoning, and we are of the view that California courts "have been clear in their expression that section 16600 represents a strong public policy of the state which should not be diluted by judicial fiat." **950 (*Scott v. Snelling and Snelling, Inc.* (N.D.Cal.1990) 732 F.Supp. 1034, 1042.)[5] Section 16600 is unambiguous, ***292 and if the

Legislature intended the statute to apply only to restraints that were unreasonable or overbroad, it could have included language to that effect. We reject Andersen's contention that we should adopt a narrow-restraint exception to section 16600 and leave it to the Legislature, if it chooses, either to relax the statutory restrictions or adopt additional exceptions to the prohibition-against-restraint rule under section 16600.

### C. Contract Provision Releasing "Any and All" Claims

[7] [8] [9] Edwards was not terminated from Andersen for refusing to sign the noncompetition agreement. Rather, Andersen made it **294 a condition of Edwards's obtaining employment with HSBC that Edwards execute the TONC, releasing Andersen from, among other things, "any and all" claims, including " claims that in any way arise from or out of, are based upon or relate to [Edwards's] employment by, association with or compensation from" Andersen. As the Court of Appeal held, to the extent Andersen demanded Edwards execute the TONC as consideration for release of the invalid provisions of the noncompetition agreement, such demand could be considered a wrongful act for purposes of his claim for interference with prospective economic advantage. An employer "cannot lawfully make the signing of an employment agreement, which contains an unenforceable covenant not to compete, a condition of continued employment.... [A]n employer's termination of an employee who refuses to sign such an agreement constitutes a wrongful termination in violation of public policy." (*D'sa v. Playhut, Inc., supra,* 85 Cal.App.4th at p. 929, 102 Cal.Rptr.2d 495.)

More important here, however, are the provisions of the TONC that purport to release Andersen from liability for claims arising out of Edwards's employment with that company. These are the provisions that Edwards contested in the appellate court. As is a fairly typical practice, at the time of his separation from Andersen, Edwards was asked to execute a broad general release in Andersen's favor. Section (1)(d) of the TONC provided that Edwards must release and discharge Andersen from "any and all actions, causes of action, claims, demands, debts, damages, costs, losses, penalties, attorneys' fees, obligations, judgments, expenses, compensation or liabilities of any nature whatsoever, in law or equity, whether known or unknown, contingent or otherwise, that Employee now has, may have ever had in the *951 past or may have in the future against any of the Released Parties by reason of any act, omission, transaction, occurrence, conduct, circumstance, condition, harm, matter, cause, or thing that has occurred from the beginning of time up to and including the date hereof, including, without

limitation, claims that in any way arise from or out of, are based upon or relate to Employee's employment by, association with or compensation from [Andersen] or any of its affiliated firms, except for claims (i) arising out of [Andersen's] obligations set forth in this agreement or (ii) for any accrued and unpaid salary or other employee benefit or compensation owing to Employee as of the date hereof." The trial court concluded that on the issue of waiver of indemnity, the TONC was a typical broad release that did not request indemnity rights be waived. The court ***293 added that "the Labor Code pretty much tells us that right can't be waived. As a matter of law, any provision in the release that attempts to waive it would be void." The court concluded that it did not have to reach the question because the release did not require Edwards to "give up his rights as a matter of law."

The Court of Appeal disagreed. It concluded that the TONC's plain language did indeed implicitly waive Edwards's Labor Code section 2802, subdivision (a), indemnity rights, and that Andersen could not make Edwards's future employment contingent on his waiving the statutorily mandated rights. As we explain, we disagree with the Court of Appeal on this point.

Labor Code section 2802, subdivision (a), provides for an employee's right to indemnity. That subdivision reads: "An employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer, even though unlawful, unless the employee, at the time of obeying the directions, believed them to be unlawful."

[10] Labor Code section 2804 voids any agreement to waive the protections of Labor Code section 2802 as against public policy. Labor Code section 2804 provides, "Any contract or agreement, express or implied, made by any employee to waive the benefits of this article or any part thereof, *is null and void,* and this article shall not deprive any employee or his personal representative of any right or remedy to which he is entitled under the laws of this State." (Italics added.) Courts have interpreted Labor Code section 2804 to apply to Labor Code section 2802, making all **295 contracts that waive an employee's right to indemnification null and void. (See *Liberio v. Vidal* (1966) 240 Cal.App.2d 273, 276, fn. 1, 49 Cal.Rptr. 520.) Thus, indemnity rights *952 are nonwaivable, and any contract that does purport to waive an employee's indemnity right would be contrary to the law and therefore unlawful to that extent.[6]

[11] "California has a strong public policy that favors the indemnification (and defense) of employees by their employers for claims and liabilities resulting from the employees' acts within the course and scope of their employment." (Chin et al., Cal. Practice Guide: Employment Litigation (The Rutter Group 2007) ¶ 3:1, p. 3–1.) Labor Code section 2802 codifies this policy and gives an employee a right to indemnification from his or her employer. (See *Grissom v. Vons Companies, Inc.* (1991) 1 Cal.App.4th 52, 59–60, 1 Cal.Rptr.2d 808 [the purpose of Lab.Code, § 2802 is "to protect employees from suffering expenses in direct consequence of doing their jobs"]; *Janken v. GM Hughes Electronics* (1996) 46 Cal.App.4th 55, 74, fn. 24, 53 Cal.Rptr.2d 741 [Lab.Code, § 2802 "shows a legislative intent that duty-related losses ultimately fall on the business enterprise, not on the individual employee"].)

Edwards asserts that the TONC's language releasing "any and all" claims encompassed his statutorily nonwaivable right to indemnification under Labor Code section 2802, thus amounting to an independent wrongful act that would support his intentional interference with prospective economic advantage claim. The Court of Appeal agreed with Edwards, concluding that although the TONC did not reference the right to indemnity, it did not have ***294 to because those rights were "necessarily encompassed within the clear terms of the broad release." The Court of Appeal found it especially telling that Labor Code section 2802 requires indemnification for "all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties," and that the TONC waives claims for losses, costs, and expenditures "of any nature whatsoever."

Although the Court of Appeal noted that the TONC did not expressly waive Edwards's indemnity rights, the court cited *Bardin v. Lockheed Aeronautical Systems Co.* (1999) 70 Cal.App.4th 494, 505, 82 Cal.Rptr.2d 726 (*Bardin* ), for the rule that "[a] broadly worded release covers all claims within the scope of the language, even if the particular claim is not expressly listed." In *Bardin,* the appellant, Bethany Bardin, applied for a job with the Los Angeles Police Department (LAPD). The LAPD performed an investigation into Bardin's background, in the course of which it obtained information from her former employer, Lockheed Martin Corporation (Lockheed). (*Id.* at pp. 497–498, 82 Cal.Rptr.2d 726.) When applying to the LAPD, Bardin signed a "Release and Waiver" form that "released any former employer from 'any or all liability *953 for damage of whatever kind, which may at any time result to [appellant], ... because of compliance with this authorization and request to release information....' " (*Id.* at p. 498, 82 Cal.Rptr.2d 726.) When the LAPD did not offer her a job, Bardin sued

Lockheed, claiming it provided the LAPD with misleading negative information that caused the LAPD to reject her employment application. (*Id.* at pp. 498–499, 82 Cal.Rptr.2d 726.) Bardin claimed that the release did not "expressly release respondents from disseminating false or baseless statements," but the court disagreed, finding that the release "broadly and unambiguously releases a former employer '*from any and all liability for damage of whatever kind....* ' " (*Id.* at p. 505, 82 Cal.Rptr.2d 726.)

The language "any and all" is common to both the release in *Bardin* and the release in the present case (and is common to most release agreements). In addition, the remaining language in both releases is generally similar. But the rights being released in each are entirely different. Unlike the rights at issue in *Bardin,* the indemnity rights in the present case are nonwaivable **296 under Labor Code section 2802, and any agreement or release that attempts to waive those rights is unlawful. Therefore, the fact that we must interpret those rights as within the scope of the phrase "any and all," makes *Bardin* inapposite here.

[12] In contrast to the release in *Bardin,* the TONC at issue here expressly excepted two types of claims from release. The first were claims arising from the TONC itself. The second was for "any accrued and unpaid salary or other employee benefit or compensation owing to Employee as the date hereof." The Court of Appeal believed that indemnity rights did not fall within either of these exceptions, and even if the right to indemnification did qualify as compensation, the release remained invalid because its exception applied only to compensation owed as of the date of the agreement, a clause that would have improperly waived Edwards's right to future indemnity claims under Labor Code section 2802. The court also noted that, because the release expressly excepted two types of claims but did not expressly exempt indemnification rights, the release intended to waive those rights. As we explain, under Labor Code section 2802, a contract provision releasing "any and all" claims ***295 generally does not encompass nonwaivable statutory protections, and in particular does not implicitly apply to an employee's right to indemnification from the employer.

[13] [14] [15] "Where the language of a contract is clear and not absurd, it will be followed. [Citations.] But if the meaning is uncertain, the general rules of interpretation are to be applied." (1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 741; Civ.Code, §§ 1637, 1638; see also *Sierra Vista Regional Medical Center v. Bontá* (2003) 107 Cal.App.4th 237, 245–246, 132 Cal.Rptr.2d 9.) Here the meaning is in dispute and uncertain; we must therefore decide what the phrase "any and all" means. "If

a contract **954 is capable of two constructions courts are bound to give such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect...." (*Rodriguez v. Barnett* (1959) 52 Cal.2d 154, 160, 338 P.2d 907; see also *Jones v. Humanscale Corp.* (2005) 130 Cal.App.4th 401, 411, 29 Cal.Rptr.3d 881; *Loral Corp. v. Moyes* (1985) 174 Cal.App.3d 268, 278, 219 Cal.Rptr. 836; Civ.Code, §§ 3541["[a]n interpretation which gives effect is preferred to one which makes void"], 1643 ["[a] contract must receive such an interpretation as will make it lawful, operative, reasonable, and capable of being carried into effect"].)

[16] [17] The TONC did not expressly reference indemnity rights, and we should not read it as encompassing a waiver of Edwards's indemnity rights. Giving the TONC such a reading is consistent with the tenets of contractual interpretation because it makes the contract lawful, valid and capable of being carried into effect. In addition, our conclusion makes it unnecessary to insert additional language or terms into the contract, which is consistent with Code of Civil Procedure section 1858 and its mandate that when courts construe an instrument, a judge is "not to insert what has been omitted, or to omit what has been inserted...." "[I]t is one of the cardinal rules of interpreting an instrument to give it such construction as will make it effective rather than void." (*Toland v. Toland* (1898) 123 Cal. 140, 143, 55 P. 681.) We apply this rule in holding that a contract provision releasing "any and all" claims, such as that used in the TONC in the present case, does not encompass nonwaivable statutory protections, such as the employee indemnity protection of section Labor Code 2802. In so holding, we interpret the TONC such that it does not violate Labor Code section 2804. As a consequence, the TONC is neither unlawful nor null and void.

[18] Even if we ignored the above principles of contract interpretation, we would still find that releasing "any and all" claims does not implicate Edwards's nonwaivable right to indemnity. Andersen contends it did not except indemnity rights from the release because it was aware that under Labor Code section 2804, such rights are statutorily nonwaivable. Andersen asserts essentially that such an exception was legally unnecessary. California case law arguably supports Andersen's contention. " ' "[A]ll applicable laws in existence when an agreement is made, which **297 laws the parties are presumed to know and to have had in mind, necessarily enter into the contract and form a part of it, without any stipulation to that effect, as if they were expressly referred to and incorporated." [Citation.]' " (*Torrance v. Workers' Comp. Appeals Bd.* (1982) 32 Cal.3d 371, 378, 185 Cal.Rptr.

645, 650 P.2d 1162, quoting *Alpha Beta Food Markets v. Retail Clerks Union* (1955) 45 Cal.2d 764, 771, 291 P.2d 433.) This means that when we interpret the TONC, we could presume that Andersen knew Edwards's indemnity rights were statutorily nonwaivable. It ***296 also means we may treat the TONC as if it expressly includes the substance of Labor Code section 2804: that no *955 employee's right to indemnification, to which he or she is entitled under the law, can be waived. (*Liberio v. Vidal, supra,* 240 Cal.App.2d at p. 276 & fn. 1, 49 Cal.Rptr. 520.) Therefore, the waiver of "any and all" claims would not encompass the right to indemnification, because we treat the TONC as expressly incorporating the law that the employee cannot waive that right.[7]

[19] Edwards suggests contract drafters could easily fix the overbroad release problem by including the clause "except as otherwise prohibited by law" after "any and all." We fail to see what difference this would make. The phrase "except as otherwise prohibited by law" is vague and essentially informs the employee of nothing. In addition, it appears most practitioners already operate with the understanding that such releases do not encompass items "otherwise prohibited by law." If they do, they are null and void under the Labor Code. Therefore, we believe that voiding all existing releases which include the language "any and all" is inappropriate.

We conclude that a contract provision releasing "any and all" claims does not encompass nonwaivable statutory protections, such as the employee indemnity protection of Labor Code section 2802 and, accordingly, is not void under Labor Code section 2804.

### DISPOSITION

We hold that the noncompetition agreement here is invalid under section 16600, and we reject the narrow-restraint exception urged by Andersen. Noncompetition agreements are invalid under section 16600 in California, even if narrowly drawn, unless they fall within the applicable statutory exceptions of sections 16601, 16602, or 16602.5. In addition, we conclude that the TONC at issue in this case did not purport to release Andersen from any nonwaivable statutory claims and therefore is not unlawful under Labor Code sections 2802 and 2804.

We therefore affirm in part and reverse in part the Court of Appeal judgment, and remand the matter for proceedings consistent with the views expressed above.

WE CONCUR: GEORGE, C.J., BAXTER, MORENO, and CORRIGAN, JJ.

*956 Concurring and Dissenting Opinion by KENNARD, J.

Plaintiff Raymond Edwards, a certified public accountant, was employed by defendant Arthur Andersen in its Los Angeles office as a tax manager, and he was eventually promoted to senior manager. When Edwards was hired in 1997, Andersen insisted that he sign a noncompetition agreement that barred him from leaving Andersen and (during the subsequent 18 months) performing the same professional services for any of the same clients.

In the wake of the Enron scandal, Andersen sold its domestic accounting practice to various purchasers. HSBC USA, Inc. (HSBC) agreed to purchase Edwards's practice group. As part of this purchase, employees in Edwards's practice ***297 group would resign from Andersen and they would be offered employment at HSBC, where they would perform the same duties they had previously performed at Andersen, but, to do **298 so, they first needed to sign a "Termination of Non-compete Agreement" (TONC). The TONC was a general release of claims against Andersen, in exchange for which Andersen would release the employee from the noncompetition agreement, thereby freeing the employee to advise the same clients on behalf of their new employer.

Edwards explains in his brief that he "was painfully aware that he was exposed to potential liability by Andersen's marketing of disallowed tax shelters, and [therefore] he specifically raised the issue of waiver of his indemnification rights when Andersen presented him with the release." Andersen, however, insisted that he sign the release. When Edwards refused to do so, Andersen terminated him without paying severance benefits, and HSBC withdrew its offer of employment.

Edwards sued Andersen, HSBC, and an HSBC subsidiary. After he settled with HSBC and the subsidiary, and after the trial court sustained a demurrer to Edwards's claim under the Cartwright Act (Bus. & Prof.Code, § 16720 et seq.), his only remaining claim against Andersen was for intentional interference with prospective economic advantage. One element of this tort is that the act of interference be wrongful for a reason independent of the interference itself. (See *Della Penna v. Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376, 392–393, 45 Cal.Rptr.2d 436, 902 P.2d 740.) Among other things, Edwards asserted that the 1997 noncompetition agreement

was invalid under Business and Professions Code section 16600, and it was therefore wrongful for Andersen to require him to sign the TONC as a condition for releasing him from the invalid noncompetition agreement. Edwards also asserted that releases of employee indemnity rights are "null and void" under Labor Code sections 2802 and 2804, and it was therefore wrongful for Andersen to include in the TONC a release of such rights.

**\*957** The trial court held a bifurcated trial on the issue of the validity of the 1997 noncompetition agreement and the TONC. Without taking evidence, the court found both agreements valid as a matter of law, and it granted judgment in favor of Andersen. The Court of Appeal reversed, concluding that both the noncompetition agreement and the TONC were invalid and that Andersen's actions were therefore wrongful.

The majority affirms in part and reverses in part the judgment of the Court of Appeal. The majority agrees with the Court of Appeal that the noncompetition agreement was invalid under Business and Professions Code section 16600 (maj. opn., *ante,* 81 Cal.Rptr.3d at pp. 287–292, 189 P.3d at pp. 290–294) and concludes that "to the extent Andersen demanded Edwards execute the TONC as consideration for release of the invalid provisions of the noncompetition agreement, such demand could be considered a wrongful act for purposes of his claim for interference with prospective economic advantage" (*id.* at pp. 291–292, 189 P.3d at pp. 293–294). I agree.

The majority, however, disagrees with the Court of Appeal's conclusion that the TONC was invalid. (Maj. opn., *ante,* 81 Cal.Rptr.3d at pp. 291–296, 189 P.3d at pp. 293–297.) On this point, I disagree with the majority.

The majority focuses on the TONC's use of the words "any and all ... claims," concluding that the phrase is ambiguous (maj. opn., **\*\*\*298** *ante,* 81 Cal.Rptr.3d at pp. 294–295, 189 P.3d at p. 296) and should be interpreted narrowly to make the release "valid and capable of being carried into effect" (*id.* at p. 295, 189 P.3d at p. 296). On that basis, the majority concludes that the words "any and all" were not intended to encompass within the release's scope indemnity claims that under Labor Code sections 2802 and 2804 are not subject to release. (Maj. opn., *ante,* 81 Cal.Rptr.3d at p. 295, 189 P.3d at p. 296.) The majority finds persuasive Andersen's argument that the TONC did not need to include an express exception preserving these indemnity claims because these indemnity rights are statutorily nonwaivable. (*Id.* at pp. 295–296, 189 P.3d at pp. 296–297.) Thus, the majority reads the TONC "as if it expressly includes the substance

of Labor Code section 2804: that no employee's right to indemnification, to which he or she is entitled under the law, can be waived." (Maj. opn., **\*\*299** *ante,* 81 Cal.Rptr.3d at p. 296, 189 P.3d at p. 297.)

But the majority fails to analyze the language of the TONC that most strongly supports Edwards's argument. The TONC did not merely require Edwards to release Andersen from "any and all" claims; it specifically required Edwards to release Andersen from "any and all ... *losses* [or] ... *expenses* ... including ... *claims that ... arise from ... employment* ...." (Italics added.) This language closely tracks Labor Code section 2802, subdivision (a), which requires an employer to indemnify an employee "for all necessary *expenditures* or *losses* incurred by the employee *in direct consequence of the discharge of his or her duties* ...." (Italics added.) Thus, although it is true that the TONC did not use the words "indemnity claims" **\*958** and did not mention Labor Code section 2802, it unambiguously required Edwards to release the precise indemnity rights that Labor Code section 2802 grants him.

Andersen argues in effect that the TONC was a standard release of "any and all" claims and that the TONC failed to spell out a special exception preserving indemnity claims, but that in light of Labor Code sections 2802 and 2804, the exception was implied. That argument, however, mischaracterizes the TONC. The TONC was not a vague general release whose only shortcoming was the failure to include a special exception preserving indemnity claims; rather, the TONC used language *expressly releasing the precise indemnity claims that the Labor Code preserves.* Therefore, this court should not lightly dismiss the Court of Appeal's conclusion that Andersen may have wanted its employees to *think* they had released their indemnity rights, although it knew that any release of such rights was void. As the Court of Appeal explained, quoting from *Latona v. Aetna U.S. Healthcare Inc.* (1999) 82 F.Supp.2d 1089, 1096: " '[D]efendant's argument, that the Agreement cannot violate public policy because ... it is simply a nullity, ignores the realities of the marketplace.... Employees, having no reason to familiarize themselves with the specifics of California's employment law, will tend to assume that the contractual terms proposed by their employer ... are legal, if draconian.... Thus, the *in terrorem* effect of the Agreement will tend to secure employee compliance with its illegal terms in the vast majority of cases.' "

This latter point goes directly to the independent *wrongfulness* of Andersen's conduct, which is a critical issue for purposes of Edwards's claim of intentional

interference with prospective economic advantage. Labor Code section 2804 states that an agreement is "null and void" if it waives the indemnity rights set forth in Labor Code section 2802, and it prescribes no other penalty. Therefore, Andersen asserts that, even if the TONC is overbroad, ***299 Andersen's conduct in asking Edwards to sign the TONC was not wrongful; rather, the release is merely "null and void" to the extent of its overbreadth. I disagree.

If Andersen had merely drafted a vague general release without specifically describing indemnity claims, I would conclude, as does the majority, that Andersen's actions were taken in good faith and that the release's broad language should be read in light of existing law, making it "null and void" (Lab.Code, § 2804) to the extent the release's provisions might be read to cover nonwaivable rights. But instead Andersen drafted a release that expressly released specific claims (employment-related losses and expenses) that Andersen *knew were not subject to release.* As the Court of Appeal *959 observed, Andersen's actions suggest a possible purpose of misleading employees into thinking they had waived rights that could not be waived, thereby minimizing the number of indemnity claims these employees might bring against Andersen.

In my view, Andersen's insistence that Edwards sign the TONC was sufficiently wrongful to support Edwards's claim of intentional interference with prospective economic advantage. I would therefore affirm the judgment of the Court of Appeal in its entirety.

I CONCUR: WERDEGAR, J.

**All Citations**

44 Cal.4th 937, 189 P.3d 285, 81 Cal.Rptr.3d 282, 156 Lab.Cas. P 60,653, 2008-2 Trade Cases P 76,299, 27 IER Cases 1761, 08 Cal. Daily Op. Serv. 10,256

Footnotes

1   All further unlabeled statutory references are to the Business and Professions Code.

2   Edwards's reasons for refusing to sign the TONC included the fact that he believed it required him to give up his right to indemnification, which he felt was particularly important in light of the government's investigation into the company. Edwards also believed several of Andersen's clients for whom he did work would sue Andersen and name him as a defendant, and if that were the case he wanted to ensure he retained his right to indemnification.

3   Prior to oral argument, we granted Andersen's request that we take judicial notice of various documents providing information on the history of section 16600 and its predecessor statutes. (Evid.Code, §§ 452, 453, 459.)

4   We do not here address the applicability of the so-called trade secret exception to section 16600, as Edwards does not dispute that portion of his agreement or contend that the provision of the noncompetition agreement prohibiting him from recruiting Andersen's employees violated section 16600.

5   As noted, the Ninth Circuit's reading of *Boughton, supra,* 231 Cal.App.2d 188, 41 Cal.Rptr. 714, and *King, supra,* 109 Cal.App.2d 316, 240 P.2d 710 may be the source of that Circuit's narrow-restraint exception to section 16600. We are not persuaded that *Boughton* or *King* provides any guidance on the issue of noncompetition agreements, largely because neither involved noncompetition agreements in the employment context. However, to the extent they are inconsistent with our analysis, we disapprove *Boughton v. Socony Mobil Oil Co., supra,* 231 Cal.App.2d 188, 41 Cal.Rptr. 714, and *King v. Gerold, supra,* 109 Cal.App.2d 316, 240 P.2d 710.

6   Webster's Collegiate Dictionary (1991) at page 1459 defines "unlawful" as "not lawful; *contrary to law;* illegal." (Italics added.)

7   Our holding that contracts ordinarily are presumed to incorporate statutory requirements and that the TONC here was not per se unlawful, does not preclude Edwards from offering proof on remand of facts that might prove the exception to the general rule based on Andersen's conduct. We express no opinion concerning the merits of such a claim, which alleges a factual theory that is independent of the legal theory the trial court resolved and that we review in this opinion.

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by Trustees of Boston University v. Ligand
Pharmaceuticals, Inc., D.Del., April 11, 2003

**38 Del.Ch. 459**
**Court of Chancery of Delaware, New Castle County.**

N. Norman SCHUTZMAN, trading as Snelling and
Snelling, Plaintiff,

v.

John M. GILL and Casey Employment Service,
Inc., a Delaware corporation, Defendants.

**Aug. 27, 1959.**

Action by individual operating employment agency under
franchise from national organization to enjoin former
employee from continuing employment with defendant
employment agency contrary to agreement executed by
former employee and individual to the effect that former
employee would not within a period of one year following
termination of employment engage in employment agency
business. The Court of Chancery, Seitz, Chancellor, held
that although agreement stated that it was made between
employee, individual and the national employment
service which franchised individual and national
employment service did not execute agreement until after
termination of employment by former employee, since
individual had executed agreement within reasonable time
after former employee had signed the same and former
employee worked many months after execution of
agreement, agreement was enforceable by individual
against employee even though it was not enforceable by
national employment service against employee.

Judgment for plaintiff.

West Headnotes (13)

[1] **Contracts**
  Signature

Where contract is reduced to writing and a
number of persons are named therein as parties,
a portion of whom signed and a portion of
whom did not affix their signatures, question of
whether or not those who have signed contract
are bound thereby is to be determined by

intention and understanding of parties at time of
execution of instrument.

2 Cases that cite this headnote

[2] **Contracts**
  Signature

Where employment contract recited that
employee would not engage in employment
agency business within one year after
terminating services with individual operating
employment agency under franchise from
national corporation, and agreement by its terms
was between employee, individual employer and
national corporation and was executed by
employee and individual employer, agreement
was enforceable by individual employer
notwithstanding fact that it was not enforceable
against employee by national corporation which
had failed to sign the same until after
termination of employment.

Cases that cite this headnote

[3] **Equity**
  Nature of unconscionable conduct

Where employee signed agreement with
individual operator of employment agency under
franchise from national corporation to the effect
that employee would not engage in employment
agency business for one year after termination of
services, and individual employer refused to
give approval to national corporation's
employment of employee subsequent to
termination of employment services, under
circumstances, refusal of individual could not be
considered inequitable and hence individual was
not prevented from bringing action to enforce
agreement because of clean hands doctrine.

Cases that cite this headnote

**[4]** **Contracts**
👈Effect of breach in general

If employer was guilty of any material breach of employment contract which provided that employee would not engage in similar business within one year after termination of employment, employer could not enforce provisions against employee who had terminated services and worked in similar business within the one-year period.

1 Cases that cite this headnote

**[5]** **Contracts**
👈Weight and sufficiency in general

In employer's action against former employee to enforce provision of employment contract requiring employee not to engage in competing business within one year after termination of services and providing that rate of compensation should be agreed upon between the parties, evidence of employer's withholding slightly more than he should have for employee's social security payments did not disclose anything more than an innocent error arising from lack of competence in field and treatment of withholding was not considered by employee as a breach of oral compensation agreement.

Cases that cite this headnote

**[6]** **Accord and Satisfaction**
👈Disputed or Unliquidated Claims
**Accord and Satisfaction**
👈Operation and effect of satisfaction
**Compromise and Settlement**
👈Acceptance
**Compromise and Settlement**
👈Operation and Effect

Where employment contract provided that compensation should be as orally agreed upon and under subsequent oral arrangement

employee was to receive commissions in accordance with a schedule agreed upon and dispute arose over commission due with respect to a particular piece of business and employer paid commission that he contended was right and employee did not give notice of intention to leave until about five months after dispute, parties had reached a practical accord as to this aspect of compensation agreement and employee could not rely upon that dispute to establish a breach of contract by employer seeking to enforce employment agreement forbidding employee to compete in similar business for one year after termination of employment.

Cases that cite this headnote

**[7]** **Contracts**
👈Acts or Omissions Constituting Breach in General

Where employment agreement forbidding employee to compete in a similar business for a year after terminating services provided compensation was to be orally agreed upon and there was a subsequent oral agreement with respect to commissions to be received by employee but parties at no time agreed as to whether certain fees were to be included in determining applicability of a 10% bonus provision, and dispute arose on this matter shortly before employee terminated services, employee could not rely on this dispute as establishing a breach of contract in order to prevent enforcement of noncompeting provision by employer.

3 Cases that cite this headnote

**[8]** **Injunction**
👈Non-competition and non-solicitation issues

Where employment contract provided that employee upon termination of services agreed not to engage in employment agency business for one year following termination of services

and employee terminating service did become employed by another employment agency and employer had not breached employment contract, employee would be restrained from working for employment agency for one year from date of termination of employment with former employer.

Cases that cite this headnote

[9] **Labor and Employment**
🔑 Defenses

In employer's action to enforce employment contract provision requiring employee not to compete for one year after termination of services wherein employee counterclaimed for money due him, evidence failed to establish that employee had taken any records with him contrary to provision of written agreement stipulating that employee taking any records upon termination of employment forfeited all claim to any compensation.

Cases that cite this headnote

[10] **Labor and Employment**
🔑 Commissions

In counterclaim by former employee of employment agency seeking to recover compensation due him, evidence established that former employer determination that former employee was not to get credit for placement of a certain individual was made under strained conditions and after employer was aware that employee was leaving, and hence decision was arbitrary and contrary to compensation agreement entitling employee to recover commission based on placement of such man.

Cases that cite this headnote

[11] **Labor and Employment**

🔑 Effect of termination of employment

In former employee's counterclaim to recover compensation allegedly due him from former employer who had written agreement providing that if services were terminated within one year employee should receive half of any commissions earned by him, employee failed to prove subsequent oral amendment to such provision.

Cases that cite this headnote

[12] **Labor and Employment**
🔑 Effect of termination of employment

In former employee's counterclaim to recover commissions allegedly due him from former employer operating employment agency, where employment contract provided that if the same were terminated after one year employee should receive one half of any commissions earned by him after they had been collected by national franchising organization, evidence established that employee was entitled to commission on placement of individual referred by him although such individual's contract of employment was not consummated until after employee had left employment of agency.

Cases that cite this headnote

[13] **Injunction**
🔑 Non-competition and non-solicitation issues
**Injunction**
🔑 Award of damages and other monetary relief

Where employment contract provided that employee would not engage in employment agency work within one year after termination of service and defendant employment agency was put on notice before hiring former employee that former employer had a contract with former employee containing the restrictive covenant, employment agency would be restrained from employing former employee for one year from date of termination of services with former

employer but punitive damages would not be assessed since there was some basis for believing that employment agency's actions were based in part on an omission not personal to owner of such agency.

[Cases that cite this headnote]

**Attorneys and Law Firms**

**228 *462 Joseph H. Flanzer, Wilmington, for plaintiff.

Arthur J. Sullivan, of Morris, James, Hitchens & Williams, Wilmington, for defendant, John M. Gill.

Ernest S. Wilson, Jr., of Morford, Young & Conaway, Wilmington, for defendant, Casey Employment Service, Inc.

**Opinion**

**229 SEITZ, Chancellor.

N. Norman Schutzman, trading as Snelling and Snelling ('plaintiff'), brought this action to enjoin the defendant, John Gill ('defendant') from continuing his employment with the defendant, Casey Employment Service, Inc. ('Casey'). Plaintiff's request is based upon a provision of an agreement signed by defendant and plaintiff to the effect that defendant would not within a period of one year following termination of his employment with plaintiff 'engage in the employment agency business for himself or association in any capacity with any other person or firm engaged in a similar business to Snelling and Snelling, * * *'.

It is conceded that defendant is now working for Casey and that Casey is a firm engaged in a business similar to Snelling's.

The plaintiff is an independent entity but has a franchise from a national employment service known as Snelling and Snelling, Incorporated of Philadelphia, Pa. ('Snelling'). The plaintiff's predecessor *463 employed defendant in April 1956. The plaintiff purchased the Wilmington office about January 2, 1957, and continued defendant's employment. About August 16, 1957, at plaintiff's request, the defendant signed a written document containing the covenant which plaintiff now

seeks to enforce.

About January 15, 1959, defendant gave the plaintiff notice that he intended to terminate his employment and he did terminate it about February 13, 1959. About March 2, 1959, defendant was employed by Casey and continues to be so employed. This action resulted.

Defendant first contends that the agreement is not binding because it was not seasonally executed by Snelling. Below the signature lines it was recited that the agreement was to be executed in triplicate by the employee and the employer; that all copies were to be delivered to Snelling at Philadelphia for execution.

Although defendant suggests to the contrary, I am satisfied that it was signed by plaintiff within a reasonable period after it was executed by defendant. It is agreed, however, that the agreement was not sent to Snelling for execution until after the defendant terminated his employment with plaintiff. On the basis of this fact defendant contends that the contract is not binding on him.

[1] The law in this general area is set forth in [Deputy & Co. v. Hastings, 2 W.W.Harr. 345, 32 Del. 345, 123 A. 33, 34]. There the Superior Court, through Judge Rodney, stated that,

'* * * when a contract is reduced to writing and a number of persons are named therein as parties, a portion of whom sign the same and a portion of whom do not affix their signatures, the question of whether or not those who have signed the contract are bound thereby is to be determined by the intention and understanding of the parties at the time of the execution of the instrument'.

The court goes on to consider some of the more particular applications of this rule and states that,

'* * * in the absence of testimony showing that execution by all of the parties was intended or some other reason or consideration *464 calling for joint execution, the signatures of part of those named in the instrument bind them though others named therein have not signed the same'.

[2] Since Snelling did not sign the agreement before defendant terminated his employment it is clear that Snelling could not enforce this agreement against Gill. But plaintiff has a substantial property interest of his own which is entitled to protection and he signed the agreement seasonably. Defendant does not suggest that the covenant is invalid by virtue of any public policy or rule of contract law other **230 than that herein considered. Moreover, defendant worked many months

WESTLAW    © 2017 Thomson Reuters. No claim to original U.S. Government Works.                    4

after its execution.

Contrary to defendant's testimony, it is my conclusion that it was not agreed or intended that the agreement should be executed by Snelling before becoming effective. Considering the provisions of the agreement alone, it is clear that the signature of Snelling was called for solely so that it might enforce its provisions against defendant. Nowhere in the agreement is defendant given any rights against Snelling.

I therefore conclude that the agreement is enforceable by plaintiff against defendant despite the failure of Snelling to execute the agreement seasonably.

[3] Defendant next contends that the plaintiff does not come into equity with clean hands. Defendant says plaintiff prevented him from obtaining employment in the Philadelphia office of Snelling, even though such employment would not have violated his agreement. Had the evidence shown that Snelling unconditionally agreed to employ defendant after he terminated his services with plaintiff there might well be merit to defendant's contention. However, the evidence shows that Snelling only agreed to employ defendant if it was acceptable to plaintiff. Plaintiff refused to give such approval and I do not think such refusal can be considered inequitable action under the circumstances.

I therefore conclude that plaintiff is not prevented from bringing this action because of the clean hands doctrine.

*465 [4] Defendant next contends that plaintiff breached his contract of employment with defendant and therefore is not entitled to enforce the written agreement. If the plaintiff was guilty of any material breach of his employment contract, he may not enforce its provisions against the defendant. Compare Capitol Bakers v. Leahy, 20 Del.Ch. 407, 178 A. 648.

[5] Defendant says that the only reason he terminated his employment with plaintiff was because plaintiff failed to pay him certain money to which he was entitled. It should be noted that the written agreement containing the covenant which plaintiff seeks to enforce also provides that 'the rate of compensation shall be as agreed upon between the parties'. The compensation arrangement between the parties was entirely oral. Its terms are discussed later herein.

Defendant first alleges that plaintiff breached his contract by withholding excessive sums for social security payments from defendant's compensation. For the calendar year 1957, the plaintiff admittedly withheld from defendant's pay for social security payments $6.56 more than he should. However, he included this sum later as part of the money withheld and paid for defendant's federal income tax. It was included in the sum shown on the W–2 form. For the calendar year 1958 the plaintiff withheld $27.44 more than was required for social security payments. He once again included it in the defendant's federal withholding tax and showed it on the W–2 form.

Defendant says he told plaintiff he was withholding too much for social security but that plaintiff persisted in his error. I do not believe plaintiff was guilty of anything more than innocent error arising from lack of competence in this field. I can find no intent to deprive defendant of these relatively small sums. Of course the money should have been paid to defendant but I cannot and do not believe the treatment thereof was considered by defendant as a breach of their oral compensation arrangement. Nor was it such in fact.

[6] Defendant claims that plaintiff failed to pay him the agreed compensation. Under their oral arrangement defendant was to receive one-third of all cash commissions brought in by him. He was also to receive certain 'bonus' money consisting of the following:

**231 *466 1. Fifty per cent of the second split commission in any one month and 60% of any additional splits in the same month.

2. An additional 10% of commissions in the event more than $2,000 per month was brought in by his division.

Defendant claims a breach of the compensation arrangement because he was given only 33 1/3% rather then 50% of the fee obtained from a second split placement made in the same month. Under their oral compensation arrangement defendant was to receive 50% of a second split obtained in any one month. The dispute arose because, while the second split placement was also made in July 1958, it was not billed until August. Incidentally, it was billed by defendant not plaintiff. Plaintiff claims that the billing date controls while defendant contends that the placement date controls. The testimony on this point is conflicting. Regardless of which date is the most logical one to control, any agreement between the parties must prevail.

According to defendant's own testimony he did not give notice of an intention to leave until January 15, 1959. This was about five months after the issue over this dispute had been resolved in practice in favor of the billing date. Thus, the parties reached a practical accord as to this aspect of their compensation agreements and the

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

defendant cannot now rely upon that dispute to establish a breach of contract by the plaintiff.

Defendant's final contention is that plaintiff broke the contract by failing to pay to defendant a 10% bonus on the commissions earned by him in November of 1958. This claim is based upon the theory that a term of the contract was that plaintiff was to pay to defendant a bonus of 10% of all commissions earned by defendant in any month that defendant brought in placement fees exceeding $2,000. It is agreed that in November of 1958, defendant brought in over $2,000 in placement fees. However, plaintiff contends that since splits on which bonuses had already been paid were necessary to make up the $2,000, the 10% commission was not due; i. e. that the 10% commission was due only if placement fees resulting from non-splits exceeded $2,000.

[7] In view of defendant's admission and the lack of evidence to the contrary, I must assume that November of 1958 is the first month **467** in which this situation arose. Since defendant gave notice of termination shortly thereafter, it is impossible to construe a 'practical accord' on this issue. It is my belief that the parties at no time agreed as to whether placement fees from splits were to be included in determining the applicability of the 10% bonus provision. Since an agreement was never reached between the parties to cover this particular situation, defendant cannot prevail upon his contention that plaintiff broke the agreement by failing to accept defendant's construction of plaintiff's bonus plan.

It must be noted, however, that the failure of the parties to agree as to this particular aspect of the compensation plan does not negate the covenant not to compete which was contained in the written agreement. I say this because the compensation aspects of the agreement were only to be those which should 'be agreed upon between the parties'. Defendant does not contend that the written agreement is, in and of itself, a legal nullity.

I therefore conclude that plaintiff is not precluded from enforcing the covenant against accepting employment with a competitor because of any breach of the compensation agreement.

[8] An injunction will issue restraining defendant from working for the defendant Casey until February 12, 1960.

[9] Defendant has counterclaimed for money due him. Plaintiff argues that defendant is not entitled to any money because he took records and information when he left. He relies upon paragraph 6 of the **232** written agreement which provides in pertinent part that if an employee takes records, etc., he forfeits all claims to any compensation whether accrued or not. The short answer is

that plaintiff failed completely to prove that defendant took any records or made any list of job applicants for the purpose of taking it with him. Consequently the provision of paragraph 6 is inapplicable. Plaintiff's memorandum does not suggest any other ground as the basis for a general denial of compensation to defendant.

I now deal with specific items in dispute. Defendant claims certain sums based upon his contentions with respect to plaintiff's alleged breaches of contract. Since I have resolved these 'bonus' items **468** against defendant on the breach of a contract issue, it follows that he cannot recover these items in his counterclaim.

Defendant says he should have received the commission on the placement of one Walker as a plant manager. This placement was credited by plaintiff to the administrative division rather than to the technical division of which defendant was in charge. The facts show that the placement made in the Walker case was made by defendant. However, the undisputed evidence was that the classification of the placement (i. e., whether technical or administrative) depended upon the type of work done by the person placed. Obviously, such an arrangement invites problems where, as here, the man's duties are both administrative and technical.

[10] The testimony was that the plaintiff made the determination as to which placement desk was to get 'credit'. Ordinarily the court would give great weight to that determination. Here, however, the determination was made under strained conditions and after plaintiff was aware that defendant was leaving. Considering this circumstance and in the light of the other evidence as to past similar determinations, I conclude that plaintiff's decision was arbitrary and contrary to his compensation arrangement with defendant.

It follows that defendant is entitled to recover his portion of the Walker placement commission.

The defendant also seeks to recover the regular one-third commission on payments received from placements made by defendant before he terminated his employment. The plaintiff contends that the defendant is not entitled to any such compensation because he took books and records. I have, of course, decided that defendant did not take any records and so defendant is entitled to payment.

[11] I next consider whether defendant is entitled to the regular 33 1/3% commission or only to one-sixth of the commission received on each placement made by him before he terminated his employment. Plaintiffs' contention that defendant is entitled to only one-sixth is based on paragraph 3 of the written agreement which

provides that 'If terminated after one year from the date hereof, employee shall receive one-half of any commissions earned by him after they shall **469** have been collected by Snelling.' Defendant contends that plaintiff paid other employees their full commissions when they terminated their employment. This plaintiff admitted. However, plaintiff denied that defendant was entitled to this because of the fact that he took records and went with a competitor. He also said that this arrangement was not a matter of agreement but was a voluntary act on his part.

Since the written agreement covered this situation the defendant has a heavy burden to show that its terms were subsequently altered by the later oral agreement. I have come to the conclusion that defendant failed to prove an agreement between plaintiff and defendant on this point. I say this principally because I believe that the matter was not handled as one of contract but one of 'grace' on the part of plaintiff. **233** Thus, I need not consider the effect of defendant's going with a competitor.

I therefore conclude that as to any commission collected on placements made by defendant before he terminated his employment, the plaintiff must pay him the one-sixth provided by the written contract rather than the one-third claimed.
[12] The parties are in dispute as to whether the Beverly placement is subject to the termination-commission arrangement. It appears that while Beverly was referred by defendant, the contract of employment was not consummated until after defendant left the employ of plaintiff. The wording of paragraph 3 of the agreement states that an employee terminating his agreement shall receive one-sixth of any commission earned by him. Consequently the problem is to determine whether or not the Beverly commission was earned by defendant.

I think the evidence shows that insofar as the relation of the employment office was concerned the placement was complete before defendant terminated his services. Under these circumstances I think defendant earned the Beverly commission before he left. Consequently, he is entitled to one-sixth thereof.

There seems to be a slight difference of opinion between plaintiff and defendant with respect to the amount owed for the month of January **470** 1959. It is not clear from the memoranda submitted as to the basis upon which the court should decide this issue. Consequently, unless defendant desires to present his contention on this point orally to the court, the item will be disallowed.

I believe my rulings herein will permit the parties to determine the commission to which defendant is entitled for subsequent months. After the amount is ascertained the Court will enter a money judgment therefor.

The plaintiff will of course also be required to account to defendant for the monies due him on the basis of fees hereafter received on placements made by defendant before he terminated his employment.

The plaintiff also seeks an injunction against the defendant Casey as well as punitive damages.
[13] Casey, through its attorney, was put on notice before hiring defendant that plaintiff had a contract with defendant containing the covenant here enforced. Consequently it should also be restrained from employing Gill for the same period. However, I do not deem it appropriate to assess punitive damages because there is some basis for believing that Casey's actions were based in part on an omission not personal to Casey.

Present order on notice.

## All Citations

38 Del.Ch. 459, 154 A.2d 226

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Declined to Extend by Robert Half Intern., Inc. v. Stenz, E.D.Pa.,
November 17, 2000

**1997 WL 458494**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Court of Chancery of Delaware.

VITALINK PHARMACY SERVICES, INC., a
Delaware corporation, and MANOR CARE, INC., a
Delaware corporation, Plaintiffs,
v.
GRANCARE, INC., a Delaware corporation, f/k/a
NEW GRANCARE, INC., Defendants.

Date Submitted:

Date Decided:

No. 15744.
|
Aug. 7, 1997.

*MEMORANDUM OPINION*

JACOBS, Vise Chancellor.

July 25, 1997

August 7, 1997

**\*1** Martin P. Tully, A. Gilchrist Sparks, III, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; and James A. Laurenson and Susan V. Belanger, Esquires of ARTER & HADDEN, Cleveland, Ohio; Attorneys for Plaintiff Vitalink Pharmacy Services, Inc.

Bruce M. Stargatt, David C. McBride and James P. Hughes, Jr., of YOUNG, CONAWAY, STARGATT & TAYLOR, Wilmington, Delaware; and Laurence A. Silverman, Kevin J. Burke, and Daniel L. Cantor, Esquires of CAHILL GORDON & REINDEL, New York, New York;; Attorneys for Plaintiff Manor Care, Inc.

Allen M. Terrell, Jr., Jesse A. Finkelstein, and Raymond J. DiCamillo, Esquires of RICHARDS, LAYTON & FINGER, Wilmington, Delaware; and William W. Maycock, and Jason S. Bell, Esquires of SMITH, GAMBRELL & RUSSELL, Atlanta, Georgia; Attorneys for Defendant GranCare, Inc.

Pending is a motion for preliminary injunctive relief in this action brought to enforce a noncompetition agreement entered into in connection with a contemplated recapitalization and merger. In this action the plaintiffs,

Vitalink Pharmacy Services, Inc. ("Vitalink") and Manor Care, Inc. ("Manor Care"), seek to prevent the defendant, GranCare, Inc. ("GranCare"), from entering into a proposed combination with Living Centers of America, Inc. ("LCA"). The basis for the motion and this action is that that proposed transaction would violate a February 12, 1997 Non–Competition Agreement (the "Non–Competition Agreement" or "Agreement") by and among Vitalink, Manor Care, and GranCare. Under that Agreement, GranCare may not, for a period of three years, "... directly or indirectly, own, manage, operate, join, control, or participate in the ownership, management, operation or control of any person (other than Vitalink) that is engaged in the institutional pharmacy business in the United States ..."[1] Plaintiffs contend that because LCA is engaged in the institutional pharmacy business and competes with Vitalink, the proposed combination of GranCare with LCA will violate that prohibition. GranCare disputes that claim.

For the reasons set forth below, the Court concludes that a preliminary injunction must issue.[2]

## I. FACTS

To understand the legal dispute presented, some recent history is helpful. Manor Care, GranCare, and LCA each provide specialized medical services that center on long-term care facilities. Before 1996, each of these corporations owned subsidiaries that operated and managed three basic business: 1) institutional pharmacy services ("IP business"); 2) skilled nursing services ("SN business"); and 3) ancillary services ("Rehab business"). With specific respect to the IP Business, Manor Care owned 82% of the stock of Vitalink, GranCare owned 100% of TeamCare, and LCA owned 100% of American Pharmaceutical Services, Inc. ("APS"). Vitalink, TeamCare and APS are all institutional pharmacy businesses.

A. *The February 12, 1997 Vitalink/TeamCare Transaction*

**\*2** In January 1996, Grancare (referred to as "Old Grancare") began discussions with Manor Care about a possible combination of TeamCare and Vitalink.[3] One year later, on February 12, 1997, Vitalink acquired TeamCare in a three step transaction. First, all of Old GranCare's businesses and related assets (other than TeamCare) were transferred to "New Grancare," a specially-created subsidiary of Old GranCare. Second, New GranCare was spun off as a free-standing public company, and was then renamed "GranCare." Third, Old GranCare (which at that point was a holding company for TeamCare) merged into Vitalink. As a result of this transaction: (i) Manor Care's stock ownership in Vitalink was reduced to 45%, (ii) GranCare exited from the IP Business, and (iii) Manor Care and Old GranCare's shareholders owned the combined Vitalink/TeamCare. The transaction occurred as illustrated below:

*PRE-ACQUISITION (Before February 12, 1997)*

TABULAR OR GRAPHIC MATERIAL SET AT THIS POINT IS NOT DISPLAYABLE

*POST-ACQUISITION (After February 12, 1997)*

As part of the TeamCare acquisition, the parties to that transaction entered into certain agreements whose terms are pertinent to the instant injunction motion. Those agreements are next summarized.

1. *The Shareholders Agreement*

As part of the TeamCare acquisition, Manor Care entered into a shareholders agreement that permitted GranCare to designate four of the eight members of the Vitalink Board of Directors, and required Manor Care to vote in favor of those directors and/or their designated successors for three years.[5] GranCare then appointed four of its current directors to sit on Vitalink's board, and GranCare's Chairman, Gene Burleson, became Vitalink's Chairman and Chief Executive Officer.

2. *The Non–Competition Agreement*

On February 12, 1997, Vitalink, Manor Care and GranCare also entered into the Non–Competition Agreement. The relevant language of the Agreement is found in Section 1.1, which provides:

> Section 1.1 *Non-competition.* Manor Care and New GranCare acknowledge that: the principal business of Vitalink is, and will be following the Merger, the institutional pharmacy business (the "Institutional Pharmacy Business"), the Institutional Pharmacy Business of Vitalink is national in scope and Vitalink will suffer substantial and irreparable harm in the event Manor Care or New GranCare should engage in the Institutional Pharmacy Business in competition with Vitalink. Accordingly, for a period of three years from the Effective Time neither Manor Care nor New GranCare will, directly or indirectly, own, manage, operate, join, control or participate in the ownership, management, operation or control of any person (other than Vitalink) that is engaged in the Institutional Pharmacy Business in the United States, other than temporarily as provided in Section 1.3 hereof.[6]

The Non–Competition Agreement also contains a mechanism that governs if GranCare were to acquire a firm that includes an IP business.[7] In that event, GranCare would be required to offer to Vitalink the opportunity to purchase that IP business, and if Vitalink declined, then

GranCare must use commercially reasonable efforts to divest the IP business within one year of the closing of the acquisition.


B. *LCA's Participation in the IP Business*

*3 LCA's IP division consists solely of APS. The IP division and APS are both headed by the same person, William Korslin ("Korslin"), who is APS's President.[8] Korslin's employment contract is with LCA, not APS, and Korslin reports directly to Leroy Williams, who is LCA's Chief Operating Officer ("COO").[9] Major strategic decisions regarding the business of APS are made by Korslin in consultation with, and subject to the final approval of, Mr. Williams and Edward L. Kuntz ("Kuntz"), LCA's Chief Executive Officer ("CEO"). Messrs. Williams and Kuntz retain ultimate responsibility for the overall performance of APS.[10]


C. *The Proposed LCA/GranCare Merger*

The record discloses that even before GranCare executed the Non–Competition Agreement with Manor Care and Vitalink, LCA and GranCare had been negotiating a possible business combination. On February 13, 1997—one day after the Non–Competition Agreement was executed—LCA sent GranCare a Confidentiality Agreement as a condition of responding to GranCare's *earlier* request for information "in connection with [GranCare's] consideration of a possible acquisition or other transaction involving the Company ..."[11] Over the next three months LCA and GranCare continued to negotiate.


1. *The May 8, 1997 Press Release*

On May 8, 1997—less than three months after the Non–Competition Agreement was executed—GranCare publicly announced in a press release a recapitalization and merger transaction that would result in a new company ("New LCA"), that would be the second largest long-term care provider in the United States, in a transaction valued at roughly $1.8 billion.[12] The merged entity would operate over 330 facilities in 21 states, and in addition to long term care, "*the company will provide pharmaceutical* and rehabilitation *services,* assisted living and geriatric specialty health care services nationwide."[13] LCA's current shareholders would own 11.2% of New LCA shares, GranCare shareholders would own 49.5%, and Apollo Management, L.P., a New York based investment firm ("Apollo"), would own the remaining 39.3%. The board of directors and management of New

LCA would consist of directors and executives from both GranCare and LCA.

In the May 8, 1997 press release, GranCare's Chairman, Gene Burleson, stated that the "partnering" of GranCare and LCA "will achieve increased revenue growth, economies of scale and strengthened operating margins."[14] LCA's Chairman and CEO, Mr. Kuntz, stated that "[w]e are very excited about the opportunity to grow this combined company, which will now be a powerful force and a strong consolidator in the long-term care industry."[15]

Five days later, on May 13, 1997, Manor Care informed GranCare that its proposed merger with LCA appeared to violate the Non–Competition Agreement.[16] Responding on May 16, 1997, GranCare took the position that its obligations under the Non–Competition Agreement were not triggered by the proposed merger.[17] On May 20, 1997, Vitalink responded to both letters, stating, *inter alia,* that it expected GranCare to comply with the terms of Section 1.1 of the Non–Competition Agreement.[18] GranCare never answered Vitalink's letter.


2. *The June 16, 1997 Press Release*

*4 On June 16, 1997, GranCare, LCA and Apollo issued a second press release that announced amendments to the proposed merger terms.[19] Under the amended terms, Apollo would own approximately 45% of the New LCA stock, GranCare's stockholders would own 43%, and LCA's current shareholders would own 12%. Following the acquisition as presently planned, New LCA would be structured thusly:

TABULAR OR GRAPHIC MATERIAL SET AT THIS POINT IS NOT DISPLAYABLE

Under this amended structure, GranCare and APS would be wholly-owned "sister" corporate subsidiaries of New LCA, and APS (but not GranCare) would operate the IP business of the combined LCA entity.

The June 16, 1997 press release also announced that (i) Mr. Burleson, GranCare's Chairman and Vitalink's CEO, would become New LCA's Chairman, (ii) Scott Athans, GranCare's CEO, would become New LCA's COO, and (iii) Everett Benton, GranCare's Executive Vice President and General Counsel, would become New LCA's Executive Vice President and General Counsel. New LCA would be headquartered in Atlanta, Georgia, where GranCare is headquartered, rather than in Houston, Texas, where LCA has its current headquarters, and APS would be headquartered in Naperville, Illinois, where Vitalink is

also headquartered.

### 3. *The Preliminary Proxy Materials*

The LCA Preliminary Proxy Materials for the proposed LCA/GranCare transaction disclose that the post-merger GranCare/LCA entity will be a fully integrated operation. In LCA's letter to its shareholders describing the GranCare/LCA merger, LCA states that "New LCA will conduct the current business of both GranCare and LCA under management that includes current executives of both companies ..."[20] Those documents indicate that APS is regarded as but one component of LCA's contemplated provision of a comprehensive integrated health services package. The prospectus for the New LCA stock to be issued in the merger describes LCA as a "provide[r] [of] a diverse range of health care services across the health care continuum ... [LCA] has organized its operations into four groups ... [including] institutional pharmaceutical services."[21] That prospectus also describes APS as "the institutional pharmaceutical group of LCA."[22]

APS currently operates 33 institutional pharmacies in 11 states.[23] Although APS produces only 11% of LCA's revenues, it accounts for approximately one third of LCA's overall value as disclosed in the Preliminary Proxy Materials.[24] The provision of pharmaceutical services is viewed as a significant component of New LCA's business:

> Upon completion of the Merger, New LCA will be ... a leading provider of comprehensive post-acute health care services, *primarily ... pharmaceutical services,* ... Upon completion of the Mergers, New LCA is expected to provide these services through 332 long-term facilities (including eight free-standing assisted living facilities) with over 38,500 licensed beds, 134 outpatient rehabilitation clinics, 31 institutional pharmacies and 12 home health care agencies ... In select markets, New LCA will seek to operate these businesses as an inter-related network of services to provide a continuum of cost-effective, post-acute care.[25]

**\*5** The Preliminary Proxy Materials also disclose the extent of the current GranCare management's expected participation in the management of New LCA:

> Three of GranCare's current directors, Messrs. Burleson (currently Chairman of the GranCare Board), Kanter and Petty ... are currently expected to serve as directors of New LCA following the [merger]. Mr. Burleson is expected to serve as Chairman of the Board of New LCA. Messrs. Athans (currently a member of the GranCare Board and President and Chief Executive Officer of GranCare), ... Johnston (currently a Senior Vice President of GranCare ...) and Benton (currently Executive Vice President, Chief Administrative Officer, General Counsel and Secretary of GranCare) are expected to serve as, Chief Operating Officer, ... President of the Rehabilitation Division and Executive Vice President—Acquisitions and Development, General Counsel and Secretary, respectively, of New LCA.[26]

### 4. *The May 16, 1997 Memorandum*

On May 16, 1997, M. Scott Athans, GranCare's CEO, and Leroy D. Williams, LCA's COO, wrote a memorandum directing the corporate department heads of both GranCare and LCA to meet with their counterparts to "prepare a presentation of their concept of how a new combined department would work."[27] That document contained a basic organizational structure, denoting a "LCA/GCI Holding Company" with three "operational subsidiaries": 1) facilities operations; 2) rehabilitation and contract management operations; and 3) pharmacy operations. As LCA's CEO, Mr. Kuntz, testified, the executive functions of the institutional pharmacy operations will continue to be handled by New LCA, not APS, and the head of the pharmacy operations will report directly to Kuntz or indirectly to him through a COO.[28] All major APS acquisitions will also have to be approved by New LCA.[29]

## II. THE APPLICABLE STANDARD

To prevail on a motion for a preliminary injunction, the plaintiffs must show (i) that the plaintiff will probably succeed on the merits of its claim at trial, (ii) that a failure to issue the injunction will result in immediate and

irreparable harm, and (iii) that the balance of equities favors granting injunctive relief.[30]

The plaintiffs claim to have met all three prongs of this standard. The defendant, GranCare, claims that plaintiffs have demonstrated none of the three required elements, and that the motion must be denied. To summarize the parties' various contentions, responses, and rejoinders at this point would unnecessarily protract this Opinion. Accordingly, the contentions will be identified, where appropriate, in connection with the analysis of each requirement for preliminary injunctive relief.

### III. PROBABLE SUCCESS ON THE MERITS

Under Section 1.1 of the Non–Competition Agreement, GranCare may not "...directly or indirectly, own, manage, operate, join, control or participate in the ownership, management, operation or control of any person (other than Vitalink) that is engaged in the Institutional Pharmacy Business in the United States."[31] Vitalink contends that the proposed GranCare/LCA merger will violate Section 1.1 because by combining with and becoming a wholly-owned subsidiary of LCA, which is a "person engaged in the [IP] Business," GranCare will "join" LCA. Plaintiffs argue that this interpretation of the Agreement is necessary to carry out its purpose, which is to ensure that GranCare and Manor Care will not compete with, and would work together to "grow," Vitalink, which embodies their combined respective institutional pharmacy businesses.

*6 GranCare responds to these contentions by advancing a series of arguments, all rooted in the fact that after the completion of the merger, (i) GranCare will not own or control New LCA, but will be a wholly owned New LCA subsidiary whose only business is skilled nursing (SN) services, not institutional pharmacy (IP) services, and (ii) the IP business will be operated by a separate New LCA subsidiary, APS, over which GranCare will have no ownership or control.

These arguments are now addressed.

### A. LCA is Engaged in the IP Business
First, GranCare asserts that it will not violate the Non–Competition Agreement because even if GranCare will have "joined" LCA as a result of the merger, neither LCA nor New LCA is or will be "engaged" in the IP business, since APS is and will continue to be a

"separate" and "independent" LCA subsidiary. Even if *arguendo* one were to accept the premise that a holding company should not be considered to be "engaged" in the business of its wholly-owned operating subsidiary, the factual record—including LCA's own public representations—demonstrates that while legally APS is a separate subsidiary of an LCA holding company, operationally it is (and after the proposed merger will continue to be) a division of LCA's integrated corporate structure.[32]

LCA has repeatedly held itself out to its shareholders and the public as being engaged in the IP business. The Preliminary Proxy Materials represent that "LCA provides a diverse range of health care services in the health care continuum. [LCA] has organized its operations into four groups: long term services, specialty health care services, rehabilitation services and *institutional pharmaceutical services.*"[33] LCA's IP group consists entirely of APS, which is LCA's IP subsidiary. APS's President, Mr. Korslin, is LCA's Vice President in charge of the IP Group, and reports directly to LCA's COO and indirectly to LCA's CEO. Major strategic decisions regarding APS's business are made by Korslin in consultation with LCA's COO and CEO, who retain ultimate responsibility for APS's overall performance and determine Korslin's compensation. The May 16, 1997 memorandum co-authored by the CEOs of GranCare and LCA confirms that APS is an "operational subsidiary" and that the executive functions of the pharmacy operations will continue to be performed by New LCA, not APS.

The record establishes to my satisfaction that LCA is, and New LCA will be, "a person that is engaged in the [IP] Business in the United States."[34]

### B. *GranCare Will Be "Joining" LCA*
The Court having determined that LCA is engaged in the IP business, the pivotal question then becomes whether, by virtue of the GranCare/LCA transaction, GranCare will "directly or indirectly.....join" LCA within the meaning of Section 1.1 of the Agreement. For the reasons next discussed, I conclude that GranCare will.

#### 1. *The Parties' Contentions*
*7 Both sides agree that in construing the Non–Competition Agreement, "the language of [the] contract is to be given its plain and ordinary meaning."[35] Each side argues, however, that the plain language of the Agreement supports its position.

Vitalink argues that by becoming a subsidiary of LCA in the merger, GranCare is "joining" LCA. Noting that Delaware courts have relied upon dictionary definitions to assist in construing the ordinary meaning of words,[36] the plaintiffs point out that "join" is defined in the *Random House Unabridged Dictionary* as "1. to bring in contact, connect, or bring or put together ... 3. to bring together in a particular relation or a specific purpose ... unite ... 7. to participate with (someone) in some act or activity ... 13. to become united, associated or combined ..."[37] The term "join" is also defined in *Black's Law Dictionary* as "to unite; to come together; to combine or unite in time, effort, action, to enter into an alliance."[38] These definitions, plaintiffs argue, describe precisely the contemplated relationship between GranCare and LCA after the proposed merger transaction.

Plaintiffs further contend that their construction of "join" is consistent with the purpose of Section 1.1, which is to prohibit GranCare from engaging, directly or indirectly, in the institutional pharmacy business in competition with Vitalink for three years. Plaintiffs contend that by merging with LCA, GranCare is not only lending its material and human resources to an enterprise that is engaged in a competitive IP business, but also is shaping its entire future competitive strategy in terms of that alliance. The economic reality of the proposed relationship, plaintiffs argue, makes it plain that if this merger is found not to constitute a "join[ing]" of GranCare with LCA, then that term will have no meaning and effectively be read out of the Agreement.

GranCare takes a quite different approach. It argues that "join," as used in Section 1.1, "reasonably refer[s] to joint ventures, partnerships or other similar arrangements of common control by which GranCare will enjoy or be in a position to exercise control over APS."[39] Because GranCare would not engage in the IP Business, and would have only a sister-subsidiary or "affiliate" relationship with LCA's IP Business subsidiary (APS), it would not be in a position to control LCA or APS, and therefore its post-merger relationship with APS will not constitute "a joining, a uniting, a coming together, a combining, or an alliance between GranCare and APS."[40]

GranCare emphasizes that Section 1.1 applies only to it, but not to any of its "affiliates" or employees. GranCare insists that if the contracting parties had truly intended to prohibit GranCare from being acquired by a firm involved in the IP Business or by a firm that owns an IP business, they could easily have so provided. As support, GranCare points to other agreements to which Vitalink is a party, that use the term "affiliate" or otherwise explicitly impose restrictions upon entities other than GranCare. Those agreements, GranCare argues, confirm its position that the parties did not intend Section 1.1 to cover acquirors of GranCare.

**\*8** Finally, GranCare argues that the LCA merger is consistent with the purpose of the Non–Competition Agreement, which it characterizes as prohibiting GranCare from re-entering the IP business for three years. The defendant claims that because neither GranCare nor New LCA will sell pharmaceuticals directly or indirectly, and because neither New LCA or GranCare will establish another TeamCare or otherwise deprive Vitalink of the goodwill associated with TeamCare, the proposed transaction will not deprive Vitalink of the benefit of its bargain.

Stated differently, GranCare takes the position that Section 1.1 is intended to apply only where GranCare acquires another company that is engaged competitively in the IP business, but not where GranCare itself is acquired by such a company, which is the case here. GranCare points to Section 1.3 of the Non–Competition Agreement, which requires GranCare to offer to Vitalink any IP business owned by a company that it acquires, and if Vitalink refuses, then requires GranCare to divest itself of that IP business. It argues that Section 1.3, when read together with Section 1.1, evidences that the contracting parties intended for that Section to apply only where GranCare is the acquiring company.

### 2. *Analysis*

Having considered the parties' arguments, I conclude that plaintiffs have demonstrated that they will probably succeed on the merits of their claims at trial, and that GranCare will not. My reasons follow.

*First,* the plaintiffs' construction of the term "join" is consistent with the plain meaning of that term, and the result that plaintiffs advocate is consistent with the underlying intent of Section 1.1. All parties to the proposed transaction agree that it is a merger or combination. If by merging or combining with another entity GranCare is not "joining" with it, then it is difficult to fathom what the term "join" could mean. The intent of Section 1.1 is to enable Vitalink to develop its newly acquired TeamCare institutional pharmacy business for three years, free of competition from GranCare in any form. Here, GranCare is committing in perpetuity all its resources to a combined enterprise, one third of whose post-merger value will consist of an IP business that will compete with Vitalink. At oral argument, GranCare conceded that it would be in violation of the Agreement if

it participated as an investor in a joint venture that operates a competitive IP business. Despite that admission, GranCare is unable to explain how the challenged LCA merger differs in any functional sense from such a joint venture arrangement.

*Second*, GranCare's construction of "join" and of Section 1.1 rests upon premises that find no support in the Non–Competition Agreement. Nothing in the Agreement states, expressly or impliedly, that Section 1.1 applies only to transactions where GranCare is the acquiror or that result in GranCare controlling the IP business or an entity that owns the IP business. To the contrary, the Agreement states in the broadest terms that GranCare shall not "*directly or indirectly* own, manage, operate, join, control, or participate in the ownership, management, operation, or control of any person (other than Vitalink) that is engaged in the [IP] Business...." "Control" is only one of a host of operative terms, which include "join," "manage," "operate," and "own." GranCare's construction would render meaningless the term "join" (as well as the remaining terms other than "control" and, perhaps, "own"), and also would violate the rule of construction that requires that, where possible, each term of a contract must be given effect.[41]

**\*9** Nor does the language of Sections 1.1 and 1.3, read separately or together, support GranCare's limited reading of Section 1.1. Section 1.1 makes no distinctions that depend upon whether GranCare is the "acquired" company or the "acquiror," and Section 1.3 may fairly be understood as a limited exception to the blanket prohibition of Section 1.1. Under the Section 1.3 exception, where GranCare is the acquiring company it may complete an acquisition that would violate Section 1.1, but only if GranCare sells the competitive IP business to Vitalink or otherwise divests it. No such exception is provided, however, where GranCare is the acquired company.

Even if there were merit to GranCare's construction that Section 1.1 applies only where GranCare is the acquiror, the record shows that GranCare, in fact, joined with Apollo to bid for, *and acquire*, LCA and its institutional pharmacy business. The bid letters that GranCare and Apollo sent to LCA recite that "Apollo Advisors L.P....and GranCare...are pleased to submit this offer *to acquire* [LCA] through a leveraged recapitalization."[42] The minutes of GranCare's board of directors' meetings authorizing the joint bids also recite that GranCare is "acquiring" LCA through the leveraged recapitalization structure set forth in the bid letters.[43] Thus, GranCare itself has repeatedly acknowledged that in terms of the economic reality of this transaction, GranCare is

acquiring LCA.

*Third*, and finally, GranCare's discussion of "affiliates," as used in unrelated agreements, ignores the word "indirectly," a term that is broader than "affiliate," which appears in certain other agreements. Although GranCare concedes that the term "indirectly" was intended to address the concept of acting through subsidiaries,[44] it is unable to explain why LCA's common 100% ownership of GranCare and APS would not result in GranCare *indirectly* joining with APS in violation of the Non–Competition Agreement.

I conclude, for these reasons, that the plaintiffs will probably succeed on the merits of their claim.

## IV. IRREPARABLE HARM

The plaintiffs have also demonstrated that the GranCare/LCA transaction threatens them with irreparable harm. That element of the injunction standard is established by GranCare's own contractual stipulation in the Non–Competition Agreement, that "... Vitalink will suffer substantial and irreparable harm in the event ... New GranCare should engage in the [IP] Business in competition with Vitalink."[45] That alone suffices to establish the element of irreparable harm, and GranCare cannot be heard to contend otherwise.[46]

GranCare insists, nonetheless, that the GranCare/LCA transaction will not injure Vitalink, because it will create no additional competition for Vitalink. In addition to being legally impermissible, the argument is factually unsupported. The Non–Competition Agreement itself states that "the Institutional Pharmacy Business of Vitalink is national in scope."[47] And, the "APS/Vitalink Competitive Market Analysis" cited by the defendant demonstrates that there is significant competition between APS and Vitalink/TeamCare.[48] In addition, the plaintiffs have demonstrated specific instances of business that will be lost as a result of the proposed merger: a) Vitalink will no longer provide orthotics services to certain GranCare facilities in North and South Carolina; and b) Vitalink facilities in San Antonio, Texas are predicted to close.[49] The predicted harm to Vitalink is not minimal or speculative, as GranCare suggests.

**\*10** Nor would the competitive injury to Vitalink be limited to current GranCare facilities. Vitalink is also threatened with being effectively precluded from providing services to any future or any unserved current GranCare facility. As LCA's Mr. Korslin noted, it is

expected that when an SN business is acquired, the pharmacy provider will change. And, as LCA's CEO Mr. Kuntz testified, LCA's goal is to have 100% of its long-term beds serviced by APS—not Vitalink.[50]

Finally, GranCare will have the ability to impart sensitive proprietary information about Vitalink and TeamCare to its proposed parent company—New LCA. GranCare argues that that is not the case, because all the TeamCare personnel were transferred with the company. The record shows, however, that certain current GranCare executives, who served in that capacity during the years GranCare owned TeamCare, will be serving as executives at New LCA, and that GranCare will retain its right to appoint four members of Vitalink's board of directors. To this extent, GranCare will continue to have potential sources of sensitive Vitalink/TeamCare information for at least two more years.

For these reasons, the Court finds that the plaintiffs will be irreparably harmed if the LCA/GranCare transaction is allowed to go forward.

## V. THE BALANCE OF EQUITIES

The plaintiffs argue that the balance of equities favors them, because the only effect of an injunction would be to prohibit GranCare from doing that which it agreed not to do only six months ago. Plaintiffs emphasize that GranCare contractually acknowledged that a breach of the Non–Competition Agreement will result in "substantial and irreparable harm" to Vitalink, and the record establishes that substantial irreparable harm will actually occur if the merger occurs. A refusal to enjoin the merger, plaintiffs argue, will cause Vitalink's stock price to be depressed and will increase the risk that sensitive Vitalink information will be divulged to a competitor. Plaintiffs also contend that a GranCare/LCA combination will be difficult, if not impossible, to unwind, if GranCare is later found to have violated the Non–Competition Agreement. In contrast to this potential harm to Vitalink, plaintiffs argue that the only harm to GranCare will be the predictable consequence of the contractual prohibition to which GranCare freely agreed.

GranCare responds that this Court should deny the motion because the harm to GranCare if the Court grants injunctive relief will outweigh the harm the plaintiffs will suffer if the injunction is denied. GranCare argues that Vitalink will suffer only minimal harm, since APS and TeamCare compete directly in only a few states where TeamCare's total annual profit is relatively small.[51]

That minimal harm, GranCare argues, is vastly outweighed by (i) the harm to Apollo and LCA if they are deprived of the fruits of the considerable resources both companies have committed to the GranCare/LCA transaction, and (ii) the harm to GranCare's and LCA's shareholders if they are deprived of the benefits of the merger, as evidenced by the increased stock price of GranCare and LCA stock after the transaction was announced.[52]

**\*11** In deciding whether to specifically enforce a restraint on future competition, this Court must carefully balance the legitimate interests of the parties and of the public. The Court "cannot ... risk greater harm to defendants, the public or other identified interests, in granting the injunction, than it seeks to prevent."[53] Nor will equity enforce an oppressive covenant or one that goes further than the legitimate interests of the plaintiff justify.[54]

GranCare relies upon cases wherein the Court declined to enjoin tender offers for fear that if delayed, the transaction would not be consummated. But, in those cases the Court was asked to balance the potential for a higher market premium if the transaction were enjoined, against the risk that the enjoined transaction would not be consummated and the shareholders would receive no premium. In each case, the Court found that the prospect of a higher premium if the transaction were enjoined was too uncertain to warrant risking the (lower) premium that was guaranteed by the challenged transaction.[55]

Here, GranCare does not claim that Vitalink's or Manor Care's shareholders risk being foreclosed from a guaranteed premium if the LCA/GranCare transaction is preliminarily enjoined. What GranCare argues is that its *own* shareholders (and Apollo investors and LCA shareholders), will be denied the benefit of that proposed transaction. That benefit, however, is one that GranCare has bargained away. The loss of an additional benefit due to a party's inability to violate a contractual duty is not a cognizable justification for denying an injunction enforcing that obligation. Nor do the interests of LCA shareholders and Apollo investors independently justify allowing GranCare to violate the very covenant to which it agreed.

GranCare also argues that the Non–Competition Agreement goes beyond the plaintiffs' legitimate interest in protecting the value and goodwill of TeamCare, and is being misused in order to insulate the plaintiffs from future legitimate competition.[56] I cannot agree. Manor Care bargained for GranCare's participation in the growth of the combined Vitalink/TeamCare as a national pharmaceutical business, for a period of three years. To

that end, Manor Care agreed to vote for GranCare's designees to the Vitalink board of directors for three years, and Manor Care and Vitalink/TeamCare obtained GranCare's agreement not to compete with Vitalink during that period, in return for allowing GranCare to participate at the board level and Manor Care's pre-transaction control of Vitalink to be reduced. GranCare now seeks to abandon its commitment and to compete directly with Vitalink by participating in a GranCare/LCA merger. In these circumstances, it comes with poor grace for GranCare to argue that Vitalink is unfairly diminishing its future competition by seeking to have its bargain enforced.

The Non–Competition Agreement is reasonably limited in time, and is also reasonably calculated to protect the value and goodwill of the purchased asset (TeamCare). Moreover, because LCA has stated its intent to have all of GranCare's pharmaceutical needs furnished by APS, it appears that the maintenance of the contractual *status quo*, wherein Vitalink and APS are both free to compete for GranCare business, may actually increase competition.[57] Finally, as earlier discussed, absent an injunction, GranCare has and will continue to have access to sensitive information about TeamCare and Vitalink.[58] Vitalink has a legitimate interest in protecting itself from that risk. For these reasons, I find that the balance of equities favors the granting of injunctive relief, and that GranCare's contrary argument lacks merit.

### VI. REMEDY

**\*12** Finally, GranCare argues that a preliminary injunction would be "draconian" and that if any relief is to be granted, there are other, less drastic alternatives. Specifically, GranCare asserts that the following alternative remedies would be appropriate: 1) money damages; 2) a "Chinese wall" arrangement ensuring that LCA operates APS and GranCare as separate subsidiaries, with no interlocking directors or managers; or 3) a limited divestiture of APS facilities in those states where APS competes directly with TeamCare. The plaintiffs respond that none of these options would afford adequate relief. The Court concurs.

First, no showing is made that monetary damages would be appropriate or accurately measurable. GranCare acknowledged this contractually by agreeing that a breach of the Non–Competition Agreement would result in "substantial and irreparable harm." If the merger were allowed to go forward, the Court could not measure with any reasonable degree of confidence the financial harm

that Vitalink would incur as a result of the Non–Competition Agreement violation. Any such determination would presumably require comparing Vitalink's actual performance with the projected performance of Vitalink had GranCare not violated the Non–Competition Agreement. That exercise is inherently speculative. For that reason, the Court is unable to conclude that money damages would be an adequate alternative remedy.

Nor would the creation of a "Chinese wall" be an effective or practical alternative. LCA and GranCare have consistently represented that New LCA's competitive strategy will be to integrate its various operating units to provide a comprehensive network of health care services. As currently structured, New LCA's executives will continue to supervise and direct the operations of both GranCare and APS, and several current GranCare executives will be assuming positions with New LCA. In these circumstances it is difficult to foresee how a "Chinese wall" could effectively prevent New LCA from integrating the GranCare and APS businesses. Any such remedy would also be impractical because it would require ongoing supervision by the Court.[59]

Although in the abstract the possibility of divestiture has some appeal, it has not been shown that a limited divestiture would bring the proposed GranCare/LCA transaction into compliance with the Non–Competition Agreement. Vitalink's IP business is national in scope and New LCA will still be a person engaged in the IP business in the United States. GranCare argues that under Section 1.3 of the Non–Competition Agreement, GranCare would have the opportunity to divest itself of any competitive IP Business it acquired, and that it (GranCare) should not be worse off than it would be under Section 1.3 simply because it is the company being acquired. The flaw in that argument is that the company that would have to divest itself of APS is LCA, which is not a party to this action. Because the Court has no power to force LCA to divest any of its businesses, an injunction prohibiting GranCare from consummating the transaction with LCA until further Order of the Court, is the only remedy that is adequate in the circumstances.

**\*13** For the foregoing reasons, the plaintiffs' motion for a preliminary injunction will be granted and the defendant's motion for summary judgment will be denied. The parties shall submit a form of order that implements the rulings made herein.

### All Citations

1997 WL 458494

Not Reported in A.2d, 1997 WL 458494

Footnotes

1    Affidavit of Martin P. Tully (July 15, 1997) ("Tully Aff.") Ex. 2, at § 1.1.

2    The defendant has moved for summary judgment. Because the Court concludes that GranCare will probably not succeed on the merits of its defense, its motion for summary judgment will be denied.

3    Affidavit of Raymond J. DiCamillo (July 22, 1997) ("DiCamillo Aff.") Ex. 6, at 56.

4    DiCamillo Aff. Ex. 2, at 67. The Court is unable to ascertain from the selected portions of the various SEC filings of record, what percentage of Vitalink stock the Old GranCare shareholders ultimately received in the February, 1997 TeamCare Transaction. Assuming that the public shareholders (who held 18% of the pre-acquisition Vitalink) retained their shares, then the Old GranCare shareholders and the public shareholders together would have held the 55% of the post-acquisition Vitalink stock not owned by Manor Care.

5    DiCamillo Aff. Ex. 2, at 74.

6    Tully Aff. Ex. 2, at § 1.1. The Agreement also contains a reciprocal provision that prohibits Vitalink from competing in the SN business for a period of three years. *Id.,* at § 2.1.

7    *Id.,* Ex. 2, at ¶¶ 1.3(a) and (b). That is the "temporary ownership" provision referred to in the last sentence of Section 1.1, quoted above.

8    *Id.,* Ex. 1, at 89.

9    Affidavit of James P. Hughes, Esquire (July 24, 1997) ("Hughes Aff.") Ex. 8 (Deposition of Edward L. Kuntz (July 23, 1997) ("Kuntz Dep.")), at 12–14.

10    *Id.,* Ex. 8 (Kuntz Dep.), at 14, 71–72.

11    Tully Aff. Ex. 5. LCA's Preliminary Proxy Materials also disclose that negotiation of the GranCare/LCA merger began in February, 1997, the same month in which the Non–Competition Agreement was executed. *Id.,* Ex. 1, at 34.

12    *Id.,* Ex. 4 (May 8, 1997 Press Release).

13    *Id.* (emphasis added).

14    *Id.*

15    *Id.*

16    *Id.,* Ex. 7.

17    *Id.,* Ex. 8.

18    *Id.,* Ex. 9.

19    *Id.,* Ex. 11.

20  Preliminary Proxy Materials, Letter to LCA Stockholders. As of the oral argument, no definitive proxy materials had been placed of record. Hence, the parties and the Court have relied upon and referenced the Preliminary Proxy Materials, which (defendant's counsel has advised) accurately discloses the facts that are material to the challenged transaction.

21  *Id.,* Ex. 1, at 1.

22  *Id.,* Ex. 1, at 117.

23  *Id.,* Ex. 1, at 120.

24  DiCamillo Aff. Ex. 5, at 20; LCA Preliminary Proxy Materials, at 46–48.

25  Tully Aff. Ex. 1, at 60 (emphasis added).

26  *Id.,* Ex. 1, at 89. Despite these disclosures in their Preliminary Proxy Materials, the defendants now inconsistently assert, in a July 2, 1997 Affidavit of Peter P. Copses, an Apollo principal, that New LCA management will be structured to avoid any interlocking directors or officers with GranCare. (DiCamillo Aff. Ex. 11, at ¶ 14). Specifically, Mr. Copses represents that GranCare's three current "outside" directors will resign from GranCare and will be appointed to New LCA's board of directors; and GranCare's general counsel and GranCare's President of the Rehabilitation Division will assume similar positions with New LCA, and will resign their positions with GranCare. No GranCare executive or employee will depart GranCare for APS. Although the defendants represent this as the understanding of the parties to the LCA/GranCare merger, to date GranCare has issued no corrective press release, updated proxy materials, or modified shareholders agreement that gives legally binding effect to the representations in the Copses Affidavit.

27  Hughes Aff. Ex. 3.

28  *Id.,* Ex. 8 (Kuntz Dep.), at 25–26; Ex. 3.

29  *Id.,* Ex. 8 (Kuntz Dep.), at 31–32.

30  *Kaiser Aluminum Corp. v. Matheson,* Del.Supr., 681 A.2d 392, 394 (1996); *Emerson Radio Corp. v. International Jensen Inc.,* Del. Ch., C.A. Nos. 15130, 14992, Jacobs, V.C. (Aug. 20, 1996), Mem. Op. at 22.

31  Tully Aff. Ex. 2, at § 1.1.

32  LCA's 1996 Form 10K discloses that "[w]hile each [of LCA's] group[s] has its own distinct corporate structure and management team, each reports to [LCA's] Chief Operating Officer and is supported by the corporate group located in Houston, Texas." Hughes Aff. Ex. 1.

33  Tully Aff. Ex. 1, at 1 (emphasis added).

34  Nor is there merit in GranCare's argument that this finding ignores the separate corporate identities of LCA and APS. In contrast to the cases cited by the defendant, the Court here is not "piercing the corporate veil" by imposing a legal duty of APS upon its parent company. *Compare Landgarten v. York Research Corp.,* Del. Ch., C.A. No. 8417, Berger, V.C. (Feb. 3, 1988) (stockholder of parent denied access to subsidiary's books and records absent showing of possible fraud); *J. Royal Parker Assoc. v. Parco, Brown & Root, Inc.,* Del. Ch., C.A. No. 7013, Berger, V.C. (Nov. 30, 1984) (refusing to find that parent may be held liable for subsidiary's breaches of fiduciary duty absent allegations of fraud or other equitable considerations); *Universal Studios, Inc. v. Viacom, Inc.,* Del. Ch., C.A. Nos. 14971, 14973, Steele, V.C. (May 15, 1997) (same). Here, the Court (preliminarily) determines only that LCA is a "person ... engaged in the [IP] Business" within the meaning of the Non–Competition Agreement.

35  *Universal Studios, Inc. v. Viacom, Inc., supra* note 34, at 20.

36    *See Moore v. Wilmington Housing Authority,* Del.Supr., 619 A.2d 1166, 1174 (1993); *Crescott Inv. Assocs. v. Davis,* Del. Ch ., C.A. No 10839, Jacobs, V.C. (Dec.26, 1989), Mem. Op. at 30–32.

37    *Random House Unabridged Dictionary* (2d ed.1987), at 1032.

38    *Black's Law Dictionary* (6th ed.1990), at 836.

39    Defendants' Brief in Opposition to Motion for A Preliminary Injunction (July. 22, 1997) ("Defs.Br."), at 15.

40    *Id.*

41    *See, e.g., E.I. duPont de Nemours and Co., Inc. v. Shell Oil Co.,* Del.Supr., 498 A.2d 1108, 1114 (1985); *Rainbow Navigation, Inc. v. Yonge,* Del. Ch., C.A. No 9432, Allen, C. (Apr. 24, 1989), Mem. Op. at 8.

42    Hughes Aff. Exs. 9–11 and 16 (emphasis added).

43    Hughes Aff. Exs. 12–15.

44    Defs. Br., *supra* note 39, at 17, n. 11.

45    Tully Aff. Ex. 2, at § 1.1.

46    *See SLC Beverages, Inc. v. Burnup & Sims, Inc.,* Del. Ch., C.A. No. 8860, Hartnett, V.C. (Aug. 20, 1987). GranCare attempts to distinguish *SLC Beverages* by arguing that the contract here does not provide a remedy as the *SLC Beverages* contract did. That is a distinction without a difference. The parties having stipulated that a breach would constitute "substantial and irreparable harm," any specific reference to the remedies would be unnecessary. Nor may GranCare be heard to argue that it is not bound by its contractual commitment. As the *SLC Beverages* Court held, having agreed that its breach would constitute irreparable harm that would justify specific enforcement of the contract, the "defendant cannot now assert that plaintiff cannot seek [that remedy]." *Id.,* at 6.

47    Tully Aff. Ex. 2.

48    That Market Analysis shows that the combined Vitalink/TeamCare received 34.8% of its April revenue from locations where it competes with APS. (Tully Aff. Ex. 6). GranCare asserts that the Court should only look to TeamCare locations, presumably because Vitalink was already competing with APS at the time of the TeamCare acquisition. Even were the Court to consider only the TeamCare locations, however, the document indicates that Vitalink received approximately 17% of its April revenues from TeamCare locations that compete directly with APS. The Court does not consider that percentage (about one-sixth of Vitalink's total revenues) as insignificant.

49    *See* Affidavit of Donna DeNardo (July 24, 1997), at ¶¶ 4 and 5. The defendants assert that paragraph 4 of Ms. DeNardo's affidavit, which discusses the provision of orthotics services, is speculation and hearsay and is refuted by Mr. Korslin's testimony that APS would only provide those services if approved by Vitalink. The Court cannot agree. Paragraph 5 of that Affidavit, where Ms. DeNardo's testifies that Vitalink employees in San Antonio have been asked to interview with APS because Vitalink's facility will have to close after the GranCare/LCA transaction, stands unrefuted. Moreover, the fact that GranCare had the opportunity—but chose not—to take the deposition of Ms. DeNardo, is highly telling. For these reasons, the Court concludes that the Affidavit of Ms. DeNardo, who is the President of Vitalink, is the more reliable source of information about the competitive threat to Vitalink.

50    Hughes Aff. Ex. 8 (Kuntz Dep.), at 72; *see also Id.* Ex. 7 (Deposition of Jeffrey L. Petersen (July 22, 1997)), at 112–14.

51    Tully Aff. Ex. 6.

52    Defendants represent that after the announcement of the GranCare/LCA transaction, the market value of LCA's common stock increased by over $100 million, and the value of GranCare's common stock increased by over $25 million. *See* Def. Br., *supra* note 39, at 30.

53    *Lennane v. Ask Computer Sys., Inc.,* Del. Ch., C.A. No. 11744, Allen, C. (Oct. 11, 1990), Mem. Op. at 14, *appeal refused,* Del.Supr., 583 A.2d 660 (1990).

54    *C. Edgar Wood, Inc. v. Clark,* Del. Ch., C.A. No. 883–K, Allen C. (Jan. 21, 1986), Mem. Op. at 11. As support for its assertion that this Court strongly disfavors granting preliminary injunctions specifically enforcing covenants not to compete, GranCare cites cases in which the grant of injunctive relief would have had the effect of depriving an employee of an opportunity to earn a living or to practice his profession. In such circumstances, the Court found that those special equities favored more limited relief. *See LewMor, Inc. v. Fleming,* Del. Ch., C.A. No. 8355, Allen C. (Jan. 29, 1986), Mem. Op. at 5; *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Price,* Del. Ch., C.A. No. 11097, Allen C. (Sept. 13, 1989), Mem. Op. at 7; *Take–A–Break Coffee Service, Inc.,* Del. Ch., C.A. No. 11217, Jacobs, V.C. (May 14, 1990), Mem. Op. at 6–7. No such special equities exist in this case.

55    *See Freedman v. Restaurant Assocs. Indus. Inc.,* Del. Ch., C.A. No. 9212, Allen C. (Oct. 16, 1987); *Hecco Ventures v. Sea–Land Corp.,* Del. Ch., C.A. No. 8486, Jacobs, V.C. (May 19, 1986); *Emerson Radio Corp. v. International Jensen Inc.,* Del. Ch ., C.A. Nos. 15130 & 14992, Jacobs V.C. (Aug. 20, 1996); *Braunschweiger v. American Home Shield Corp.,* Del. Ch., C.A. No. 10755, Allen, C. (Oct. 26, 1989).

56    In support of that position, GranCare relies upon *LewMor, Inc. v. Fleming, supra* note 54, at 7 ("no legitimate economic interest of plaintiff is being impacted by defendant's activities ... he seeks by this action not to protect good will, proprietary information or other legitimate interests of his business but rather seeks to hamper future competition"); *Bess v. Bothman,* Minn.Supr., 257 N.W.2d 791, 794 (1977) (restraint that provides more protection than necessary to secure the goodwill purchased is unreasonable and therefore illegal); and *Drumheller v. Drumheller Bag & Supply, Inc.,* Ga. Ct.App. 204 Ga.App. 623, 420 S.E.2d 331, 335 (1992) (reasonableness of restraint depends on whether restricted activity protects the purchaser's legitimate business interests, *i.e.,* the value of the business purchased and its goodwill).

57    *See Lehman v. Standard Forms, Inc.,* Del. Ch., C.A. No. 13688, Steele, V.C. (Jan. 12, 1995), Mem. Op. at 16 (granting preliminary injunction enforcing non-competition agreement because it "would maintain the status quo as agreed upon by the parties"); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Price,* Del. Ch., C.A. No. 11097, Allen, C. (Sept. 13, 1989), Mem. Op. at 8 (enforcing non-competition agreement because "plaintiff threatens to be deprived of that which its contract accords it"); *C. Edgar Wood, Inc. v. Clark,* Del. Ch., C.A. No. 883–K, Allen, C. (Jan. 21, 1986) (granting preliminary injunction specifically enforcing non-compete agreement where the restrictions were not oppressive, were not designed to secure a special advantage in future competition with a former employee, and would not involve a material deprivation to the public).

58    *See* DeNardo Aff. at ¶ 6 ("information and knowledge regarding Vitalink which is held by GranCare employees ... will be transferred to the combined LCA–GranCare merged company. The merged company will then have the ability to utilize that institutional and proprietary information to benefit the future performance of APS to the detriment of Vitalink").

59    The defendants cite *Take–A–Break Coffee Service, Inc. v. Grose,* Del. Ch., C.A. No. 11217, Jacobs, V.C. (May 14, 1990), where this Court declined to specifically enforce an employee's agreement not to work for a competing business for two years after leaving employment, because the plaintiff's interests could be adequately protected by a "Chinese wall" prohibiting the former employee from soliciting the plaintiff's clients. In *Take–A–Break,* however, the covenant not to compete involved a single employee, enforcing the covenant would have forbidden the employee to work in the business for two years, the "Chinese wall" erected by her new employer had proven effective in controlling any potential unfair advantage to the new employer from information the employee had gained in her previous employment, and the arrangement could be easily monitored.

      Here, in contrast, the Non–Competition Agreement is between sophisticated parties, its enforcement would not restrict GranCare from competing in its area of business, there is no indication that a "Chinese wall" would be effective, nor has any manner of effectively monitoring its efficacy been suggested. Finally, in *Take–A–Break,* there was no evidence that the employee had been hired specifically to confer a competitive advantage on the new employer. Here, in contrast, a primary purpose for the LCA/GranCare merger was to gain a competitive advantage in providing integrated medical services, including IP services. That is precisely the kind of competitive advantage that Manor Care and Vitalink successfully negotiated to prohibit in the Non–Competition Agreement.

Case 3:17-cv-01053   Document 24   Filed 08/02/17   Page 76 of 92 PageID #: 447

**WESTLAW** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 902406
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Court of Chancery of Delaware.

CONCORD STEEL, INC. a Delaware Corporation
as a successor in interest to CRC Wilmington
Acquisition, LLC, a Delaware limited liability
company, Plaintiff/Counterclaim Defendant,
v.
WILMINGTON STEEL PROCESSING CO., INC. a
Delaware corporation, Kenneth Neary, and
William Woislaw, Defendants/Counterclaim
Plaintiffs.

Civil Action No. 3369–VCP.
|
Submitted: March 17, 2008.
|
Decided: April 3, 2008.

West KeySummary

1    **Injunction**
     👉Non-competition and non-solicitation issues

     A steel company seeking a preliminary
     injunction against a competitor showed a
     reasonable probability of success on its claim
     that the competitor engaged in competitive
     business in violation of its covenant of
     noncompetition. Instead of contesting the
     provisions' enforceability, the competitor
     contended that the covenants of nonsolicitation
     and noncompetition did not preclude it from
     engaging in the transactions at issue because a
     commercial relationship or enterprise that
     involved only weights or only steel components
     for heavy equipment, but not both, did not
     constitute "Competitive Business" under the
     restrictive covenant. APA § 7.7.

     11 Cases that cite this headnote

**Attorneys and Law Firms**

Lawrence V. Cronin, Esquire, Etta R. Wolfe, Esquire,
Smith Katzenstein & Furlow LLP, Wilmington, DE,
Attorneys for Plaintiff/Counterclaim Defendant.

John G. Harris, Esquire, Riley Riper Hollin & Colagreco,
Wilmington, DE; David T. Shulick, Esquire, Law Offices
of David T. Shulick, Philadelphia, PA, Attorneys for
Defendants/Counterclaim Plaintiffs.

**MEMORANDUM OPINION**

PARSONS, Vice Chancellor.

**\*1** Plaintiff Concord Steel, Inc. ("Concord") seeks to
enjoin defendants Wilmington Steel Processing Co., Inc.
("WSP"), Kenneth Neary, and William Woislaw
(collectively, "Defendants") from ongoing conduct in
alleged violation of restrictive covenants in an Asset
Purchase Agreement ("APA") between Concord and
WSP. Concord's Verified Complaint ("Complaint")
asserts claims for breach of contract and indemnification.
The matter is currently before me on Concord's motion
for a preliminary injunction.

Concord bases its breach of contract claim on restrictive
covenants of noncompetition and nonsolicitation in the
APA. Its arguments under both covenants depend on
whether Concord can prove WSP engaged in
"Competitive Business," a defined term under the APA.
Although I find the covenants in question ambiguous in
certain respects, I conclude Concord has shown a
reasonable probability of success on its claim WSP
engaged in "Competitive Business" in violation of its
covenant of noncompetition. I also find Concord has
shown an imminent threat of irreparable injury, and that
the balance of the equities is neutral or tips slightly in its
favor. Thus, I grant Concord's motion for a preliminary
injunction.

**I. BACKGROUND**[1]

**A. The Parties**

Concord is a Delaware corporation with operations in Pennsylvania, Ohio, and Illinois. Concord has been in the steel fabrication business since 1928. It manufactures steel counterweights and structural weldments or similar steel plate products that are incorporated into aerial work platforms, cranes, elevators, material handling equipment, and other industrial equipment. Paul Allen Vesey is president of Concord.[2]

WSP is allegedly a Delaware Corporation with its principal place of business in Pennsylvania. WSP was founded in 1987 and manufactures steel plate products; WSP purchases steel plates and processes them into other products.[3] Neary is the president and founder of WSP;[4] Woislaw is its vice president of sales.[5]

### B. Concord enters into the APA with WSP

In 2006, Concord, at the behest of its future parent company, Net Perceptions, Inc. (now known as Stamford Industrial Group, Inc.) was considering a purchase of all of WSP. Instead, due to environmental concerns, Concord decided to acquire only certain assets of WSP. In particular, Concord was concerned about WSP's facility being located in a naval shipyard.[6]

In connection with the negotiation of the APA, both Concord and WSP retained sophisticated counsel. The negotiation process was "long and involved," encompassing "[r]ewrite after rewrite," and generating approximately twenty-five drafts.[7] On September 19, 2006, Concord entered into the APA and, for $4,000,000, purchased certain assets of WSP.[8]

WSP was to continue as a separate entity after the APA. In fact, Concord initially leased the WSP facility until February 2007 when its independent facility in Essington, Pennsylvania began production .[9]

### C. High Definition Plasma Cutting for Ryerson, Skytrak, and JLG

**\*2** Contemporaneously with the APA, WSP began in June or July 2006 to pursue the acquisition of equipment to cut steel using a high definition plasma technique.[10] Neary had informed Concord of WSP's plan to acquire that equipment.[11] Concord has never engaged in, and does not currently have the capability to engage in, high definition plasma cutting.[12]

High definition plasma is one of several techniques for cutting steel. It achieves higher tolerances than other methods such that, for example, there would not be deviation of more than a few millimeters over 600 to 700 inches.[13] In contrast, oxyfuel cutting equipment utilizes a technique more than a hundred years old and is not suitable for high-precision cutting.[14] The equipment Concord purchased from WSP included its oxyfuel system.[15] The only steel cutting equipment WSP currently has is its high definition plasma equipment.[16]

JLG has been Concord's largest customer for the past twenty years; Ryerson has been a customer of Concord for five years. Together, JLG and Ryerson account for 44% of Concord's annual revenue. At the same time, WSP claims it and "Ryerson–Philadelphia have a longstanding, ongoing business relationship in the specialized business of supplying high definition plasma cutting parts."[17]

In October 2007, Concord discovered WSP was cutting steel frames for Ryerson, who in turn was supplying them to JLG for its Skytrak vehicle.[18] The parties' disagreement over the propriety of this relationship under the APA led to this litigation. WSP alleges Ryerson approached it to cut these steel parts, and that WSP did not solicit Ryerson's business.[19]

### D. Procedural History

Concord commenced this action on November 21, 2007, and requested a preliminary injunction against WSP, Woislaw, and Neary. On January 8, 2008, Defendants filed their Answer and Affirmative Defenses, and later, on January 22, they filed an Amended Answer and Counterclaim against Concord, alleging tortious interference and defamation. On February 7, 2008, Concord replied to Defendants' Counterclaim. After preliminary discovery and briefing, the Court heard argument on Concord's motion for a preliminary injunction on March 17, 2008.

At argument, I stated my inclination to grant the preliminary injunction, but indicated I would make a more formal ruling shortly. On March 26, 2008, Defendants sought leave to file supplemental affidavits from two witnesses, Neary and Raymond DeLuca, a Fabrication Sales Manager for Ryerson, in opposition to Concord's preliminary injunction motion. In a letter the next day, Concord urged the Court to strike those supplemental affidavits.

### E. Parties' Contentions

Concord asks the Court to preliminarily enjoin WSP and Neary from: "disrupting and/or attempting to disrupt Concord's relationship with Ryerson, JLG and others"; soliciting, calling on and accepting, and engaging in a "Competitive and/or Competing Business"; and "hiring employees, consultants or agents of the Company and/or the Acquired Business."[20] Concord's principal argument is that WSP's business with Ryerson constitutes "Competitive Business," and therefore violates the noncompetition and nonsolicitation covenants in the APA.

**\*3** WSP and Neary reply that such an interpretation of the APA "would improperly expand the contractual restrictive covenant to something that Concord never paid for and to something WSP never agreed to."[21] WSP and Neary also allege Concord knew of WSP's high definition plasma cutting for Ryerson, and therefore waived its right to invoke the restrictive covenants against that activity.

The APA is a complicated, 53 page agreement, and the nonsolicitation and noncompetition covenants are particularly convoluted. With the benefit of hindsight, Concord characterizes those restrictive covenants as limiting WSP's and Neary's postAPA activities, absent Concord's written consent, to the defense, ship building, and wind power generation industries. Defendants vigorously oppose that interpretation and argue the APA includes an equally broad exception that would enable them to use their new steel cutting equipment, which involves high definition plasma cutting, virtually without restriction. Defendants reason that because Concord currently does not use high definition plasma steel cutting equipment, WSP's use of that equipment for work requiring strict tolerances is not competitive with Concord's business. To evaluate Concord's motion, therefore, I must closely examine the relevant restrictive covenants.

## II. ANALYSIS

### A. Legal Standard

### 1. Preliminary injunction standard

This Court has broad discretion in granting or denying a preliminary injunction.[22] "A preliminary injunction may be granted where the movants demonstrate: (1) a reasonable probability of success on the merits at a final hearing; (2) an imminent threat of irreparable injury; and (3) a balance of the equities that tips in favor of issuance of the requested relief."[23] "The moving party bears a considerable burden in establishing each of these necessary elements. Plaintiffs may not merely show that a dispute exists and that plaintiffs might be injured; rather, plaintiffs must establish clearly each element because injunctive relief will never be granted unless earned."[24] However, "there is no steadfast formula for the relative weight each deserves. Accordingly, a strong demonstration as to one element may serve to overcome a marginal demonstration of another."[25]

Moreover, "preliminary injunctive relief should not be granted if the injury may be adequately compensated for after a full trial on the merits, either by an award of damages or by some form of final equitable relief."[26] The injury "must be of such a nature that no fair and reasonable redress may be had in a court of law and that to refuse the injunction would be a denial of justice."[27]

### 2. Contract interpretation standard

The court's ultimate goal in contract interpretation is to determine the parties' shared intent.[28] "A determination of whether a contract is ambiguous is a question for the court to resolve as a matter of law."[29] Delaware adheres to the objective theory of contracts.[30] In that respect, "the court looks to the most objective indicia of that intent: the words found in the written instrument."[31] "As part of this initial review, the court ascribes to the words their common or ordinary meaning, and interprets them as would an objectively reasonable third-party observer."[32] A contract is not rendered ambiguous solely because parties do not agree as to its construction.[33] Contract language must be susceptible to two or more reasonable interpretations to be deemed ambiguous.[34] "Moreover, extrinsic, parol evidence cannot be used to manufacture an ambiguity in a contract that facially has only one reasonable meaning."[35]

**\*4** Under the parol evidence rule, "where the language of a written integration is susceptible to more than one reasonable interpretation, the court will consider proffered admissible evidence bearing upon the objective circumstances relating to the background of the

contract."[36] "Such extrinsic evidence may include 'overt statements and acts of the parties, the business context, prior dealings between the parties, and business custom and usage in the industry.' "[37] Generally, the court evaluates such evidence with respect to the existence of a disputed contractual right under the preponderance of the evidence standard;[38] the burden of persuasion to obtain specific performance, however, is by a "clear and convincing evidence" standard.[39] Upon examination of the relevant extrinsic evidence, "a court may conclude that, given the extrinsic evidence, only one meaning is objectively reasonable in the circumstances of [the] negotiation."[40]

With these standards in mind, I address the parties' contentions. As stated earlier, to obtain a preliminary injunction Concord must demonstrate: (1) a reasonable probability of success on the merits; (2) an imminent threat of irreparable injury; and (3) that the balance of the equities tips in favor of issuance of its requested relief.

### B. Has Concord Shown a Reasonable Probability of Success on the Merits?

Concord alleges WSP's business with Ryerson (hereinafter the "Ryerson Transactions") breaches two provisions of the APA, WSP and Neary's covenants of nonsolicitation and noninterference in Section 7.7(a) and noncompetition in Section 7.7(b).

The first step in evaluating Concord's breach of contract claim is to determine whether the covenants are valid and enforceable. A contract is valid if it manifests mutual assent by the parties and they have exchanged adequate consideration. There is no dispute the APA, and in particular the covenants in question, are valid. The parties' execution of the APA after twenty-five drafts manifests mutual assent. The sale of WSP's assets (including goodwill) for approximately $4 million suggests all parties received adequate consideration.[41]

A covenant not to compete, as a restraint on competition, is subject to the additional requirements that it: (1) be reasonable in geographic scope and temporal duration, (2) advance a legitimate economic interest of the party seeking its enforcement, and (3) survive a balancing of the equities in order to be enforceable.[42] Furthermore, in order to obtain specific performance of a covenant not to compete, Concord must establish these elements by clear and convincing evidence.[43] WSP and Neary make no argument the covenants are unenforceable on these grounds; thus, the Court assumes at this preliminary

juncture the covenants in question are reasonable and enforceable.

Instead of contesting the provisions' enforceability, WSP contends the covenants of nonsolicitation and noncompetition, as written and therefore intended, do not preclude it from engaging in the Ryerson Transactions. I therefore turn to the pertinent provisions, Sections 7.7(a) and (b) of the APA.

### 1. APA § 7.7(a): Nonsolicitation and noninterference

**\*5** Concord contends the Ryerson Transactions violate Section 7.7(a) of the APA because they "involve[ ] business with a company" that "formerly was a customer of WSP," "was and is a customer of Concord," "will become a customer of WSP," and "was a customer's customer of Concord."[44] Defendants answer that the Ryerson Transactions do not constitute "Competitive Business" under the APA.[45]

Section 7.7(a) is a covenant for nonsolicitation and noninterference. It states in pertinent part:

> [F]or a period of four (4) years ..., neither [WSP] nor [Neary] shall, directly or indirectly, for their own account or jointly with or for or on behalf of any other Person, as principal, agent or otherwise *call upon and accept Competitive Business* from, *or solicit the Competitive Business* of any Person who is, or who had been at any time during the preceding (4) years, or will become, a customer, a customer's customer, known prospective customer, or supplier of [Concord], [WSP] or [the] Acquired Business (including but not limited to, JLG and Johnstown Welding, unless [Concord] in writing specifically authorizes [WSP] or [Neary] to do so....[46]

Concord asserts WSP's acceptance of Ryerson's business for high definition plasma cutting violated the APA because Ryerson was a customer of WSP and Concord, will be a customer of WSP, and was a customer's customer of Concord within the meaning of Section 7.7(a). That section, however, appears to require more

than the acceptance of business to make out a breach. In particular, Section 7.7(a) prohibits WSP and Neary from "call[ing] upon and accept[ing] Competitive Business from, or solicit[ing] the Competitive Business of any Person" who meets certain requirements.

The preliminary injunction record fails to convince me Concord is likely to succeed in meeting its burden to prove by clear and convincing evidence WSP "call[ed] upon and accept[ed] Competitive Business from, or solicit[ed] the Competitive Business of" Ryerson.[47] To the contrary, the evidence indicates Ryerson solicited WSP to do the steel plate cutting for it. The facts ultimately adduced at trial may support a different conclusion. For purposes of the pending motion, however, Concord has not demonstrated a reasonable probability of success of showing the Ryerson Transactions violated APA § 7.7(a).

### 2. APA § 7.7(b): Noncompetition

Section 7.7(b) of the APA, the parties' noncompetition covenant, is at the heart of this dispute. The issue is ultimately whether the Ryerson Transactions constitute "Competitive Business" under the APA. Section 7.7(b) states in pertinent part:

> [WSP] acknowledges that in order to assure [Concord] that [it] will retain the value of the Acquired Business as a "going concern," [WSP] on and subject to the terms set forth in this Section 7.7, shall not utilize its special knowledge of the Acquired Business to compete with the Purchaser by engaging in Competitive Business. As of the Initial Closing and for a period of four (4) years beginning on the Initial Closing Date, *[WSP] and [Neary] shall not engage in or have an interest,* anywhere in the world ... whether through the investment of capital, lending of money or property, rendering of services or capital, or otherwise, *in any Competitive Business.* The Seller acknowledges that compliance with the restrictions set forth in this Section 7.7(b) will not prevent any Person from earning a livelihood.[48]

**\*6** Under this provision, WSP and Neary agreed "not [to] engage in ... Competitive Business." I read Section 7.7(b)

to refer to "Competitive Business" both as a type of commercial relationship or transaction, and as an ongoing commercial enterprise. That is, WSP and Neary are precluded from engaging in particular types of transactions or enterprises related to the steel industry.

Concord contends the Ryerson Transactions constitute "Competitive Business" in violation of the APA. The APA defines "Competitive Business" as follows:

> Competitive business shall collectively mean any business (on a worldwide basis) that is engaged in (i) the design, manufacture and sale of (a) counterweights, elevator weights, stage weights, counterbalances, test weights and crane weights made of any material and (b) steel components for heavy equipment as engaged in or to be engaged in by Purchaser, [WSP] or the Acquired Business prior to and after the Effective Time, or (ii) any other business competitive with the type of business engaged in by Purchaser, [WSP] and the Acquired Business at any time prior to or after the Final Effective Time, except for the Defense Business, Ship Building, Wind Power Generation and Other Permitted Businesses.[49]

This definition contains three important clauses. The first two are subparagraphs (i) and (ii), which delineate two kinds of businesses constituting "Competitive Business," and the third is the carve-out, "except for the Defense Business, Ship Building, Wind Power Generation and Other Permitted Businesses."

### a. Do the Ryerson Transactions constitute "Competitive Business" under subparagraph (i)?

"Competitive Business" under subparagraph (i) of the APA's definition is "any business ... engaged in (i) the design, manufacture and sale of (a) [weights] ... made of any material and (b) steel components for heavy equipment as engaged in or to be engaged in by Purchaser, [WSP] or the Acquired Business prior to and after the Effective Time...."[50] Before addressing the parties' arguments, I note certain ambiguities on the face of this subparagraph. For example, because of a dearth of punctuation in the definition of "Competitive Business," it

is not clear if the modifying phrases at the end of subparagraph (i) modify both clauses (a) and (b), or just clause (b). Further, it is unclear whether the phrase, "as engaged in or to be engaged in by Purchaser, [WSP] or the Acquired Business prior to and after the Effective Time" includes the situation where, for instance, the Purchaser only conducts an activity before the Effective Time, and WSP only conducts that activity after the Effective Time.[51] For purposes of deciding Concord's motion for a preliminary injunction, I need not address all of these potential ambiguities. I note, however, that Delaware courts construe restrictive covenants narrowly as written.[52]

WSP contends the language of subparagraph (i) requires that, to amount to "Competitive Business," the commercial relationship or enterprise must be engaged in the design, manufacture, and sale of weights *and* of steel components for heavy equipment.[53] Under this interpretation, a commercial relationship or enterprise that involved only weights or only steel components for heavy equipment, but not both, would not constitute "Competitive Business" under subparagraph (i). Concord replies, however, that because a counterweight is a component of heavy equipment, such a reading would render clause (a), of the definition of "Competitive Business," superfluous.[54] I disagree. Clause (a) explicitly applies to weights "made of any material"; unlike clause (b), it is not limited to "steel components." Furthermore, Concord did not present sufficient evidence to show a likelihood that the requirements of clause (a) of subparagraph (i) have been met. In particular, Concord did not show the steel plate cutting for Ryerson involves counterweights, or any of the other enumerated weights.

**\*7** Alternatively, Concord effectively urges this Court to read out the conjunctive "and" connecting clauses (a) and (b) in subparagraph (i), by broadly asserting that a commercial relationship or enterprise engaged in the design, manufacture and sale of *either* counterweights *or* steel components for heavy equipment would constitute "Competitive Business."[55] In effect, Concord argues in this instance, at least, that "and" means "or." This would suggest the meaning of "and" is ambiguous. Usually, one would interpret "and" only in the conjunctive, joining two or more elements in a list and requiring all of those elements;[56] the other extreme would be to interpret "and" as including the disjunctive "or."[57] A third approach would interpret each occurrence of "and" as part of a conjoined list contextually, determining its meaning based on the elements of the list and the surrounding words.[58]

Because the definition of "Competitive Business" uses "or" elsewhere, and reading the "and" connecting clauses

(a) and (b) in the conjunctive would not lead to an absurd result, I consider it unlikely Concord would succeed on this contention. Furthermore, if the Court were to accept Concord's interpretation, then any commercial relationship involving the design, manufacture and sale of weights, even if they were made of concrete, stone or glass, for example, would be "Competitive Business," as clause (a) states that such weights could be "made of any material." Assuming, however, that "and" takes its normal conjunctive definition, such that the requirements of both clauses (a) and (b) must be met, the addition of clause (b)'s reference to "steel components for heavy equipment" would narrow significantly the scope of subparagraph (i) .[59]

Even if this Court were to accept Concord's disjunctive interpretation of subparagraph (i), the Ryerson Transactions would have to qualify as involving "heavy equipment" under clause (b) because they did not qualify under clause (a). "Heavy equipment" is not a defined term under the APA. Without burdening the reader with the details, both parties submitted extrinsic evidence as to (1) what "heavy equipment" means, and (2) whether the Skytrak vehicle constitutes "heavy equipment." At this preliminary stage, the competing definitions of the parties each appear reasonable. Thus, the term "heavy equipment" is likely to be found ambiguous. Based on the record to date, Concord has not shown by clear and convincing evidence that it is more likely to succeed in proving the Ryerson Transactions involve heavy equipment, than WSP is in proving they do not.

Thus, Concord has not shown a reasonable probability of success of proving the Ryerson Transactions were "Competitive Business" under subparagraph (i) of the APA's definition.

### b. Do the Ryerson Transactions constitute "Competitive Business" under subparagraph (ii)?

Concord contends the "restrictive covenant plainly prohibits the type of work WSP is performing for Ryerson and allows only such work to be done in the context of the Defense, Shipbuilding and Wind Power Generation businesses—regardless of how the work is performed (by laser, by plasma, by shearing or by saw)."[60] "Competitive Business," as defined in subparagraph (ii), is "any business ... engaged in ... any other business competitive with the type of business engaged in by Purchaser, [WSP] and the Acquired Business at any time prior to or after the Final Effective Time...."[61] In comparison to subparagraph (i), subparagraph (ii) is fairly expansive.

**\*8** Concord reads subparagraph (ii) to mean that "Competitive Business" includes any business competitive with the type of business engaged in by WSP before or after the acquisition, subject to the enumerated exceptions in the carve-out. WSP makes no direct response to this reading, except to deny the parties ever agreed that, "no matter what Wilmington Steel does in the future, that's deemed competitive."[62] Instead, WSP focuses on the high definition plasma cutting it now is doing for Ryerson and argues it is not "competitive" with what Concord's business, because it involves a different product entirely.[63]

First, I note that "competitive" may be ambiguous. One plausible definition is that "competitive" refers to a situation where "two or more commercial interests [try] to obtain the *same* business from third parties."[64] This definition emphasizes a competition for the same contract. Under it, if WSP's high definition plasma cutting of steel at a higher tolerance is a type of manufacturing Concord does not perform, it arguably would not be "competitive" with Concord, which uses the less precise oxyfuel cutting technique.[65] Another plausible definition of "competitive" would include a rivalry for a broader relationship with a particular customer, not for an individual contract.[66] Under this broader definition, WSP's Ryerson Transactions would be "competitive" with Concord's overall commercial relationship with Ryerson and JLG, and with its steel cutting activities. I find Concord has a reasonable probability of succeeding in showing the parties intended subparagraph (ii) to cover this latter construction of "competitive," and that the Ryerson Transactions constituted "Competitive Business."

Moreover, subparagraph (ii) defines "Competitive Business" not as business "competitive" with the precise business engaged in by Purchaser, WSP and the Acquired Business, but rather as business "competitive" with the "*type of* business" engaged in by "Purchaser, [WSP] and the Acquired Business." The APA's use of "type of" broadens the sphere of activity defined as "Competitive Business." Thus, the issue here is whether the APA prevents WSP from engaging in the Ryerson Transactions because they involve business that is "competitive with the type of business engaged in by Purchaser, [WSP] and the Acquired Business at any time prior to or after the Final Effective Date." I find that Concord is likely to succeed in proving the Ryerson Transactions represent business that is competitive with steel cutting, whether through the use of high definition plasma, laser, saw, or oxyfuel, which is a "type of business" engaged in by WSP before and after the effective date of the APA, September 19, 2006.[67] The question remains whether the Purchaser

and the Acquired Business also engaged in steel cutting at any of the relevant times.[68]

Under the APA, the "Purchaser" is CRC Wilmington Acquisition, LLC.[69] Concord is the sole stockholder of and successor in interest to CRC Wilmington Acquisition, LLC.[70] The record indicates Concord engaged in the cutting of steel parts both before and after the Effective Date of the APA,[71] which I have concluded is likely to be shown to be a type of business with which the Ryerson Transactions are competitive. I now turn to the "Acquired Business."

**\*9** "Acquired Business" is defined in the APA as follows:

> "Acquired Business" shall mean the business of designing, manufacturing and selling counter weights and plate steel products, including without limitation, sub assembly components for the following: man lifts, shipbuilding, military applications and forestry as well as other components made from plate steel that a customer might require (but excluding the Defense Business, Shipbuilding, Wind Power Generation and Other Permitted Businesses).[72]

First, consistent with clause (b)'s reference to other commercial enterprises (*e.g.,* WSP and the Purchaser), I interpret "the business of designing, manufacturing and selling ..." in the definition of "Acquired Business" as referring to an ongoing commercial enterprise (and not a commercial relationship). Second, I interpret the phrase, "including without limitation" to mean the enumerated components following that phrase are examples only. The only limitation, then, is the parenthetical carve-out excluding the defense,[73] shipbuilding, and wind power generation businesses. I therefore find preliminarily that the cutting of steel plates through the use of high definition plasma, oxyfuel, or other known means is a type of business the Acquired Business engaged in both prior to and after the Final Effect Time.

Thus, I conclude Concord has shown a reasonable probability of success of demonstrating the Ryerson Transactions are "Competitive Business" under subparagraph (ii). The Court still must address the carve-out, however, to determine if the Ryerson Transactions are subject to Section 7.7(b) of the APA.

### c. Is the Ryerson Business an "Other Permitted Business[ ]"?

The Ryerson Transactions do not fall under the carve-out, "except for the Defense Business, Ship Building, Wind Power Generation and Other Permitted Businesses."[74] Neary admitted WSP's relationship with Ryerson would not qualify as being part of the defense, ship building, or wind power generation industries.[75] Thus, the only way the Ryerson Transactions could fall within the exclusionary clause would be if they qualified as "Other Permitted Businesses."

WSP and Neary contend the Ryerson Transactions fall under the defined term "Other Permitted Businesses," and thus are not "Competitive Business."[76] In that regard, the APA provides: " 'Other Permitted Businesses' shall mean, *subject to the written consent and agreement between [Concord] and [Neary],* the manufacture, design and sale of steel parts and services, but excludes in all cases the business of CRC as of the date hereof."[77] Under this definition, for any business to be considered "Other Permitted Business[ ]," there must be a written agreement between Concord and Neary to that effect. The record contains no evidence of any such agreement; hence, the Ryerson Transactions do not qualify for the carve-out as "Other Permitted Businesses."

**\*10** I therefore hold that Concord is reasonably likely to succeed in proving the Ryerson Transactions were prohibited "Competitive Business" in breach of WSP and Neary's obligations under the APA. Before turning to the other requirements for preliminary injunctive relief, *i.e.,* a threat of imminent, irreparable harm, and the balance of the equities, however, I briefly address Defendants' waiver argument.

### 3. Has Concord waived its right to enforce the restrictive covenants?

WSP and Neary contend Concord waived its right to enforce the restrictive covenants because it "allowed WSP to provide high definition plasma cutting to Ryerson–Philadelphia for nearly a year without any ... objection."[78] Concord replies that WSP and Neary never advised Concord that they would be taking Ryerson's orders for high definition plasma cutting, and that Concord was unaware of WSP's commercial relationship with Ryerson until October 2007.[79]

The parties presented conflicting evidence as to when Concord learned about WSP's Ryerson business

involving high definition plasma cutting. In December 2006, when Concord was working out of WSP's facility, Woislaw claims that he notified two Concord employees of the Ryerson order, which required use of a high definition plasma machine, and that sometime thereafter he discussed the Ryerson order with Vesey.[80] At that time, nobody from Concord informed Woislaw that WSP's acceptance of that kind of work from Ryerson would violate the APA.[81] Neary claims either he or Woislaw informed Concord of WSP's Ryerson business around February 2007, and Concord at least knew of WSP's commercial relationship with Ryerson.[82] Nothing in the record, however, shows that after accepting Ryerson's order in February 2007, WSP told Concord of its ongoing commercial relationship with Ryerson.[83] Indeed, Concord's Vesey denies knowing of that relationship until October 2007, when an ex-employee, Enrique Benavides, told him WSP was working on an order for Ryerson.[84]

Based on this conflicting testimony and related factual disputes, and the absence of either a written authorization under the "Other Permitted Businesses" carve-out or a specific disclosure to Vesey of the Ryerson Transactions, I conclude Concord is likely to succeed in rebutting Defendants' waiver defense. I therefore hold that Concord has shown a reasonable probability of success on its breach of contract claim against WSP and Neary.[85]

### C. Is There an Imminent Threat of Irreparable Injury?

Delaware courts have "consistently found a threat of irreparable injury in circumstances when a covenant not to compete is breached," and "use injunctive relief as the principal tool of enforcing covenants not to compete."[86] "Unless parties ... realize that injunctive relief should be expected in the event of a clear breach, non-competition agreements will not produce their intended effect, breaches will proliferate, and complicated damage inquiries into the 'what might have been' world will ensue."[87]

**\*11** The irreparable harm allegedly caused by the Ryerson Transactions "is the loss (or foreseeable loss) of client goodwill, and [Concord's] suffering of the use of [WSP's] client connections against it."[88] Furthermore, on a motion for a preliminary injunction, a contractual stipulation of irreparable harm may suffice to demonstrate irreparable harm.[89] In that respect, Section 7.7(b) of the APA states in pertinent part:

[WSP] and [Neary] acknowledge that the Purchaser

would be irreparably harmed and that monetary damages would not provide an adequate remedy to Purchaser in the event the covenants contained in this Section 7.7 were not complied with in accordance with their terms. Accordingly, [WSP] and [Neary] agree that any breach or threatened breach by any of them of any provision of this Section 7.7 shall entitle Purchaser to injunctive and other equitable relief to secure the enforcement of these provisions, in addition to any other remedies ... which may be available to the Purchaser.[90]

Defendants have not advanced any persuasive reason for this Court to refuse to give effect to this provision. Thus, I find Concord has sufficiently demonstrated an imminent threat of irreparable injury.

### D. Does the Balance of the Equities Favor Issuance of the Requested Relief?

The third prong of the test for preliminary injunctive relief is the balance of equities. The Court must balance the harm Concord would suffer if relief is denied against the harm to WSP and Neary if the preliminary injunction is granted.

In the circumstances of this case, the balance of the equities is neutral or tips slightly in Concord's favor. Neary testified that, at the time of the argument, WSP had completed all of Ryerson's purchase orders.[91] Nothing in the record developed as of the conclusion of the argument suggests WSP's services to Ryerson were unique or so specialized that Ryerson or JLG would be seriously harmed, if their source for that service were interrupted briefly, while they found an alternate supplier. In contrast, the failure to issue an injunction reasonably could lead to irreparable harm to Concord. At a minimum, Concord's bargained for contractual right to preclude Neary and WSP from competing in "Competitive Business" would be lost in the absence of an injunction. The damage from Concord's loss of that right likely would be difficult to quantify.

### E. Defendants' Post–Argument Supplementary Submissions

After having had a full opportunity to be heard at the March 17, 2008 hearing on the preliminary injunction motion, Defendants sought leave on March 26 to file two supplemental affidavits from its previous affiants, Neary

and Raymond DeLuca of Ryerson, in opposition to Concord's motion. By letter dated March 27, Concord objected to that request and asked that the supplementary affidavits be stricken. For the reasons stated below, I hold that the supplementary affidavits are untimely and therefore should be stricken. Furthermore, even if I were to have considered those affidavits, they would not have caused me to change my decision to grant the preliminary injunction.

**\*12** Concord commenced this action on November 21, 2007, and promptly moved for a preliminary injunction. The parties engaged in fairly extensive discovery and agreed to a court-approved schedule calling for a hearing on Concord's motion on March 4, 2008. In mid-February, Defendants requested a postponement of the hearing based on certain family obligations of one of its counsel. In a telephone conference on February 21, 2008, the Court entered a revised scheduling order moving the hearing date to March 17 and extending the dates for completion of the related briefing. By letters dated March 12 and 13, 2008, Defendants' counsel sought leave to present live testimony from some of their witnesses at the hearing and to file an affidavit from an additional witness, Raymond DeLuca. Over Concord's objection, I granted both of those requests.

Against this background, there is no question Defendants had a full and fair opportunity to present their case in opposition to the preliminary injunction motion on March 17. The evidence they submitted in connection with that hearing included the affidavits of Neary and DeLuca and live testimony of Neary and Defendant Woislaw. Nevertheless, after hearing the Court was inclined to grant the preliminary injunction, Defendants sought leave on March 26 to file additional affidavits from Neary and DeLuca. Concord opposed that request as untimely and not based on any newly discovered evidence or other claim the additional information in the affidavits was not available earlier. I consider Concord's objections well taken and will strike the supplementary affidavits on those grounds.

In addition, I note that there are inconsistencies among at least some of the statements in the supplementary affidavits and the other evidence previously presented by Defendants. At a minimum, these apparent inconsistencies undermine the reliability of the new affidavits and most likely would necessitate additional discovery, which would be inconsistent with the expedited and interim nature of a preliminary injunction proceeding. Assuming the new allegations are true and accurate, they indicate that WSP and its employees will suffer serious consequences as a result of a preliminary

injunction and that nonparty Ryerson will be inconvenienced by having its source of supply interrupted for up to 120 days. In the context of the thoroughly negotiated APA and the importance of the restrictive covenants in Section 7.7 to Concord as part of the underlying transaction, the alleged harm to WSP and Ryerson is not so significant that it would cause the balance of the equities to tip materially in Defendants' favor or warrant denial of the preliminary injunction motion.

For the reasons stated, I grant Concord's motion for preliminary i njunction. The Court is entering the attached Preliminary Injunction Order concurrently with this memorandum opinion. Based on the terms of § 7.7 of the APA, I also have determined that no bond need be posted.[92]

**All Citations**

Not Reported in A.2d, 2008 WL 902406

### III. CONCLUSION

Footnotes

1        Unless stated otherwise, the facts recited herein come from the Complaint.

2        Vesey Dep. at 6.

3        Neary Dep. at 4–5.

4        *Id.* at 4.

5        Tr. at 61 (Woislaw). Citations in the form "Tr." are to the transcript of argument held on March 17, 2008. To the extent the Court refers to witness testimony, the identity of the witness is indicated parenthetically.

6        *See* Vesey Dep. at 18, 21.

7        Neary Dep. at 16–17, 20, 22, 142.

8        The parties to the APA are CRC Wilmington Acquisition, LLC, WSP, and CRC Acquisition Co. LLC, a Delaware limited liability company ("CRC"). CRC was the parent company of Concord at the time of the APA. Concord was later sold to a different company, Net Perceptions, in October 2006. *See* Vesey Dep. at 10.

9        *See* Vesey Dep. at 24–28.

10       Tr. at 74–76 (Neary).

11       *See* Neary Dep. at 73.

12       Vesey Dep. at 37. WSP admits, however, that Concord is contemplating acquiring such a capability. *See* DAB at 12.

13       *See* Neary Dep. at 71–72.

14       Tr. at 69 (Neary).

15       *Id.* at 69.

16    Woislaw Dep. at 13.

17    DAB at 27; *see also id.* at 12, 21 (discussing WSP's historical customer relationship with Ryerson).

18    Vesey Dep. at 28, 46–47. WSP, however, uses the high definition plasma equipment for customers besides Ryerson. Neary Dep. at 73.

19    *See* Woislaw Dep. at 14–15.

20    Concord's Mot. for Prelim. Inj. (Nov. 21, 2007). Concord presented no evidence of, or argument about, "hiring" by WSP in violation of the APA. I therefore assume it is no longer pursuing that aspect of its motion, and will not discuss it further.

21    DAB at 10.

22    *Data Gen. Corp. v. Digital Computer Controls, Inc.,* 297 A.2d 437, 439 (Del.1972) (citing *Richard Paul, Inc. v. Union Improvement Co.,* 91 A.2d 49 (Del.1952)).

23    *Nutzz.com v. Vertrue, Inc.,* 2005 Del. Ch. LEXIS 101, at *20 (July 6, 2005) (internal citations omitted).

24    *La. Mun. Police Emps. ' Ret. Sys. v. Crawford,* 918 A.2d 1172, 1185 (Del.Ch.2007) (internal citations omitted).

25    *Alpha Builders, Inc. v. Sullivan,* 2004 Del. Ch. LEXIS 162, at * 11 (Nov. 5, 2004) (citing *Cantor Fitzgerald, L.P. v. Cantor,* 724 A.2d 571, 579 (Del.Ch.1998)).

26    *Id.* at * 11.

27    *State v. Del. St. Educ. Ass'n,* 326 A.2d 868, 875 (Del.Ch.1974).

28    *Sassano v. CIBC World Mrkts. Corp.,* 2008 Del. Ch. LEXIS 5, at * 19 (Jan. 17, 2008).

29    *HIFN, Inc. v. Intel Corp.,* 2007 Del. Ch. LEXIS 58, at *29 (Del. Ch. May 2, 2007) (citing *Reardon v. Exch. Furniture Store, Inc.,* 188 A. 704, 707 (Del.1936)).

30    *See United Rentals, Inc. v. RAM Holdings, Inc.,* 937 A.2d 810, 835 (Del.Ch.2007) (citing *Seidensticker v. Gasparilla Inn, Inc.,* 2007 Del. Ch. LEXIS 155, at *1 (Nov. 8, 2007)).

31    *Sassano,* 2008 Del. Ch. LEXIS 5, at *20. In determining the intent of the parties, the court looks first at the relevant document, read as a whole. *PharmAthene, Inc. v. SIGA Techs., Inc.,* 2008 Del. Ch. LEXIS 9, at *33 (Jan. 16, 2008) (quoting *Matulich v. Aegis Comm'cns Group, Inc.,* 2007 WL 1662667, at *12 (Del.Ch. May 31, 2007)).

32    *Sassano,* 2008 Del. Ch. LEXIS 5, at *20 (providing extensive citations); *see also PharmAthene,* 2008 Del. Ch. LEXIS 9, at *33–34.

33    *Rhone–Poulenc Basic Chem. Co. v. Am. Motorists Ins. Co.,* 616 A.2d 1192, 1196 (Del.1992).

34    *Id.*

35    *United Rentals,* 937 A.2d at 830 (citing *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.,* 702 A.2d 1228, 1232 (Del.1997)).
    However, "[i]n some cases, determining whether a contract is susceptible to more than one interpretation requires an understanding of the context and business circumstances under which the language was negotiated; seemingly

36    *U.S. West,* 1996 Del. Ch. LEXIS 55, at *31. "A preliminary consideration of extrinsic evidence may be necessary to determine whether this sort of hidden or latent ambiguity exists." *Id.* at *31 n. 10 (citing *Bell Atl. Meridian Sys. v. Octel Commc'ns Corp.,* 1995 Del. Ch. LEXIS 156, at *18 n. 5 (Nov. 28, 1995)); *see also Eagle Indus.,* 702 A.2d at 1232 n. 7.

37    *United Rentals,* 937 A.2d at 834–35 (quoting *Supermex Trading Co. v. Strategic Solutions Group, Inc.,* 1998 Del. Ch. LEXIS 66, at *9 (May 1, 1998)).

38    *See id.* at 834 n. 112 (citing *Carlson v. Hallinan,* 925 A.2d 506, 524 (Del.Ch.2006)).

39    *See id.* (citing *In re IBP, Inc., S'holders Litig.,* 789 A.2d 14, 52 (Del.Ch.2001)).

40    *U.S. West,* 1996 Del. Ch. LEXIS 55, at *32.

41    In that context, respected commentators have observed:
> An important part of many transactions is the buyer's obtaining the seller's agreement not to compete with the business being sold to the buyer for some period after the closing. This can be particularly critical in the sale of a private company where the principal stockholder may have been the founder of the company and be closely associated with its products or services.... The ability of such a person or group of persons to use their knowledge and contacts within the industry could be devastating to the buyer's new enterprise.

LOU R. KLING & EILEEN T. NUGENT, NEGOTIATED ACQUISITIONS OF COMPANIES, SUBSIDIARIES AND DIVISIONS § 18.06 (2001).

42    *Hough Assocs. v. Hill,* 2007 Del. Ch. LEXIS 5, at *47–48 (Jan. 17, 2007) (citing *All Pro Maids, Inc. v. Layton,* 2004 Del. Ch. LEXIS 116, at *8–9 (Aug. 9, 2004); *TriState Courier & Carriage, Inc. v. Berryman,* 2004 Del. Ch. LEXIS 43, at *40 & n. 126 (Apr. 15, 2004)).

43    *Id.* at *48 (citing *Cirrus Holding Co. v. Cirrus Indus., Inc.,* 794 A.2d 1191, 1201 (Del.Ch.2001)); *Am. Homepatient, Inc. v. Collier,* 2006 Del. Ch. LEXIS 79, at *5 (Apr. 19, 2006); *TriState Courier & Carriage,* 2004 Del. Ch. LEXIS 43, at *35 n. 120.

44    POB at 12–14.

45    *See* DAB at 16.

46    APA § 7.7(a) (emphasis added). The APA is reproduced in full at Daichman Aff. Ex. 3.

47    The APA broadly uses "business" to encompass three distinct concepts depending on the context: (1) a commercial enterprise or establishment, (2) a commercial transaction(s), and (3) a synonym for "commerce," "trade," and "industry." *See* BLACK'S LAW DICTIONARY 211 (8th ed.2004); THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 252 (4th ed.2000); WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 190 (1987).
> In the context of Section 7.7(a), "Competitive Business" appears to refer to a set of transactions or a commercial relationship, and not a particular industry or an ongoing commercial enterprise.

48    APA § 7.7(b) (emphasis added).

49    APA § 1.

50    *Id.*

51    A colorable argument also exists that the temporal limitation, "prior to and after the Effective Time," modifies only "Acquired Business."

52    "Restrictive covenants are carefully negotiated and our law requires that their unambiguous terms be given effect." *Allied Capital Corp. v. GC–Sun Holdings, L.P.,* 910 A.2d 1020, 1024 (Del.Ch.2006). "Restrictive covenants in contracts ... limit[ing] the commercial freedom otherwise available to the parties cannot reasonably be read in [a] squishy and uncertain manner...." *Id.*

53    *See* Tr. at 26–27.

54    *See* Tr. at 49. In that regard, "a contract should be interpreted in such a way as to not render any of its provisions illusory or meaningless." *Sonitrol Holding Co. v. Marceau Investissements,* 607 A.2d 1177, 1183 (Del.1992).

55    *See* POB at 10–11.

56    In that regard, the following discussion by Judge Kozinski of the Court of Appeals for the Ninth Circuit exemplifies this approach:
      As a linguistic matter, "and" and "or" are not synonyms; indeed, they are more nearly antonyms. One need only start the day with a breakfast of ham or eggs to be duly impressed by the difference. While "and" and "or" are both small words, and are occasionally seen joined with a slash, when they stand alone, they have substantially different meanings with dramatically different effects. We give our language, and our language-dependent legal system, a body blow when we hold that it is reasonable to read "or" for "and." While I don't foreclose the possibility of substituting the two words for each other where it is necessary to avoid a patent absurdity or correct a drafting error ..., I can't agree that the substitution is permissible in ordinary circumstances.
      *MacDonald v. Pan Am. World Airways, Inc.,* 859 F.2d 742, 746 (9th Cir.1988) (dissent).

57    In the analogous statutory interpretation context, courts occasionally have construed "and" to mean the disjunctive "or" to avoid an incoherent reading of a statute. *See Officemax, Inc. v. United States,* 428 F.3d 583, 589–90 (6th Cir.2005) (extensive citations to federal law omitted).

58    In that vein, Judge Sutton stated in his dissent in *Officemax* that "[t]wo meanings may be possible when elements are conjoined by 'and' because of ambiguity as to whether the surrounding words apply to the conjoined elements separately or only together." *Officemax,* 428 F.3d at 603 (Sutton, dissenting).

59    Concord points to nothing in the APA, or otherwise, suggesting that clauses (a) and (b) should be considered separately. "[C]ourts should be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it." *Allied Capital Corp. v. GC–Sun Holdings, L.P.,* 910 A.2d 1020, 1035 (Del.Ch.2006). If the parties meant to use "or," or even "and/or," between the clauses (a) and (b), they easily could have. I express no opinion at this preliminary stage of the litigation as to whether every single occurrence of "and" within the APA or even the definition of "Competitive Business" itself should be construed in the conjunctive. The context conceivably could dictate otherwise.

60    PRB at 13–14.

61    APA § I.

62    Tr. at 38.

63    *See, e.g.,* DAB at 22–23.

64    BLACK'S LAW DICTIONARY 302 (8th ed.2004) (emphasis added); *see also* WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 268 (1987) (defining competition as "two or more parties acting independently to secure the business of a third party by offering the most favorable terms.").

65    Although Vesey testified that Concord could fulfill the Ryerson orders using its existing oxyfuel cutting system, the preliminary record suggests Concord's system is not fully competitive in that regard. *See* Vesey Dep. at 95–102.

66    *See* THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 376 (4th ed.2000) (defining

competition as a "[r]ivalry between two or more businesses striving for the same customer or market.").

67      *See* APA at 1 and § 1.

68      None of the parties discussed the implication of "and" in this context. Because the APA conspicuously uses "or" in subparagraph (i)'s parallel clause, I infer the parties purposefully used "and" in subparagraph (ii) to mean that for a commercial relationship or enterprise to be "Competitive Business," it must be competitive with the type of business engaged in by "Purchaser, [WSP] and the Acquired Business" concurrently, either before or after September 19, 2006.

69      *See* APA at 1.

70      Compl. ¶ 1.

71      *See id.* ¶¶ 5, 7, 19. *See also* Vesey Dep. at 13, 19–20, 40, 70–71.

72      APA § 1 (emphasis added).

73      Although the "Defense Business" is explicitly carved-out, the preceding clause refers to "military applications" as an example of "Acquired Business." These clauses do not appear to conflict, however, because the APA defines "Defense Business" as "the manufacture, design and sale of steel parts and sub assemblies designed and used exclusively in the construction of military vehicles or ballistic resistant compounds." APA § 1. The universe of products with military applications is probably broader than the exclusion for military vehicles and ballistic resistant compounds.

74      The parties did not address whether the carve-out applies to both subparagraphs (i) and (ii), or only to subparagraph (ii). For purposes of this preliminary injunction opinion only, I assume, without deciding, the carve-out applies to both subparagraphs.

75      *See* Neary Dep. at 31.

76      *See* DAB at 10–12.

77      APA § 1 (emphasis added).

78      DAB at 23.

79      *See* PRB at 14–16.

80      Woislaw Dep. at 20–21; Tr. at 62–63 (Woislaw). Woislaw's discussions of the Ryerson order took place before WSP quoted the Ryerson order. *See* Tr. at 62 (Woislaw).

81      *See* Tr. at 64 (Woislaw).

82      Neary Dep. at 78.

83      *See* Tr. at 62 (Woislaw); Woislaw Dep. at 30–32; *see also* Neary Dep. at 62 (stating the Ryerson business began in February 2007).

84      *See* Vesey Dep. at 28.

85      At this early stage of the litigation, none of the parties has made a sufficient showing on their respective claims of unclean hands to make them germane to this decision on Concord's preliminary injunction motion. *Compare* DAB at 27 *with* PRB at 19.

86    *Hough Assocs. v. Hill,* 2007 Del. Ch. LEXIS 5, at *64–65 (Jan. 17, 2007) (citing *Tristate Courier & Carriage, Inc. v. Berryman,* 2004 Del. Ch. LEXIS 43, at *55 n. 147 (Apr. 15, 2004); *Singh v. Batta Envtl. Assocs., Inc.,* 2003 Del. Ch. LEXIS 59, at *33 (May 21, 2003); *Vitalink Pharmacy Servs., Inc. v. Grancare, Inc.,* 1997 Del. Ch. LEXIS 116, at *43–44 (Aug. 7, 1997)).

87    *Id.* at 66.

88    *See Tristate Courier & Carriage,* 2004 Del. Ch. LEXIS 43, at *55.

89    *See Gildor v. Optical Solutions, Inc.,* 2006 Del. Ch. LEXIS 110, at *38 (June 5, 2006) (citing *Kan. City S. v. Grupo TMM, S.A.,* 2003 Del. Ch. LEXIS 116, at *20–21 (Nov. 4, 2003); *Cirrus Holding Co. v. Cirrus Indus., Inc.,* 794 A.2d 1191, 1209–10 (Del.Ch.2001); *True N. Commc'ns, Inc. v. Publicis S.A.,* 711 A.2d 34, 44 (Del.Ch.), *aff'd,* 705 A.2d 244 (Del.1997)).

90    APA § 7.7(b).

91    *See* Tr. at 73.

92    In response to a question the Court raised at argument as to whether a bond would be required for any preliminary injunction, Concord submitted a letter, dated March 31, 2008, noting that § 7.7(b) of the APA provides: "If any party brings an action to enforce this Section 7.7 or to obtain damages for a breach thereof, *such party shall not be required to post bond.*" APA § 7.7(b) (emphasis added). Concord argues that, although Court of Chancery Rule 65 requires a bond to accompany injunctive relief, Defendants contractually agreed to waive that requirement in the APA. Defendants contend there is no Delaware authority that even suggests parties could extinguish the security requirement of Rule 65 by agreement or otherwise. The only case on point cited by either party is *Diaz v. John Adcock Ins. Agency,* 729 So.2d 465 (Fl.App.2d Dist 1999), which recognized a contractual waiver of a bond requirement virtually identical to that in Rule 65. Because the APA represents an agreement between sophisticated, well represented parties, including corporations, and Defendants have not articulated any reason to disregard the parties' express agreement to waive a bond, I consider *Diaz* persuasive precedent and will enforce that agreement. *See also AmeriSpec, Inc. v. Metro Inspection Servs.,* 2001 U.S. Dist. LEXIS 9259, at *21–22 (N.D.Tex. July 3, 2001). Therefore, Concord will not be required to post a bond. I do not intend the absence of a bond requirement, however, to diminish in any way Concord's potential liability for any damages Defendants incur, if the preliminary injunction proves to have been granted improvidently. *Cf. Helene Curtis, Inc. v. Nat'l Wholesale Liquid.,* 890 F.Supp. 152, 160–61 (E.D.N.Y.1995).

---

**End of Document**                                              © 2017 Thomson Reuters. No claim to original U.S. Government Works.